**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---

JASON M. KURLAND

*Plaintiff,*

v.

FIREMAN'S FUND INSURANCE COMPANY

*Defendant.*

---

Civil Action No. 2:21-CV-06440 (JMA) (SIL)

**ORAL ARGUMENT REQUESTED**

---

<u>**NOTICE OF MOTION**</u>

**PLEASE TAKE NOTICE** that, as soon as it may be heard, in the courtroom of the Honorable Joan M. Azrack, at the United States District Court for the Eastern District of New York, Long Island Courthouse, 100 Federal Plaza, Central Islip, New York, 11722, Courtroom 920, with oral argument to be held on a date and time to be designated by the Court, Plaintiff Jason M. Kurland ("Mr. Kurland"), through his undersigned attorneys, will and hereby does move this Court pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, and as permitted by this Court's Orders entered March 23, 2022, and March 28, 2022, for an order granting Mr. Kurland partial summary judgment and ruling that Defendant Fireman's Fund Insurance Company ("Fireman's Fund") (1) breached its contract with Mr. Kurland; and (2) is obligated to defend Mr. Kurland the underlying action captioned *United States v. Chierchio et al.*, No. 20 Cr. 306 (E.D.N.Y.).

Mr. Kurland's motion is based upon this Notice of Motion; the accompanying Declaration of Andrew N. Bourne, together with Exhibits 1 through 4 thereto; Plaintiff's Rule 56.1 Statement in Support of Plaintiff's Motion for Partial Summary Judgment on Count I of the Complaint; and Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment

on Count I of the Complaint; any arguments of counsel; and any other such materials properly considered by the Court at any hearing on this motion.

**PLEASE TAKE FURTHER NOTICE** that Fireman's Fund's opposition to this motion and potential cross-motion are due on April 22, 2022, as set forth in ECF Nos. 17 and 18 and adopted by the Court by Order dated March 28, 2022.

**PLEASE TAKE FURTHER NOTICE** that Mr. Kurland's reply in further support of this motion is due on April 29, 2022, as set forth in ECF Nos. 17 and 18 and adopted by the Court by Order dated March 28, 2022.

Dated: April 1, 2022                    Respectfully submitted,
      New York, New York

                              **COHEN ZIFFER FRENCHMAN & MCKENNA LLP**

                              By:  */s/ Andrew N. Bourne*
                              Andrew N. Bourne (No. 4172003)
                              abourne@cohenziffer.com
                              Amber N. Morris (admitted *pro hac vice*)
                              amorris@cohenziffer.com
                              1350 Avenue of the Americas
                              New York, New York 10019
                              P: (212) 584-1890
                              F: (212) 584-1891

                              *Attorneys for Plaintiff Jason M. Kurland*

## CERTFICATE OF SERVICE

I hereby certify that on April 1, 2022, the within Notice of Motion, along with the accompanying Declaration of Andrew N. Bourne (with Exhibits 1-4 thereto); Plaintiff's Rule 56.1 Statement in Support of Plaintiff's Motion for Partial Summary Judgment on Count I of the Complaint; and Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Count I of the Complaint were served via electronic mail in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon all counsel of record.  Pursuant to the Honorable Joan M. Azrack's Individual Rule IV.G.2., the full set of motion papers will be filed via ECF once the motion is fully briefed.

Dated: April 1, 2022                    By:      */s/ Andrew N. Bourne*
      New York, New York                    Andrew N. Bourne

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON M. KURLAND | |
| *Plaintiff,* | Civil Action No. 2:21-CV-06440 (JMA) (SIL) |
| v. | **ORAL ARGUMENT REQUESTED** |
| FIREMAN'S FUND INSURANCE COMPANY | |
| *Defendant.* | |

**DECLARATION**

ANDREW N. BOURNE, pursuant to 28 U.S.C. § 1746, does hereby declare:

1.      I am a partner at the law firm of Cohen Ziffer Frenchman & McKenna LLP, counsel for Plaintiff Jason M. Kurland ("Mr. Kurland") in the above-captioned case.  I am an attorney duly admitted to practice law in the State of New York and before this Court.  I submit this declaration in support of Plaintiff's Motion for Partial Summary Judgment on Count I of the Complaint pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.

2.      Annexed hereto as **Exhibit 1** is a true and correct copy of "Lawyer's Professional Liability Claims-Made Insurance Policy," No. USF00601120, that Defendant Fireman's Fund Insurance Company ("Fireman's Fund") issued Rivkin Radler LLP, effective for the period January 25, 2020, through January 25, 2021.

3.      Annexed hereto as **Exhibit 2** is a true and correct copy of the Indictment the United States of America filed against Mr. Kurland on August 13, 2020, in *United States v. Chierchio et al.*, No. 20 Cr. 306 (NGG) (E.D.N.Y.) (the "Underlying Action").

4.      Annexed hereto as **Exhibit 3** is a true and correct copy of the letter dated August 18, 2020, that the government filed with the presiding judge in the Underlying Action, advising the Court of allegations relevant to bail determinations for Mr. Kurland and others.

5.      Annexed hereto as **Exhibit 4** is a true and correct copy of the letter dated October 12, 2020, that Fireman's Fund sent to Mr. Kurland, denying his request for coverage.

I declare under the penalty of perjury that the foregoing is true and correct.


Dated: April 1, 2022                            By:      */s/ Andrew N. Bourne*
      New York, New York                              Andrew N. Bourne

# EXHIBIT 1

**ALLIANZ**



# Declarations

Professional Liability Insurance Policy

Lawyers

This is a claims -made Policy.  Please review your Policy carefully.
The Policy is limited to liability for only those claims that are first made against the Insured during the policy period.

Insured by the Stock Company below and hereinafter called the company.



Fireman's Fund Insurance Company
225 West Washington Street, Suite 1800
Chicago, IL 60606-3484
Phone Number: 1-888-466-7883

POLICY NUMBER:  USF00601120

| Item 1.   Named Insured and Address<br>(number, Street, Town or City, County, State, Zip Code)<br><br>Rivkin Radler, LLP<br>926 RXR Plaza<br>Uniondale, NY 11556 | Producer Name<br>Herbert L Jamison & Co. LLC | | |
|---|---|---|---|
| | Item 2.   Policy Period | | |
| | From (Mo.-Day-Yr.)<br>01/25/2020 | To (Mo.-Day-Yr.)<br>01/25/2021 | 12:01 A.M. Standard Time at the address of the Named Insured as stated herein. |
| | Item 3.   Form of Named Insured's Business<br>Insured is   ☐ Individual   ☐ Partnership   ☒ Corporation<br>☐ Other | | |

| Item 4.   Limit of Liability | |
|---|---|
| $ 10,000,000           Each Claim<br>$ 20,000,000           Aggregate<br><br>CLAIM EXPENSES<br>☒   a.  Are included within the limits of liability.<br><br>☐   b.  Claim expenses are payable in addition<br>          to the limits of liability. | THE FOLLOWING NOTICE IS APPLICABLE TO POLICIES WRITTEN WITH LIMITS OF LIABILITY OF TWO MILLION DOLLARS PER CLAIM AND ABOVE. THE LIMITS OF LIABILITY STATED IN THE POLICY SHALL BE REDUCED BY THE AMOUNT OR PERCENTAGE STATED IN THE POLICY BY CLAIM EXPENSES INCURRED IN THE SETTLEMENT OF A CLAIM COVERED BY THE POLICY. SUCH CLAIM EXPENSES SHALL ALSO BE APPLIED AGAINST THE DEDUCTIBLE BY THE AMOUNT OR PERCENTAGE STATED IN THE POLICY. PLEASE REFER TO THE POLICY FOR THE EXACT TERMS AND CONDITIONS CONCERNING THE COMPANY'S LIMITS OF LIABILITY. |

**Item 5.  Deductible**

$  500,000           Per Claim

**Item 6.  Premium**

| Amount: $ 591,500 | Class:  73444 | No. of Lawyers:  193 | Premium<br>$  591,500 |
|---|---|---|---|
| | | Total Premium | $  591,500 |

---

# NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF NEW YORK LAWS AND  REGULATIONS.

New York Free Trade Zone (Risk- Code):  2-14178

Item 7.  Forms Attached at Issue

See Forms Endorsement XSE  -1001 (01/96) (Ed. 01/98)

---

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Do Not Write In This  Box | Remark | Countersigned at | Issue Date 03/02/2020 |
|---|---|---|---|
| | | Authorized Representative | Countersign Date |

# LAWYERS PROFESSIONAL LIABILITY INSURANCE

## POLICY HOLDER NOTICE

## THIS IS A CLAIMS MADE POLICY

THIS NOTICE CONTAINS IMPORTANT CONSUMER INFORMATION.  PLEASE READ CAREFULLY.

1.   This policy is written on a claims-made basis;

2.   This policy provides no coverage for claims arising out of incidents, occurrences or alleged wrongful acts which took place prior to the retroactive date stated in the policy;

3.   This policy covers only claims actually made against the insured while the policy remains in effect, and all coverage under the policy ceases upon the termination of the policy.  Claims may, however, be reported to the company during the automatic sixty (60) day Extended Reporting Period or any additional Extended Reporting Period purchased by the Insured.

4.   This policy provides multiple options to the Policyholder to extend the period under which claims may be made and reported to the Company.  They are:

     a,   A one, two, three year and unlimited option at 100%, 150%, 185%, and 285%, respectively, of the full annual premium of this policy.

     b.   In the event of death or disability of a Named Insured, an unlimited Extended Reporting Period is provided at no additional cost.

     c.   In the event of retirement of a Named Insured, an unlimited Extended Reporting Period is provided at a cost of 285% of the full annual premium for this policy; however, in the event the retiring Named Insured has been continuously insured by the Company under a Claims Made Policy for seven consecutive years and is at least age 55, for six consecutive years and is at least age 56, or for five consecutive years and is at least age 57, the unlimited Extended Reporting Period is provided at no additional cost.

     Be advised that in the event a time limited Extended Reporting Period option is chosen, a claim made and reported to the company after the expiration of the time limited extended reporting period option will not be covered.

5.   During the first several years of the claims made relationship, claims made rates are comparatively lower than occurrence rates.  Be advised that substantial annual premium increases, independent of overall rate level increases, should be expected if the policyholder is written at a less than mature rate.  This disparity lessens the longer the claims made relationship exists.

POLICY NO:  USF00601120

# FORMS ENDORSEMENT

The following are the forms attached to and forming a part of the policy at inception:

| | |
|---|---|
| POP-2031 (02/96) (Ed. 08/19) | Declarations – Professional Liability Insurance Policy Lawyers |
| XSE-1001 (01/96) (Ed. 01/98) | Forms Endosement |
| POJ-2018 (08/99) (Ed. 04/15) | Lawyer's Professional Liability Claims-Made Insurance Policy |
| 05-PL-3503 NY (01/09) | New York Changes – 2008 N.Y. Laws (Former SB  8610) Provisions |
| MSE-8001 (11/91)  Ed. (08/05) | Change Endorsement [#01] |
| MSE-8001 (11/91)  Ed. (08/05) | Change Endorsement [#02] |
| MSE-8001 (11/91)  Ed. (08/05) | Amended Policy Territory Endorsement [#03] |
| MSE-8001 (11/91)  Ed. (08/05) | Change Endorsement [#04] |
| MSE-8001 (11/91)  Ed. (08/05) | Specific Client(s) Limit Of Liability Endorsement [#05] |
| MSE-8001 (11/91)  Ed. (08/05) | Amendment Of Exclusion G – Specific Entity [#06] |
| MSE-8001 (11/91)  Ed. (08/05) | Notice Provision Endorsement [#07] |
| POE-2182 (04/97) | New York Amendatory Endorsement |
| POE-2909 (02/14) | Self - Insured Rentention |
| GE- 0002 (Ed. 08/19) | Reporting a Claim |

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED .

# LAWYER'S PROFESSIONAL LIABILITY
# CLAIMS-MADE INSURANCE POLICY

### NOTICE
### THIS IS A CLAIMS-MADE POLICY.   PLEASE REVIEW THE POLICY CAREFULLY.

### THE POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD UNLESS AND TO THE EXTENT THAT AN EXTENDED REPORTING PERIOD OPTION APPLIES.

### FIREMAN'S FUND INSURANCE COMPANY
(a stock insurance company, herein called the Company)
agrees with all Insureds, in consideration of the payment of the premium, and in reliance upon the statements in the Declarations and subject to the limit of liability, exclusions, conditions and other terms of this policy, as follows:

### INSURING AGREEMENTS

I.   COVERAGE

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages for Claims first made against the Insured and reported to the Company during the Policy Period or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services for others by an Insured covered under this policy.  Provided always that such Professional Services or Personal Injury happen:

A.  during the Policy Period; or

B.  prior to the Policy Period provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the Named Insured or Predecessor in Business, and continuously renewed and maintained in effect to the inception of this policy period:

   1.  the Insured did not give notice to any prior insurer of any such act, error, omission or Personal Injury;

   2.  the Named Insured, any partner, shareholder, employee, or where appropriate the Named Insured's management committee or any member thereof, had no reasonable basis to believe that the Insured had breached a professional duty or to reasonably foresee that a Claim would be made against the Insured; and

   3.  there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such Claim, unless the available limits of liability of such prior policy or policies are insufficient to pay any Claim, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

The Company shall have the right and duty to defend any suit against the Insured seeking Damages to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent.  The Company, at its option, shall select and assign defense counsel; however, the Insured may engage additional counsel, solely at their expense, to associate in their defense of any Claim covered hereunder.  The Company shall also have the right to investigate any Claim and/or negotiate the settlement thereof, as it deems expedient, but the Company shall not commit the Insured to any settlement without their consent.  If the Insured refuses to consent to any settlement recommended by the Company and elects to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company shall be relieved of any further duty to defend the Claim, and the liability of the Company for Damages and Claim Expenses shall not exceed the amount for which the Claim could have been settled, as well as the Claim Expenses incurred by the Company, or with the Company's consent, up to the date of such refusal.  Furthermore, the Insured shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

In the event:

A.  Item 4.a. of the Declarations is applicable to this policy, Claim Expenses shall be part of, and not in addition to, the Limits of Liability specified in Item 4. of the Declarations;

B.  Item 4.b. of the Declarations is applicable to this policy, Claim Expenses shall be in addition to the Limits of Liability specified in Item 4. of the Declarations.

In no event shall the Company be obligated to pay Damages or Claim Expenses or to defend, or continue to defend, any suit after the applicable limit of the Company's liability has been exhausted by payments of judgments, settlements, Damages or Claim Expenses, as applicable.

II. PERSONS INSURED

Each of the following is an Insured under this policy to the extent set forth below:

A. The entity or person named in Item 1 of the Declarations as the Named Insured;

B. Any Predecessor in Business or Successor in Business;

C. Any past partners, officers, directors, stockholders or employees of any person or entity specified in item A. or B. above (except as provided in I. below), but only while acting within the scope of their duties on behalf of such person or entity;

D. Any current partner, director, stockholder or employed lawyer of any person or entity specified in item A. or B. above;

E. Any current non-lawyer employee of any person or entity specified in item A. or B. above, but only while acting within the scope of their duties on behalf of any such person or entity;

F. Any non-affiliated legal firm, including their partners, officers, directors, or employees, but solely for Professional Services performed within the scope of their contract with, and on behalf of, the Named Insured, Predecessor in Business or Successor in Business;

G. Any legal representative, if the Insured becomes incompetent, insolvent, bankrupt or dies;

H. Any lawyer acting as "of Counsel" or on a contracted basis but only while performing Professional Services on behalf of any person or entity specified in sections A., B., C. or D. above;

I. Any past partner, director, officer or employed lawyer of any person or entity specified in Item A. or B. above who retires from the private practice of law while insured under a Lawyers Professional Liability Insurance policy issued by the Company.

III. LIMIT OF LIABILITY

Regardless of the number of Insureds under this insurance or the number of Claims made, the Company's liability is limited as follows:

A. In the event Claim Expenses are included within the limit of liability as specified in Item 4.a. of the Declarations, the limit of liability stated in the Declarations as applicable to "each Claim" is the limit of the company's liability for all Damages and Claims Expenses because of each Claim covered hereby. All Claims arising from the same or related negligent act, error or omission or Personal Injury shall be considered a single Claim for the purpose of this insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each Claim", the total limit of the Company's liability under this policy for all Damages and Claims Expenses.

B. In the event Claim Expenses are in addition to the limit of liability as specified in Item 4.b. of the Declarations, the limit of liability stated in the Declarations as applicable to "each Claim" is the limit of the Company's liability for Damages resulting from each Claim covered hereby. There shall be a separate and equal limit of liability applicable to Claim Expenses for any such Claim. All Claims arising from the same or related negligent act, error or omission or Personal Injury shall be considered a single Claim for the purpose of this insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each Claim", the total limit of the Company's liability under this policy for all Damages. A separate "aggregate" limit of liability shall apply to all Claims Expenses incurred in the defense of Claims covered by this Policy, subject to the above provision respecting the Company's liability for Claim Expenses for "each Claim".

C. The Company's liability for Damages and/or Claim Expenses, as applicable, resulting from "each Claim" is in excess of the deductible amount stated in the Declarations. The deductible amount stated in the Declarations shall upon written demand by the Company, be paid by the Named Insured within 30 days of demand.

D. The application of any Extended Reporting Period option shall not increase the limit of liability stated in the Declarations.

IV.  POLICY TERRITORY

The insurance afforded by this policy applies to any negligent act, error, omission or Personal Injury  in the rendering of or failure to render Professional Services  taking place anywhere in the world.  The insurance afforded by this policy applies to Claims  which are first made and reported to the Company during the Policy Period or Extended Reporting Period, if applicable, provided Claim is made or suit, if any, is brought within the United States of America, its territories or possessions, or Canada.

V.  WHEN A CLAIM IS DEEMED AS FIRST MADE

A Claim  shall be deemed as being first made at the earlier of the following times:

A.  When the Company first receives written notice from the Insured or its representative that a Claim  has been made; or

B.  When the Company first receives written notice from the Insured or its representative of specific circumstances or a Potential Claim  involving a particular person or entity which may result in a Claim .

All Claims  arising out of the same or related negligent act, error, omission or Personal Injury  shall be considered as having been made at the time the first such Claim  is made, and shall be subject to the same limit of liability and deductible.

VI.  SUPPLEMENTARY PAYMENTS

The Company will pay, in addition to the applicable limit of liability:

A.  Up to $500 for loss of earnings to each Insured for each day or part of a day of such Insured's attendance, at the Company's request, at a trial, deposition, hearing or arbitration proceeding involving a civil suit against such Insured for covered Damages, but the amount so payable for any one or series of trials, depositions, hearings or arbitration proceedings arising out of the same or related negligent act, error, omission or Personal Injur y shall in no event exceed $10,000; and

B.  Up to $5,000 per Policy Period  for each lawyer included within sub-sections A., B., C., D. and I. of Persons Insured for attorney fees and other costs, expenses or fees resulting from the investigation or defense of a proceeding before a state licensing board, peer review committee or governmental regulatory body incurred as the result of a notice of a proceeding first received by the Insured and reported to the Company during the Policy Period , arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services  by an Insured covered under this policy.

VII. EXCLUSIONS

This insurance does not apply to Claims:

A.  Based on or arising out of the Insured's services and/or capacity as an employee, owner, partner, stockholder, director, officer or trustee of any sole proprietorship, partnership or corporation or other business enterprise which is not defined as Named Insured, Predecessor in Busin ess or Success or in Business unless such Claim arises out of a lawyer-client relationship;

B.  Arising out of any dishonest, fraudulent, criminal or malicious act or omission, or deliberate misrepresentation (including but not limited to, actual or alleged violations of state or federal antitrust, price-fixing, restraint of trade, copyright or deceptive trade practice laws, rules or regulations) committed by, at the direction of, or with the knowledge of any Insured; however, we will provide a defense of such actions until such time as the act is ruled either by trial verdict, court ruling, regulatory ruling or legal admission as dishonest, fraudulent, criminal or malicious;

C.  Based on or arising out of any obligations for which any Insured or any carrier acting as the insurer may be liable under any workers' compensation, unemployment compensation, disability or pension benefits law, or any similar laws, including but not limited to, the Employee Retirement Income Security Act of 1974 and any amendments thereof; this exclusion does not apply to the usual and customary legal services performed in connection with such capacities or laws on behalf of any person or entity not defined as an Insured ;

D.  Arising out of the Insured's services and/or capacity as:

1.  an officer, director, partner, trustee, or employee of:

a.  a charitable organization;

b.  a pension, welfare, profit sharing or mutual fund;

c.  an investment fund or investment trust;

2.  a public official, or an employee of a governmental body, subdivision, or agency; or

3.  a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto, except if an Insured is deemed to be a fiduciary solely by reason of legal advice rendered with  respect to an employee benefit plan;

4.  a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity when any Insured is a beneficiary or distributee of any trust or estate serviced and the fee accruing from such work inures to the benefit of any Insured.

E.  For bodily injury, sickness, disease or death of any person, or injury to or destruction of any tangible property or loss of use resulting therefrom;

F.  Arising out of notarized certification or acknowledgment of a signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument;

G.  Arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services for any organization, corporation, company, partnership, or operation (other than the Named Insured, Predecessor in Business or Successor in Business) while any Insured or their spouse has more than ten percent (10%) equity position in such entity;

H.  Made by an Insured under this policy against any other Insured under this policy, unless such Claim arises solely out of Professional Services performed for that party in a lawyer-client capacity;

I.  Solely as respects Personal Injury :
1.  the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the Insured;
2.  libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, made by or at the direction of the Insured with the Insured's knowledge of the falsity thereof;
3.  failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract;
4.  infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised; or
5.  knowingly incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised.

## VIII.  DEFINITIONS

When used in this policy (including endorsements forming a part hereto):

"Alternative Dispute Resolution" means the use of arbitration or mediation.

"Claim" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or alternative dispute resolution naming an Insured and alleging a negligent act, error, omission or Personal Injury resulting from the rendering of or failure to render Professional Services. Claim does not include proceedings seeking injunctive or other non-pecuniary relief.

"Claim Expenses" means:
(a)  Fees charged by an attorney(s), arbitrator(s) or mediator(s) designated by the Company and all other fees, costs, and expenses resulting from the investigation, adjustment, defense and appeal of a Claim, suit or proceeding arising in connection therewith, if incurred by the Company, or by the Insured with written consent of the Company, but does not include salary charges or expenses of regular employees or officials of the Company, or fees and expenses of independent adjusters;
(b)  All costs taxed against the Insured in suits or proceedings and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited, whether in court or otherwise, but only as respects that part of the judgment which does not exceed the limit of the Company's liability thereof; and
(c)  Premiums on appeal bonds and premiums on bonds to release attachments in such suits, but not for bond amounts in excess of the applicable limit of liability of this policy. The Company shall have no obligation to pay for or furnish any bond.

"Damages" means compensatory judgments, settlements or awards but does not include punitive or exemplary damages, sanctions, fines or penalties assessed directly against any Insured, the return of fees or other consideration paid to the Insured, or that portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law.

"Insured" means any person or organization qualifying as an Insured in the "Persons Insured" provision of this policy. The insurance afforded applies separately to each Insured against whom Claim is made or suit is brought, except with respect to the Company's limits of liability.

"Named Insured" means the person or organization named in Item I. of the Declarations of this policy.

"Personal Injury" means: (a) false arrest, detention or imprisonment, wrongful entry or eviction, other invasion of private occupancy, or malicious prosecution; (b) the publication or utterance of libel, slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right

of privacy; or (c) injury arising out of an offense occurring in the course of the Named Insured's advertising activities, including but not limited to infringement of copyright, title slogan, patent trademark, trade dress, trade names, service mark or service number.

"Policy Period" means, whenever used in this policy, the period from the inception date of this policy to the policy expiration date as set forth in the Declarations or its earlier termination date, if any.

"Potential Claim" means knowledge of any circumstances involving an individual person or entity that could result in a Claim.

"Predecessor in Business" means any legal firm which has undergone dissolution and either: (a) some or all of such firm's principals, owners, officers or partners have joined the Named Insured, provided such persons were responsible for producing in excess of fifty percent (50%) of the prior firm's annual gross billings and such billings have been assigned or transferred to the Named Insured; or (b) at least fifty percent (50%) of the principals, owners, partners or officers of the prior firm have joined the Named Insured; or (c) at least fifty percent (50%) of the prior firm's financial assets/liabilities have been assumed by the Named Insured.

"Professional Services" means:
(a)   services performed or advice given by the Insured in the Named Insured's practice as a law firm or legal professional;
(b)   services as a notary public, title agent, title insurance agent, arbitrator or mediator;
(c)   services as a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity;
(d)   activities of the Insured as a member of a formal accreditation, ethics, peer review, licensing board, standards review or similar professional board or committee;
(e)   the publication or presentation of research papers or similar materials, but only if direct pecuniary compensation per publication or presentation is less than $3,000;
(f)   services performed by the Insured in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be the performance of Professional Services for others in the Insured's capacity as a lawyer, although such services could be performed wholly or in part by non-lawyers.

"Successor in Business" means, after dissolution of the Named Insured, any law firm in which either: (a) some or all of the principals, owners, officers and/or partners of the Named Insured have joined an existing, or formed a new, law firm provided such persons were responsible for producing in excess of fifty percent (50%) of the Named Insured's annual gross billings at the time of dissolution and such billings have been assigned or transferred to the successor law firm; or (b) at least fifty percent (50%) of the principals, owners, partners or officers of the Named Insured have joined an existing, or formed a new law firm; or (c) at least fifty percent (50%) of the Named Insured's financial assets/liabilities have been assumed by the successor law firm; provided this policy does not apply to Professional Services or Personal Injury if the Successor in Business is also an Insured under any similar liability or indemnity policy, or would be an Insured under any such policy but for exhaustion of its limits of liability. This coverage shall terminate at the earlier of policy termination or ninety (90) days from the date of dissolution of the Named Insured unless written notice is given to the Company, together with such information as the Company may request, and the Successor in Business shall pay any additional premium required in the event the Company agrees to continue the policy.

## IX. CONDITIONS
A.   Premium: All premiums for this policy shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.  The Named Insured shall maintain records of the information necessary for premium computation and shall send copies of such records to the Company at such times as the Company may direct.

B.   Assistance and Cooperation of Insured in the Event of Claim or Suit: Upon the Insured becoming aware of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services which could reasonably be expected to be the basis of a Claim covered hereby, written notice shall be given by the Insured, or its representative to the Company together with the fullest information obtainable as soon as practicable.  If Claim is made or suit is brought against the Insured, the Insured or its representative shall immediately forward to the Company every demand, notice, summons or other process received by the Insured or the Insured's representative.  The Insured shall cooperate with the Company and, upon the Company's request, assist in making statements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the

Insured because of Damages with respect to which this insurance applies. The Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at the Insured's own cost, voluntarily make any payments, admit liability, assume any obligation or incur any expense. The Insured may provide for Alternate Dispute Resolution with a client under an engagement letter or any other written contract, as long as such agreement is executed in writing prior to any Claim being made.

C.  Waiver of Exclusion and Breach of Conditions:
Whenever coverage under any provision of this policy would be excluded, suspended or lost:
1.   because of EXCLUSION B. relating to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions by any Insured; or
2.   because of noncompliance with Section B. CONDITIONS, relating to the giving of notice to the Company with respect to which any other Insured shall be in default solely because of the default or concealment of such default by one or more partners or employees responsible for the loss or damage otherwise insured hereunder,

the Company agrees that such insurance as would otherwise be afforded under this policy shall apply with respect to each and every Insured who did not personally commit or personally participate in committing one or more of the acts, errors, or omissions described in any such exclusion or condition; provided that if the condition be one with which such Insured can comply, after receiving knowledge thereof, the Insured entitled to the benefit of the Waiver of Exclusions and Breach of Conditions shall comply with such conditions promptly after obtaining knowledge of the failure of any other Insured or employee to comply therewith.

With respect to provision C. 1. above, the Company's obligation to pay in the event of such waiver shall be in excess of the deductible and in the excess of the full extent of any assets in the firm of any Insured who is not a beneficiary to the waiver.

D.  Assignment: The interest of the Named Insured is not assignable.  If any Insured shall die or be adjudged incompetent, this insurance shall thereupon terminate for such person but shall cover the Insured's legal representative as the Insured with respect to liability previously incurred and covered by this insurance. Pro rata return premium will be computed from the date of termination.

E.  Action Against Company:  No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, but not until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

F.  Conformity to Statute: Notwithstanding anything contained herein to the contrary, in the event that any terms or conditions of this contract conflict with any law applicable to the coverage afforded hereunder, the terms of this contract shall by this statement be amended to conform to such law or laws.

G.  Other Insurance: If there is other valid insurance (whether primary, excess, contingent or self-insurance), against a Claim covered by this policy the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance.  This policy is written as specific excess of coverage available under any Extended Reporting Period, Optional Extended Reporting Period and Automatic Extended Reporting Period or similar period in any prior policy or policies.

When this insurance is excess, the Company shall have no duty under this policy to defend any Claim or suit that any other insurer or self-insurer has a duty to defend.  If such other insurer or self-insurer refuses to defend such Claim or suit, the Company shall be entitled to the Insured's rights against all such other insurers or self-insurers for any Claim Expenses incurred by the Company.

When both this insurance and other insurance or self-insurance apply to the Claim on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the Damages or Claim Expenses than the applicable limit of liability under this policy for such Claim bears to the total applicable limit of liability of all valid and collectible insurance against such Claim.  Subject to the foregoing, if a loss occurs involving two or more policies, each of which provides that its insurance shall be excess, each will contribute pro rata.

H.  Subrogation:  In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefore against any person, organization or entity.  The Insured shall

execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The Insured  shall do nothing after any loss to prejudice such rights.

I.   Changes: The terms of this policy shall not be waived or changed except by endorsement issued to form a part of this policy.

J.   Bankruptcy or Insolvency of Insured: Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

K.   Cancellation: This insurance may be canceled on the customary short rate basis by the Named Insured at any time by written notice or by surrender of this insurance to the Company or its authorized representative and the Company shall refund the paid premium less the earned portion thereof within thirty (30) days of the latter of the effective date of the cancellation or the date of delivery of the Named Insured's notice of intent to cancel.  This insurance may also be canceled, with or without the return or tender of the unearned premium, by the Company, or by its authorized representative on its behalf, by sending to all Named Insureds, by first class, registered or certified mail, at the Named Insured(s) address last known to the Company or its authorized agent, not less than ninety (90) days written notice stating the specific reason for such cancellation and when the cancellation shall be effective.  In such case the Company shall refund the paid premium less the earned portion thereof within ten (10) business days after the effective date of cancellation, subject always to the retention by the Company of any minimum premium stipulated herein (or proportion thereof previously agreed upon) in the event of cancellation either by the Company or the Named Insured.  In case of non-payment of premium only fifteen (15) days written notice of cancellation must be given by the Company.  Proof of mailing will be sufficient proof of notice.

Cancellation by the Company shall only be effective if based on one or more of the following reasons:
1.   Nonpayment of premium;
2.   The policy was obtained through a material misrepresentation;
3.   Violation of any of the terms or conditions of the policy;
4.   The risk originally accepted has measurably increased; or
5.   Loss by the Company of reinsurance which provided coverage for all or a substantial part of the risk insured.

L.   Nonrenewal: The Company will renew this policy unless written notice of the Company's intent not to renew, stating the specific reasons for nonrenewal, is mailed to the Named Insured not less than sixty (60) days before the policy expires.

Any notice of nonrenewal will be mailed by first class registered or certified mail to the Named Insured at the last mailing address known to the Company.  Proof of mailing will be sufficient proof of notice.

M.   Renewal Rate Increase or Change in Policy Terms:  If the Company increases the rate, changes the deductible, reduces the limit and/or substantially reduces coverage at renewal, the Company will mail to the Named Insured, at least sixty (60) days prior to the effective date of that increase or change:
1.   Written notice of any change in coverage terms;
2.   An estimate of rate increase.  If the rate increase is thirty percent (30%) or more, the exact amount of the rate increase will be stated.

A "Rate increase" is defined as any factor that would change the premium other than a change in exposure.

Any notice of renewal rate increase or change in policy terms will be mailed by first class registered or certified mail to all Named Insureds at the last mailing address known to the Company.  Proof of mailing will be sufficient proof of notice.

N.   Declarations and Applications:  By acceptance of this policy, the Insured agrees that the statements in the Declarations and application are his agreements and representations, that they shall be deemed material and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

O.   Extended Reporting Period Option:
1.   Cancellation/Non renewal: In the case of:
(a)   cancellation or nonrenewal of this policy by the Named Insured or the Company for any reason other than flat cancellation during the first year the policy shall be in effect for non-payment of premium; or

(b) advancing a retroactive or prior acts date from or previously applied by the Company

the Named Insured shall have the right, subject to the other terms and conditions of this policy, or an endorsement attached thereto, to have an endorsement issued extending the time during which Claims can be reported for an additional premium of:
(i)   100% of the full annual premium for this policy, to a period of twelve (12) months;
(ii)  150% of the full annual premium for this policy, to a period of twenty-four (24) months;
(iii) 185% of the full annual premium for this policy, to a period of thirty-six (36) months; or
(iv) 285% of the full annual premium for this policy, for an unlimited period.

following the effective date of such cancellation or nonrenewal in which to give written notice to the Company of Claims first made against the Insured during this Extended Reporting Period for any act, error, omission or Personal Injury arising from the rendering of or failure to render Professional Services occurring prior to the termination of the final Policy Period, subject to its terms, limitations, exclusions and conditions. This right shall terminate sixty (60) days after the effective date of such action as is indicated in subparagraphs (a) or (b) above unless written notice of such election, together with the additional premium, is received by the Company or its authorized agent from the Named Insured within that sixty (60) day period.

Subject to the foregoing, in the event that the Named Insured is a partnership or a corporation, and the policy is terminated, the premium calculation stated in i. through iv. above shall not include a charge for any individual legal professional who qualifies for a free Extended Reporting Period under section 2., 3. or 4. following, provided always that the notice is given to the Company as required and the other provisions of these sections are fully satisfied.

2. Retiree Provision: Notwithstanding CONDITION O. 1. above, in the event that the Named Insured is an individual, the Named Insured shall also have the right to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or non-renewal  upon his or her retirement from the private practice of law and the payment of additional premium for this option will be waived if:

(a) the Named Insured is an individual and has been continuously insured by the Company under a claims-made Lawyers Professional Liability Insurance policy for at least:
(i)   seven (7) consecutive years prior to such cancellation or nonrenewal, and is at least fifty-five (55) years of age at the time of retirement; or
(ii)  six (6) consecutive years prior to such cancellation or nonrenewal and is at least fifty- six (56) years of age at the time of retirement; or
(iii) five (5) consecutive years prior to such cancellation or nonrenewal and is at least fifty-seven (57) years of age at the time of retirement.
(b) written notice of this election is given to the Company within sixty (60) days after termination of this policy; and
(c) all premiums and deductibles due the Company have been paid in full.

3. Death or Disability of Insured: Notwithstanding CONDITION O. 1. of this policy, if the Named Insured  designated in the Declaration is an individual and shall cancel or nonrenew this policy, the Named Insured shall have the right, at no cost, to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or nonrenewal provided that:
(a) such cancellation or nonrenewal results from the death or disability of the Named Insured  during the Policy Period;
(b) in the event of disability, the Named Insured is totally and continuously disabled from the practice of law a minimum of six (6) months prior to the election of this option;
(c) satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and
(d) all premiums and deductibles due the Company have been paid in full.

This right shall terminate, however, unless written notice of election is received by the Company or its authorized agent from the Named Insured or legal representative of Named Insured within sixty (60) days after the effective date of such cancellation or nonrenewal.

4. Notwithstanding CONDITION O. 1. above, in the event that a licensed lawyer:
(a) Is an Insured under sections A. and D. of Persons Insured as defined by this policy; and
(b) Either:

(i)  Retires from the active practice of law and:
  (1)  Has been continuously insured by the Company under a claims-made policy for at least:
    (a)  seven (7) consecutive years prior to such cancellation or nonrenewal, and is at least fifty-five (55) years of age at the time of retirement; or
    (b)  six (6) consecutive years prior to such cancellation or nonrenewal, and is at least fifty-six (56) years of age at the time of retirement; or
    (c)  five (5) consecutive years prior to such cancellation or nonrenewal and is at least fifty-seven (57) years of age at the time of retirement.
  (2)  Written notice of retirement is given to the Company within sixty (60) days after retirement; and
  (3)  All premiums and deductibles due the Company have been paid in full;

or

(ii)  Dies or becomes permanently disabled during the Policy Period and:
  (1)  In the event of disability, the Named Insured must be totally and continuously disabled from the practice of law for a minimum of six (6) months prior to the election of this option;
  (2)  Satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and
  (3)  All premiums and deductibles due the Company have been paid in full

then the period during which Claims must be first made against each qualifying lawyer will be extended as follows:

During the Policy Period, or any renewal thereof, each individual will be afforded coverage as a former partner, owner, employee, officer or trustee of the Named Insured, subject to the terms, conditions and limitations of such policy or renewal policy; and/or

If this policy terminates and an Extended Reporting Period option is elected by the Named Insured, each individual will be afforded coverage subject to the terms, conditions and limitations of the policy and the extended reporting endorsement elected; and/or

If this policy terminates and an Extended Reporting Period option is not elected by the Named Insured, each individual who qualifies under (a) and (b) above will be entitled to an unlimited Extended Reporting Period endorsement at no additional premium.    This Extended Reporting Period shall be part of this policy or the last policy issued by the Company to which this is a renewal.    The limit of liability available for the Extended Reporting Period shall be part of, and not in addition to, the limits available under such policy.

In the event notice is given by the individual as provided in (a) and (b) above, a memorandum of coverage will be issued upon written request to the Company.

5.  At the commencement of any Extended Reporting Period option, the entire premium therefore shall be deemed earned and the Company shall not be liable to return to the Named Insured any portion of the premium for the Extended Reporting Period.  The cost of any Extended Reporting Period option is based on the rates and rules in effect at the time the policy was issued or last renewed.

The fact that the period during which a Claim must be first made against the Named Insured under this policy is extended by virtue of any Extended Reporting Period option shall not in any way increase the limit of this policy.  The limit of liability under any Extended Reporting Period option shall be part of, and not in addition to, the limit of liability available under the last policy or renewal certificate issued to the Named Insured.

P.  Reimbursement: While the Company has no duty to do so, if the Company pays Damages or Claims Expenses:
1.  Within the amount of the applicable deductible; or
2.  In excess of the applicable limit of liability

all Insureds shall be jointly and severally liable to the Company for such amounts.  Upon written demand, the Insured shall repay such amounts to the Company with thirty (30) days thereof.

Q. Lib eralization Clau se:
   If the Company adopts any revision that would broaden the coverage under the policy without additional premium at any time during the Policy P eriod, the broadened coverage will immediately apply to this policy.

In Witn ess wh ereof, the Company has caused this policy to be signed by its president and secretary.

Secretary

President

# New York Changes   - 2008 N.Y. Laws (Former SB 8610) Provisions
## Policy Amendment(s) Liability

The following provision is added and supersedes any provision to the contrary:

Failure to give any notice required to be given under this policy within the time prescribed therein shall not invalidate any Claim  made by the Insured , injured person or any other claimant, unless the failure to provide timely notice has prejudiced the Company, unless it can be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter. With respect to a claims-made policy, however, the policy may provide that the Claim  shall be made during the policy period, any renewal thereof, or any extended reporting period, except that failure to give any notice required to be given by this policy within the time prescribed therein shall not invalidate any Claim  made by the Insured , and injured person or any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter.  As used in this paragraph, the terms "claims-made policy" and "extended reporting period" shall have their respective meanings as provided in a regulation promulgated by the superintendent.

All other terms and conditions of this policy remain unchanged.

05-PL-3503 NY (01/09)
© 2009, Fireman's Fund Insurance Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CHANGE ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that Section IX Conditions of the policy, K4 and K5 are deleted in their entirety.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here:                                                              Premium:  $

ENDORSEMENT NO : 01                                    Effective: 01/25/2020
is attached to and forms part of your evidence of insurance no.:      USF00601120

Insured             Rivkin Radler, LLP

Date
Issued          02/28/2020                    Authorized Representative:

MSE-8001 (11/91) (Ed. 08/05)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CHANGE ENDORSEMENT

In consideration of the premium charged, Exclusion E. is deleted in its entirety and replaced with the following:

E.  For bodily injury, sickness, disease or death of any person, or injury to or destruction of any tangible property or loss of use resulting therefrom, unless such results from Professional Services rendered.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: _____ Premium:  $

ENDORSEMENT NO : 02                                Effective: 01/25/2020

is attached to and forms part of your evidence of insurance no.:      USF00601120

Insured              Rivkin Radler, LLP

Date
Issued          02/28/2020                      Authorized Representative:

MSE-8001 (11/91) (Ed. 08/05)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMENDED POLICY TERRITORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

LAWYER'S PROFESSIONAL LIABILITY

Section IV. POLICY TERRITORY is deleted in its entirety and replaced by the following:

IV. POLICY TERRITORY

This Policy applies to any negligent act, error or omission or Personal Injury   in the rendering of or failure to render Professional Services    committed by an Insured  anywhere in the world, excluding any country or jurisdiction which is the subject of trade or economic embargoes imposed by the laws and regulations of the United States of America, or any of its states or territories.

In jurisdictions outside the United States of America, its territories and possessions, Puerto Rico and Canada, if the Company is prevented from investigating, defending, settling or paying a Claim , the Named Insured will make or cause to be made such investigation, defense, settlement or payment as may be reasonably necessary. However, settlement or payment requires the Company's prior written authorization. If this paragraph applies, the Company will reimburse the Named Insured  for the reasonable cost of any investigation and defense of Claims  to which this insurance applies, and for the amounts of such authorized settlements or payment. The amount the Company will reimburse is limited as described in Section III. LIMIT OF LIABILITY and the Company's duty to reimburse Insureds  for the reasonable cost of any investigation and defense ends when applicable Limit of Liability is exhausted.

If the Company makes reimbursement to an Insured  of settlement and covered costs, it will be paid in the currency of the United States. Payment of settlement and covered costs which are made by Insureds  in the currencies of other nations will be converted to the currency of the United States at the exchange rate published in the Wall Street Journal on the date the reimbursement is processed.

Any Claims  or transactions uninsurable under the laws or regulations of the United States concerning trade or economic sanctions or export control laws are not covered under this Policy.

### ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: _____ Premium:  $

ENDORSEMENT NO : 03                              Effective: 01/25/2020
is attached to and forms part of your evidence of insurance no.:     USF00601120

Insured            Rivkin Radler, LLP

Date
Issued            02/28/2020                     Authorized Representative:

MSE-8001 (11/91) (Ed. 08/05)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CHANGE ENDORSEMENT

In consideration of the premium charged the term "negligent" is deleted from the policy and endorsements and any reference to the phrase "negligent act, error, or omission or personal injury" within the policy and endorsements attached thereto is amended to read "act, error, omission, or personal injury".

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here:                                                          Premium:  $

ENDORSEMENT NO : 04                          Effective: 01/25/2020
is attached to and forms part of your evidence of insurance no.:      USF00601120

Insured            Rivkin Radler, LLP

Date
Issued         02/28/2020            Authorized Representative:

MSE-8001 (11/91) (Ed. 08/05)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CHANGE ENDORSEMENT

## SPECIFIC CLIENT(S)
## LIMIT OF LIABILITY ENDORSEMENT

In consideration of the premium charged, notwithstanding the limit of liability identified in Item 4. Limit of Liability on the Declarations page, a limit of $1,000,000 Each claim / $1,000,000 Aggregate, shall constitute the only  limit of liability available for all Damages  arising out of or attributable to any negligent act, error, omission or Personal Injury   of the Insured  in the rendering of or failure to render Professional Services    to, for, or on behalf of:

    (1)   <u>RR Health Strategies</u>

including, but not limited to, any affiliates, subsidiaries or related entities thereof.  This limit shall be part of and not in addition to the Limit of Liability identified in Item 4. of the Declarations page.

This limit of liability shall constitute the only limit of liability available for all Damages  arising from the above-described negligent acts, errors, omissions or Personal Injuries   and no other coverage shall be available for any Damages  arising from the above-described negligent acts, errors, omissions or Personal Injuries  .

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: _____   Premium:  $ _____

ENDORSEMENT NO : 05                         Effective: 01/25/2020
is attached to and forms part of your evidence of insurance no.:     USF00601120

Insured              Rivkin Radler, LLP

Date
Issued          02/28/2020            Authorized Representative:

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CHANGE ENDORSEMENT

## AMENDMENT OF EXCLUSION G – Specific Entity

In consideration of the premium charged, Exclusion G is deleted in it entirety and replaced by the following:

G.   Arising out of any negligent act, error, omission or Personal Injury   in the rendering of or failure to render Professional Services    performed for any organization, company, partnership or operation (other than the Named Insured , Predecessor in Business or Successor in Business)  while any Insured  or their spouse has more than 10% equity in such entity.

This exclusion does not apply to any Claims  arising out of any negligent act, error, omission or Personal Injury   in the rendering of or failure to render Professional Services    by any Insured  to the following entity(ies):

RR Health Strategies

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

| | |
|---|---|
| The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: | Premium:  $ |

ENDORSEMENT NO : 06                          Effective: 01/25/2020
is attached to and forms part of your evidence of insurance no.:      USF00601120

Insured          Rivkin Radler, LLP

Date Issued          02/28/2020                    Authorized Representative:

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CHANGE ENDORSEMENT

# NOTICE PROVISION ENDORSEMENT

This endorsement modifies insurance provided under the following:

LAWYER'S PROFESSIONAL LIABILITY

Section I. COVERAGE , B, item 2. is deleted in its entirety and replaced by the following:

2.  the management  committee or other governing body of the Named Insured  had no reasonable basis to believe that the Insured  had breached a professional duty or to reasonably foresee that a Claim  would be made against the Insured ; and

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

| The premium for this endorsement is included in the premium shown on the declarations unless a specific amount is shown here: | Premium:  $ |
|---|---|
| ENDORSEMENT NO : 07 | Effective: 01/25/2020 |
| is attached to and forms part of your evidence of insurance no.: | USF00601120 |

| Insured | Rivkin Radler, LLP |
|---|---|

| Date Issued | 02/28/2020 | Authorized Representative: |
|---|---|---|

MSE-8001 (11/91) (Ed. 08/05)

# NEW YORK AMENDATORY ENDORSEMENT
## - ATTORNEYS -

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

The following terms delete and supersede any similar terms which may be contained within the policy.

I.    NON-PAYMENT OF PREMIUM:
      SENDING OF NOTICES OF CANCELLATION
      In case of nonpayment of premium, a minimum of thirty (30) days written notice of cancellation must be given by the Company.

II.   REASONS FOR CANCELLATION BY THE COMPANY LIMITED
      Cancellation by the Company shall only be effective if based on one or more of the following reasons:
      A.   Nonpayment of premium;
      B.   Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim thereunder;
      C.   After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;
      D.   Material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed; or
      E.   Required pursuant to a determination by the Department of Insurance that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interest of our policyholders, our creditors or the public (including loss of reinsurance).

III.  NONRENEWAL
      If we decide not to renew this policy we will send notice as provided in paragraph V below along with the reason for nonrenewal.

IV.   CONDITIONAL RENEWAL
      If we condition renewal of this policy upon:
      A.   Change of Limits;
      B.   Change in type of coverage;
      C.   Reduction of coverage;
      D.   Increased deductible;
      E.   Addition of exclusion;
      F.   Any increase in premium except increase due to change in exposure (including claims-made step factors) and/or rating plans based solely on the Insured's  developed experience.
      we will send notice as provided in paragraph V below.

V.    NOTICE OF NONRENEWAL AND CONDITIONAL RENEWAL
      A.   If we decide not to renew this policy or to conditionally renew this policy as provided in paragraph III or IV above, we will mail or deliver written notice to the first Named Insured shown in the Declarations at least sixty (60) but not more than one-hundred twenty (120) days before the expiration date.
      B.   We will not send you notice of nonrenewal or conditional renewal if you, your authorized agent or broker or another insurer of yours mails or delivers notice that the policy has been replaced or is no longer desired.

VI.   SENDING OF NOTICES
Any notice of cancellation, nonrenewal or renewal premium increase or change in policy terms will be mailed by first class registered or certified mail to all Named Insureds  at the last mailing address known to the Company.  Proof of mailing will be sufficient proof of notice.

VII.   EXTENDED REPORTING PERIOD
Notwithstanding any terms or conditions contained within the policy to the contrary, in the case of cancellation or nonrenewal of this policy by the Named Insured  or the Company for any reason other than flat cancellation by the Company effective at policy inception for non-payment of premium, decrease in limits, increased deductible, new exclusion or any other change in coverage less favorable to the Insured , the Named Insured  shall have the right, subject to the other terms and conditions of this policy, or any endorsement attached thereto, to have an endorsement issued extending the time during which claims can be reported.

A.  AUTOMATIC EXTENDED REPORTING TERMS
An automatic sixty (60) day extended reporting period option, effective at the termination of the policy period, will be provided by the Company at no additional cost unless this insurance is replaced with the same or similar insurance issued by the Company.  The limits available under this extension shall be part of, and not in addition to, the limits available under the expiring policy period.  Coverage provided by this automatic extended reporting period shall be specific excess over any replacement policy providing the same or similar language.

B.  ADDITIONAL EXTENDED REPORTING TERMS
1.     Within thirty (30) days after termination of coverage the Company will advise the Named Insured  in writing of the automatic extended reporting period coverage and the availability of, the premium for, and the importance of purchasing additional extended reporting period coverage or the Insured's  right to a free extended reporting period option as may be provided by the policy.
2.     Upon cancellation due to nonpayment of premium (other than at policy inception) or fraud on the part of the Insured , the Company shall not be required to provide a premium quotation unless requested by the Insured .
3.     The Insured  shall have the greater of sixty (60) days from the effective date of termination of coverage, or thirty (30) days from the date of mailing or delivery of the advice required by paragraph B.1 to submit written acceptance of extended reporting period coverage and the payment of any premiums due.
4.     For the purpose of determining the length of the extended reporting period, the coverage required by A. above shall be included in the reporting period.

C.     A separate aggregate limit of liability equal to the limit specified on the Declarations and any endorsement thereto shall apply to any Claim  or Claims  reported during the Extended Reporting Period (except for the automatic sixty (60) day extended reporting period required by A.1 above).  The limit applicable to "each Claim " shall not be increased or changed.

D.     ADDITIONAL EXTENDED REPORTING TERMS (LIQUIDATION, ETC.)
1.     A claims-made policy issued to a corporation, partnership or other entity shall provide extended reporting period coverage upon termination of coverage to any person covered under the policy, if:
a.     such entity has been placed in liquidation or bankruptcy or permanently ceases operations;
b.     the entity or its designated trustee does not purchase extended reporting period coverage; and
c.     such person requests the extended reporting period coverage in writing within one-hundred twenty (120) days of the termination of coverage.

    2.     The Company shall have no obligation to provide any notice to any such person of the availability of the extended reporting period coverage required by paragraph VII.D.1.a of this endorsement.

    3.     The Company may charge the person for whom extended reporting period coverage is provided a premium commensurate with such coverage.

VIII.    NOTICE OF CLAIM

Notice given by or on behalf of the Insured , or written notice by or on behalf of the injured person or any other claimant to any licensed agent of the Company, with particulars sufficient to identify the Insured , shall be deemed notice to the Company.

Notwithstanding anything in the policy to the contrary, failure to give any notice required by the policy within the time prescribed therein shall not invalidate any Claim made by the Insured or by any other claimant, if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible.

IX.    The section titled ACTION AGAINST THE COMPANY is deleted in its entirety and replaced by:

ACTION AGAINST THE COMPANY : No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, but not until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured or by written agreement of the Insured , the claimant and the Company.

X.    RETROACTIVE OR PRIOR ACTS DATES

A retroactive or prior acts date may not be changed during the term of the claims-made relationship or any extended reporting period.

XI.    PREJUDGMENT INTEREST

Prejudgment interest where payable under this policy, will be in addition to the limits of liability stated in the declarations.

XII.    TRANSFER OF DUTIES WHEN A LIMIT OF INSURANCE IS USED UP

    A.    If we conclude that, based on incidents, occurrences, offenses, Claims or suits which have been reported to us and to which this insurance may apply, that any limit (each Claim , each incident, each occurrence, aggregate, or other) under the policy is likely to be used up in the payment of judgments or settlements, we will notify the first Named Insured , in writing, to that effect.

    B.    When a limit of insurance described in paragraph A. above has actually been used up in the payment of judgments or settlements:

        1.     we will notify the first Named Insured , in writing, as soon as practicable, that:

            a.     such a limit has actually been used up; and

            b.     our duty to defend suits seeking damages subject to that limit has ended.

        2.     We will initiate, and cooperate in, the transfer of control, to any appropriate Insured , of all Claims and suits seeking Damages which are subject to that limit and which are reported to us before that limit is used up. That Insured must cooperate in the transfer of control of said Claims and suits.

We agree to take such steps, as we deem appropriate, to avoid a default in, or continue the defense of, such suits until such transfer is completed, provided the appropriate Insured is cooperating in completing such transfer. We have no obligation to take any action whatsoever with respect to any Claim or suit seeking damages that would have been subject to that limit, had it not been used up, if the Claim or suit is reported to us after that limit of insurance has been used up.

3.      The first Named Insured  and any other Insured  involved in a suit seeking damages subject to that limit, must arrange for the defense of such suit within such time period as agreed to between the appropriate Insured  and us.  Absent any such agreement, arrangements for the defense of such suit must be made as soon as practicable.

C.      The first Named Insured  will reimburse us for expenses we incur in taking those steps we deem appropriate in accordance with paragraph B.2 above.

The duty of the first Named Insured  to reimburse us will begin on:

1.      the date on which the applicable limit of insurance is used up, if we sent notice in accordance with paragraph A. above; or

2.      the date on which we sent notice in accordance with paragraph B.1 above, if we did not send notice in accordance with paragraph A. above.

D.      The exhaustion of any limit of insurance by the payments of judgments or settlements, and the resulting end of our duty to defend, will not be affected by our failure to comply with any of the provisions of this condition.

XIII.   CLAIMS MADE NOTICE

Notwithstanding anything to the contrary, this policy applies to Claims  made and reported to the Company during the policy period, any subsequent renewal thereof, or during any applicable Extended Reporting Period.

XIV.    If this is a Corporate Lawyer's policy, Sub-section C of VI, Supplementary Payments, is deleted in its entirety.

Should any conflict exist between the agreements or other terms or conditions of this endorsement and the policy or any endorsement or other form attached to and forming a part of the policy, the agreements, terms or conditions of this endorsement shall always take precedence.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

# SELF-INSURED RETENTION

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

LAWYER'S PROFESSIONAL LIABILITY

I.    The term "self-insured retention" will be substituted wherever the term "deductible" is utilized in the Policy or on the Declarations.

II.    Under Section I. COVERAGE

   The following paragraph is deleted in its entirety:

   The Company shall have the right and duty to defend any suit against the Insured  seeking Damages to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent.   The Company, at its option, shall select and assign defense counsel; however, the Insured  may engage additional counsel, solely at their expense, to associate in their defense of any Claim  covered hereunder.   The Company shall also have the right to investigate any Claim  and/or negotiate the settlement thereof, as it deems expedient, but the Company shall not commit the Insured  to any settlement without their consent.  If the Insured  refuses to consent to any settlement recommended by the Company and elects to contest the Claim  or continue any legal proceedings in connection with such Claim , then the Company shall be relieved of any further duty to defend the Claim , and the liability of the Company for Damages  and Claim Expenses   shall not exceed the amount for which the Claim  could have been settled, as well as the Claim Expenses  incurred by the Company, or with the Company's consent, up to the date of such refusal.  Furthermore, the Insured shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

   And is replaced by the following:

   The Named Insured  shall have the right and duty to defend any Claim  or suit against an Insured  seeking Damages  to which this insurance applies until the self-insured retention has been exhausted. In the event of litigation, the Named Insured  agrees to retain defense counsel. The Named Insured  has the right to settle any Claim  as long as the payment of Damages  and Claim Expenses   will not exceed the self-insured retention. The Named Insured  agrees to abide by all policy provisions, including Section IX. CONDITIONS, B., Assistance and Cooperation of the Insured      in the Event of Claim or Suit  , and specifically agrees to keep the Company advised as to the investigation and defense of any Claim  being handled within the self-insured retention.

   Upon exhaustion of the self-insured retention as respects any Claim , the Company will assume the right and duty to defend. The Company will:

   1.    Do this even if any of the charges of the Claim  are groundless, false or fraudulent;

   2.    Investigate any Claim  the Company feels appropriate; and

   3.    Not settle any Claim  without the Named Insured's  consent.

   If any Insured  refuses to consent to any settlement recommended by the Company  and elects to contest the Claim  or continue any legal proceedings in connection with such Claim , then the Company shall be relieved of any further duty to defend the Claim , and the Company's liability for Damages and Claim Expens es shall not exceed the amount for which the Claim  could have been settled, as well as the Claim Expenses  incurred by the Company, or with the Company's consent, up

This Form must be attached to Change Endorsement when issued after the policy is written.

to the date of such refusal. Furthermore, any Insured shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

III.   Section III. LIMITS OF LIABILITY , C. is deleted in its entirety and replaced by the following:

C.   The Company's liability for Damages or Claim Expenses , resulting from "each Claim" is excess of the self-insured retention amount shown in Section VI. of this endorsement. The Named Insured agrees to pay all Damages and Claim Expenses  up to the amount of the self-insured retention. The self-insured retention applies separately to each Claim . Payment of the self-insured retention or portion thereof shall be made by the Named Insured as Damages and Claim Expenses  are incurred.

If an Aggregate self-insured retention is stated in Section VI. of this endorsement, such amount will be the maximum payable by the Named Insured  as a Self-Insured Retention for all Claims  made during the Policy Period .

IV.   Section VI. SUPPLEMENTARY PAYMENTS  is deleted.

V.   Section IX. CONDITIONS, G. Other Insurance   is amended to include the following:

This insurance is excess over the self-insured retention that the Named Insured  has assumed by endorsement to this Policy.

VI.   Item 5. of the Declarations, Deductible, is deleted in its entirety and replaced by the following:

Item 5. Self-Insured Retention

$ 500,000          Each Claim

$ 500,000          Aggregate (if applicable)

(If no entry appears above, information required to complete this Endorsement will be shown in the Declarations as applicable to this Endorsement.)

All other terms and conditions of the Policy remain unchanged.

POE-2909  (02/14)                                                                                        Page 2 of 2

# REPORTING A CLAIM

Allianz Global Corporate & Specialty is committed to providing insureds and clients with effective claim service.

In the event of an incident which may result in a claim, an actual claim, or your receipt of suit papers, please follow the procedures outlined below.

## PROCEDURES FOR REPORTING CLAIMS

NOTICE OF EACH INCIDENT, CLAIM OR SUIT SHOULD IMMEDIATELY BE REPOR TED TO:

Allianz Global Corporate & Specialty

Phone Number:  1-800-558-1606
or
Fax Number:   1-888-323-6450

Please fill out the online claim reporting form which is available at       www.agcs.allianz.com/usclaims or send an  email to NewLoss@agcs.allianz.com.  For assistance contact your agent or broker.

05-GE 0002 Ed. 08/19

**ABOUT ALLIANZ**

Your insurance company is part of the Allianz Group – an organization with a 125-year history of partnering with clients and delivering exceptional insurance products around the world.

Allianz is the world's largest property & casualty insurance company by revenue and has one of the strongest financial ratings of the leading global property & casualty insurers. The strength of its financial ratings and quality of its people make Allianz the insurer of choice for thousands of mid-size businesses and the majority of Global Fortune 500 companies.

Allianz is also ranked "one of the world's most admired companies" by Fortune and "one of the top 100 global brands" by Interbrand.

agcs.allianz.com

700030-4-15



# EXHIBIT 2

AES:LKG/AS
F. #2020R00623

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  AUG 13 2020  ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

CHRISTOPHER CHIERCHIO,
JASON KURLAND,
    also known as "Jay,"
FRANGESCO RUSSO,
    also known as "Frankie," and
FRANCIS SMOOKLER,
    also known as "Frank,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. **C R  2 0  3 0 6**

(T. 18, U.S.C., §§ 892, 894,
981(a)(1)(C), 982(a)(1), 982(b)(1),
1343, 1346, 1349, 1956(a)(1)(A)(i),
1956(a)(1)(B)(i), 1956(h), 2 and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

**GARAUFIS, J.**

**LEVY, M.J.**

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Conspiracy to Commit Wire Fraud)

       1.     On or about and between April 12, 2019 and August 13, 2020, both

dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendants CHRISTOPHER CHIERCHIO, JASON KURLAND, also known

as "Jay," FRANGESCO RUSSO, also known as "Frankie," and FRANCIS SMOOKLER,

also known as "Frank," together with others, did knowingly and intentionally conspire to

devise a scheme and artifice to defraud Lottery Victim 1, Lottery Victim 2 and Lottery

Victim 3 (collectively, the "Lottery Victims"), individuals whose identities are known to the

Grand Jury, and to obtain money and property from the Lottery Victims by means of

materially false and fraudulent pretenses, representations and promises, and, for the purpose

of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, one or more writings, signs, signals, pictures and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

<u>COUNTS TWO THROUGH SEVEN</u>
(Wire Fraud)

2.     On or about the dates identified in the table below, within the Eastern District of New York and elsewhere, the defendants identified in the table below, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Lottery Victims, and to obtain money and property from the Lottery Victims by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, one or more writings, signs, signals, pictures and sounds as set forth below:

| Count | Approximate Date of Wire Transmission | Approximate Amount and Details of Wire Transmission | Defendants |
|---|---|---|---|
| TWO | April 12, 2019 | $12,600,000 wire transfer from Lottery Victim 3's account at Bank 1, the identity of which is known to the Grand Jury, to a RUSSO- and SMOOKLER-controlled account at Bank 2, the identity of which is known to the Grand Jury. | JASON KURLAND, FRANCESCO RUSSO and FRANCIS SMOOKLER |

| Count | Approximate Date of Wire Transmission | Approximate Amount and Details of Wire Transmission | Defendants |
|-------|----------------------------------------|-----------------------------------------------------|------------|
| THREE | April 12, 2019 | $5,000,000 wire transfer from Lottery Victim 1's account at Bank 3, the identity of which is known to the Grand Jury, to a RUSSO- and SMOOKLER-controlled account at Bank 2. | JASON KURLAND, FRANCESCO RUSSO and FRANCIS SMOOKLER |
| FOUR | May 29, 2019 | $1,000,000 wire transfer from Lottery Victim 3's account at Bank 1 to a RUSSO- and SMOOKLER-controlled account at Bank 2. | JASON KURLAND, FRANCESCO RUSSO and FRANCIS SMOOKLER |
| FIVE | October 31, 2019 | $5,000,000 wire transfer from Lottery Victim 2's account at Bank 4, the identity of which is known to the Grand Jury, to a RUSSO- and SMOOKLER-controlled account at Bank 2. | JASON KURLAND, FRANCESCO RUSSO and FRANCIS SMOOKLER |
| SIX | April 23, 2020 | $19,500,000 wire transfer from Lottery Victim 3's account at Bank 1 to a RUSSO- and SMOOKLER-controlled account at Bank 5, the identity of which is known to the Grand Jury. | CHRISTOPHER CHIERCHIO, JASON KURLAND, FRANCESCO RUSSO and FRANCIS SMOOKLER |
| SEVEN | April 29, 2020 | $2,500,000 wire transfer from Lottery Victim 2's account at Bank 4 to a RUSSO- and SMOOKLER-controlled account at Bank 5. | CHRISTOPHER CHIERCHIO, FRANCESCO RUSSO and FRANCIS SMOOKLER |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

COUNTS EIGHT THROUGH FIFTEEN
(Honest Services Wire Fraud)

3.     On or about and between October 1, 2018 and October 31, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JASON KURLAND, also known as "Jay," together with others, having devised and intending to devise a scheme and artifice to defraud, including to deprive the Lottery Victims of their respective intangible rights to the honest services of KURLAND, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit: KURLAND, owing a duty of honest services to the Lottery Victims, engaged in a scheme to obtain payments for himself from others in exchange for persuading the Lottery Victims to make investments in certain entities, without the approval and knowledge of the Lottery Victims, and used and caused the use of interstate communications to effect the scheme, as set forth below:

| Count | Approximate Dates of Wire Transmissions | Approximate Amount and Details of Wire Transmission |
|---|---|---|
| EIGHT | October 1, 2018 | $5,000,000 wire transfer from Lottery Victim 1's account at Bank 4 to a RUSSO-, SMOOKLER- and KURLAND-controlled account at Bank 5. |
| NINE | October 17, 2018 | $2,000,000 wire transfer from Lottery Victim 1's account at Bank 4 to a RUSSO- and SMOOKLER-controlled account at Bank 2. |
| TEN | January 2, 2019 | $5,000,000 wire transfer from Lottery Victim 1's account at Bank 4 to a RUSSO-, SMOOKLER- and KURLAND-controlled account at Bank 5. |
| ELEVEN | March 6, 2019 | $20,000,000 wire transfer from Lottery Victim 3's account at Bank 1 to a |

| Count | Approximate Dates of Wire Transmissions | Approximate Amount and Details of Wire Transmission |
|---|---|---|
| | | RUSSO- and SMOOKLER-controlled account at Bank 2. |
| TWELVE | March 6, 2019 | $10,000,000 wire transfer from Lottery Victim 3's account at Bank 1 to a RUSSO-, SMOOKLER- and KURLAND-controlled account at Bank 5. |
| THIRTEEN | April 12, 2019 | $12,600,000 wire transfer from Lottery Victim 3's account at Bank 1 to a RUSSO- and SMOOKLER-controlled account at Bank 2. |
| FOURTEEN | April 12, 2019 | $5,000,000 wire transfer from Lottery Victim 1's account at Bank 3 to a RUSSO- and SMOOKLER-controlled account at Bank 2. |
| FIFTEEN | October 31, 2019 | $5,000,000 wire transfer from Lottery Victim 2's account at Bank 4 to a RUSSO- and SMOOKLER-controlled account at Bank 2. |

(Title 18, United States Code, Sections 1343, 1346 and 3551 et seq.)

COUNT SIXTEEN
(Conspiracy to Commit Money Laundering)

4.     On or about and between April 12, 2019 and August 13, 2020, both

dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendants CHRISTOPHER CHIERCHIO, JASON KURLAND, also known

as "Jay," FRANGESCO RUSSO, also known as "Frankie," and FRANCIS SMOOKLER,

also known as "Frank," together with others, did knowingly and intentionally conspire to:

(a)     conduct and attempt to conduct one or more financial

transactions affecting interstate and foreign commerce, to wit: interstate transfers of funds,

which transactions in fact involved the proceeds of specified unlawful activity, to wit: wire

fraud, in violation of Title 18, United States Code, Section 1343 (the "Specified Unlawful

Activity"), knowing that the property to be involved in the financial transactions represented
the proceeds of some form of unlawful activity, and with the intent to promote the carrying
on of the Specified Unlawful Activity, contrary to Title 18, United States Code, Section
1956(a)(1)(A)(i); and

        (b)     conduct and attempt to conduct one or more financial
transactions affecting interstate and foreign commerce, to wit: interstate transfers of funds,
which transactions in fact involved the proceeds of the Specified Unlawful Activity, knowing
that the property involved in the financial transactions represented the proceeds of some form
of unlawful activity, and knowing that the financial transactions were designed in whole and
in part to conceal and disguise the nature, location, source, ownership and control of the
proceeds of the Specified Unlawful Activity, contrary to Title 18, United States Code,
Section 1956(a)(1)(B)(i).

     (Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT SEVENTEEN<br>(Money Laundering)

     5.     On or about and between April 12, 2019 and August 13, 2020, both
dates being approximate and inclusive, within the Eastern District of New York and
elsewhere, the defendants CHRISTOPHER CHIERCHIO, JASON KURLAND, also known
as "Jay," FRANGESCO RUSSO, also known as "Frankie," and FRANCIS SMOOKLER,
also known as "Frank," together with others, did knowingly and intentionally:

        (a) conduct and attempt to conduct one or more financial transactions
affecting interstate and foreign commerce, to wit: interstate transfers of funds, which
transactions in fact involved the proceeds of the Specified Unlawful Activity, knowing that

the property to be involved in the financial transactions represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of the Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i); and

(b) conduct one or more financial transactions affecting interstate and foreign commerce, to wit: interstate transfers of funds, which transactions in fact involved the proceeds of the Specified Unlawful Activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

COUNT EIGHTEEN
(Conspiracy to Commit Extortionate Extension of Credit)

6.     On or about and between March 6, 2020 and May 27, 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANGESCO RUSSO, also known as "Frankie," and FRANCIS SMOOKLER, also known as "Frank," together with others, did knowingly and intentionally conspire to participate in one or more extortionate extensions of credit to John Doe 1, an individual whose identity is known to the Grand Jury.

(Title 18, United States Code, Sections 892 and 3551 et seq.)

## COUNT NINETEEN
(Extortionate Extension of Credit)

7.    On or about and between March 6, 2020 and May 27, 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANGESCO RUSSO, also known as "Frankie," and FRANCIS SMOOKLER, also known as "Frank," together with others, did knowingly and intentionally make one or more extortionate extensions of credit to John Doe 1.

(Title 18, United States Code, Sections 892, 2 and 3551 et seq.)

## COUNT TWENTY
(Conspiracy to Commit Extortionate Collection of Credit)

8.    On or about and between March 6, 2020 and May 27, 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANGESCO RUSSO, also known as "Frankie," and FRANCIS SMOOKLER, also known as "Frank," together with others, did knowingly and intentionally conspire to participate in the use of extortionate means to collect and attempt to collect one or more extensions of credit from John Doe 1, and to punish John Doe 1 for the nonrepayment thereof.

(Title 18, United States Code, Sections 894 and 3551 et seq.)

## COUNT TWENTY-ONE
(Extortionate Collection of Credit)

9.    On or about and between March 6, 2020 and May 27, 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANGESCO RUSSO, also known as "Frankie," and FRANCIS SMOOKLER, also known as "Frank," together with others, did knowingly and intentionally participate in

the use of extortionate means to collect and attempt to collect one or more extensions of credit from John Doe 1, and to punish John Doe 1 for the nonrepayment thereof.

(Title 18, United States Code, Sections 894, 2 and 3551 <u>et</u> <u>seq</u>.)

CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS
<u>ONE THROUGH FIFTEEN AND EIGHTEEN THROUGH TWENTY-ONE</u>

10. The United States hereby gives notice to the defendants charged in Counts One through Fifteen and Eighteen through Twenty-One that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses, including but not limited to: (a) all right, title and interest in the real property and premises located at 1173 Pine Valley Road, Oyster Bay, New York 11771; (b) all right, title and interest in the real property and premises located at 720 Motts Cove Road N, Roslyn Harbor, New York 11576; and (c) all right, title and interest in the real property and premises located at 2270 Bayview Lane, North Miami, Florida 33181.

11. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      (a)     cannot be located upon the exercise of due diligence;

      (b)     has been transferred or sold to, or deposited with, a third party;

      (c)     has been placed beyond the jurisdiction of the court;

      (d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable

property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS SIXTEEN AND SEVENTEEN

12.     The United States hereby gives notice to the defendants that, upon their

conviction of either of the offenses charged in Counts Sixteen and Seventeen, the

government will seek forfeiture in accordance with Title 18, United States Code, Section

982(a)(1), which requires any person convicted of such offenses to forfeit any property, real

or personal, involved in such offenses, including but not limited to: (a) all right, title and

interest in the real property and premises located at 1173 Pine Valley Road, Oyster Bay, New

York 11771; (b) all right, title and interest in the real property and premises located at 720

Motts Cove Road N, Roslyn Harbor, New York 11576; and (c) all right, title and interest in

the real property and premises located at 2270 Bayview Lane, North Miami, Florida 33181.

13.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

other property of the defendants up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21,

United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2020R00623
FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

---

### THE UNITED STATES OF AMERICA

*vs.*

CHRISTOPHER CHIERCHIO, JASON KURLAND, also known as "Jay,"
FRANGESCO RUSSO, also known as "Frankie," and FRANCIS
SMOOKLER, also known as "Frank,"

Defendants.

---

# INDICTMENT

(T. 18, U.S.C., §§ 892, 894, 981(a)(1)(C), 982(a)(1), 982(b)(1), 1343,
1346, 1349, 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(h), 2 and 3551 et
seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

---

*A true bill.*

_____
                                                    *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                          *Clerk*

---

*Bail, $* _____

***Andrey Spektor and Lindsay K. Gerdes, Assistant U.S. Attorneys***
***(718) 254-6475/6155***

**INFORMATION SHEET**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 13 2020 ★

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LONG ISLAND OFFICE

1. Title of Case: United States v. Christopher Chierchio, et al.

2. Related Magistrate Docket Number(s): ___ C R 20 306

3. Arrest Date: Click here to enter a date.

4. Nature of offense(s): ☒ Felony        GARAUFIS, J.
                         ☐ Misdemeanor

                                         LEVY, M.J.

5. Related Cases - Title and Docket No(s). (Pursuant to Rule 50.3.2 of the Local
   E.D.N.Y. Division of Business Rules): _____

6. Projected Length of Trial:   Less than 6 weeks   ☒
                                More than 6 weeks   ☐

7. County in which crime was allegedly committed: Staten Island
   (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8. Was any aspect of the investigation, inquiry and prosecution giving rise to the case
   pending or initiated before March 10, 2012.[1]          ☐ Yes  ☒ No

9. Has this indictment/information been ordered sealed?    ☒ Yes  ☐ No

10. Have arrest warrants been ordered?                     ☒ Yes  ☐ No

11. Is there a capital count included in the indictment?    ☐ Yes  ☒ No

                                    SETH D. DuCHARME
                                    Acting United States Attorney

                         By: _____
                                    Lindsay K. Gerdes
                                    Assistant U.S. Attorney
                                    (718) 254-6155

---

[1]     Judge Brodie will not accept cases that were initiated before March 10, 2012.

Rev. 10/04/12

# EXHIBIT 3



**U.S. Department of Justice**

United States Attorney
Eastern District of New York

AES:LKG/AS                                    271 Cadman Plaza East
F#: 2020R00291                                Brooklyn, New York 11201

                                              August 18, 2020

<u>By ECF and Email</u>

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

          Re:     United States v. Chierchio, <u>et al.</u>
                  Criminal Docket No. 20-306 (NGG)

Dear Judge Bloom:

          The government respectfully submits this letter requesting that the Court enter
permanent orders of detention against defendants Frangesco ("Frankie") Russo and Francis
("Frank") Smookler.  It also asks that the Court detain defendants Christopher Chierchio and
Jason ("Jay") Kurland, unless they submit significant bail packages secured by property and
financially responsible sureties.  The charges against all four defendants are serious, the evidence
against them is overwhelming and each faces significant sentences if convicted.  Russo and
Smookler also present an unacceptable danger to the community, and for that reason they should
not be released.

          The indictment charges two schemes.  First, Kurland, Chierchio, Russo and
Smookler are charged with conspiring to commit and committing money laundering and wire
fraud offenses (including, for Kurland, honest services fraud), all stemming from the scheme by
the defendants, together with others, to defraud Kurland's clients.  Kurland is an attorney
specializing in representing lottery winners, purporting to help them make sound investments.
He abused his clients' trust by encouraging them to make large investments in entities run by
Chierchio (a soldier in the Genovese crime family), Smookler (a former securities broker) and
Russo, who, in turn, siphoned money from his clients' investments for themselves, and paid
Kurland kickbacks for steering his clients to them.  Kurland failed to disclose to his clients either
the kickbacks or his relationship with the entities.  On one occasion, Kurland simply transferred
$19.5 million out of one of his clients' accounts without permission, much of which was
ultimately funneled to Chierchio.  In total, as a result of the scheme, Kurland's clients lost more
than $80 million.  All four defendants, however, profited handsomely, fueling lavish lifestyles

that included flying private jets, taking exotic vacations, buying boats, paying country club dues and even "wrapping" luxury cars.

Second, Russo and Smookler are also charged with committing and conspiring to commit extortionate extension of credit and extortionate collection of credit, for threatening to torture, shoot and kill an individual and his family, because that person could not timely repay a usurious loan they had extended him. Although this individual had also lost some of Kurland's clients' money, Russo and Smookler told him to pay back their loan first. Both the threats and the terms of the loan are captured on audio recordings.

I.      Background

        A.      The Defendants

                1.      Jason Kurland, the "Lottery Lawyer"

        Kurland has been a practicing attorney for 20 years and is a partner at the law firm Rivkin Radler LLP. He has branded himself the "Lottery Lawyer," reserving both the website "Thelotterylawyer.com" and the @lotterylawyer Twitter handle. By one recent estimate, his clients—scattered across the nation—have won a combined $3 billion.[1] In his pitch to clients, Kurland offers trust, transparency and sophisticated financial advice to minimize risk. He has promoted those qualities in interviews, stating in one that it is important for lottery winners to "know[] that someone can walk you through it, step by step, so there are no surprises. . . ."[2] He added that, "The biggest mistake people make is doing it on their own."[3] Kurland's "exclamation point" to his law practice, as another article put it, is the work he has done for a lottery client who won $1.5 billion;[4] that client is identified as "Lottery Victim 3" in the indictment. In the article, Kurland stated that he was retained because Lottery Victim 3 was convinced that Kurland could be trusted.[5]

        Kurland's clients rely on him to safeguard their winnings and provide sound investment advice. The victims identified in the indictment (the "Lottery Victims") requested that Kurland invest their money in "secure" investments. For his services, Kurland and his law firm obtained from the Lottery Victims an upfront payment of between $75,000 and $200,000,

---

[1]      Andrew McIntyre, For Lawyer, Chance Powerball Job Leads To New Career Path, Law 360 (Aug. 23, 2019, 12:25 PM EDT), https://www.law360.com/articles/1190478/for-lawyer-chance-powerball-job-leads-to-new-career-path.

[2]      Susan DeSantis, How a $254M Powerball Ticket Changed This Lawyer's Life, Law.com (Mar. 19, 2019 at 01:59 PM), https://www.law.com/2019/03/19/how-a-254m-powerball-ticket-changed-this-mans-life-292-42192.

[3]      Id.

[4]      McIntyre, supra note 1.

[5]      Id.

and additional monthly fees of between $15,000 and $50,000. Kurland led the Lottery Victims to believe that this money—totaling millions of dollars in compensation—was the only fee Kurland received from them. As detailed below, Kurland lied to the Lottery Victims.

            2.    Kurland's Co-Conspirators

            Kurland's co-conspirators in the scheme to defraud his clients included, among others, co-defendants Chierchio, Smookler and Russo. Chierchio is a soldier in the Genovese crime family of La Cosa Nostra and controls an entity called Chrch Group. As detailed below, Chrch Group received $1.4 million from one Lottery Victim and at least $15.5 million from another. Chierchio has not returned any of the money he received from these victims, but has continued to spend tens of thousands of dollars monthly to support his lavish lifestyle.

            Russo and Smookler are Kurland's close associates and control many entities that participated in defrauding the Lottery Victims. The co-conspirators used these entities to make some investments—most of which resulted in staggering losses—but also used them to engage in money laundering and fraud. As recounted in more detail below, Russo and Smookler invested some of the Lottery Victims' money with Gregory Altieri, who lost much of it and whom they later extorted to collect a separate "street loan."

      B.    Scheme to Defraud the Lottery Victims

            The defendants' scheme was simple.[6] Kurland began by primarily presenting the Lottery Victims with traditional investment options from large and well-known institutions. After the Lottery Victims grew comfortable with Kurland's advice, Kurland returned to the Lottery Victims with different investment opportunities, in entities that extended high-interest loans to small businesses, also known as "Merchant Cash Advances" and, during the COVID-19 pandemic, a company that sold Personal Protection Equipment ("PPE") to the state of California. Kurland falsely told the Lottery Victims that all of these investments came on his radar simply because they were promising opportunities, and failed to tell the Lottery Victims that investment "managers" Russo and Smookler were his close associates; that in some cases, he was affiliated with the entities as a part owner; that he would receive substantial kickbacks if the Lottery Victims agreed invest in those entities; and that Chierchio, Russo, Smookler and others planned to siphon money from the investments for themselves. Each of the Lottery Victims followed Kurland's recommendations for these non-traditional investments, collectively investing about $107 million in the businesses managed by the co-conspirators, at least $19.5 million of which was taken from one of the victims without his/her knowledge. As a result of these investments, Kurland pocketed hundreds of thousands of dollars in undisclosed kickbacks; the other defendants stole far more money directly from the investments. In all, of the $107 million that was invested by the Lottery Victims with the defendants' entities, over $80 million was either stolen or lost.

_____

            [6]    The indictment and summary of the evidence in this letter are based on the defendants' conduct as it relates to the Lottery Victims, and the government is continuing to

Kurland also knew that failing to disclose his affiliation with the sham entities, his association with his co-conspirators and the kickbacks he received was deeply wrong: "I'm not a stockbroker. I'm—that's not what I'm supposed to be doing." [7] But Kurland did it anyway. One person who spoke with Kurland summarized Kurland's view of his clients—that lottery winners "just don't understand how much money they actually have . . . [,] so . . . right away they're a little bit, you know, cheap." With the initial, legitimate investments out of the way, Kurland steered his clients to his and his co-conspirators' entities, and they all secretly lined their pockets. At one point, they simply took almost $20 million from Lottery Victim 3 without Lottery Victim 3's knowledge.

The facts summarized below are derived from interviews with the Lottery Victims (who spoke to the FBI voluntarily), bank records and months of intercepted communications authorized by four judges in the Eastern and Southern Districts of New York. These communications captured Chierchio, Kurland, Russo and Smookler admitting to their crimes and discussing ways to obstruct the investigation. In the intercepted communications quoted below, the co-conspirators referred to Lottery Victim 1 (the winner of a $245 million Powerball jackpot) as the "Staten Island people," Lottery Victim 2 (the winner of a $150 million jackpot) as "Healthy Rainbow," and Lottery Victim 3 (the winner of the $1.5 billion Mega Millions lottery) as "South Carolina."

1.     Lottery Victim 1—"Staten Island people"

Lottery Victim 1, a Staten Island resident, signed a retainer with Kurland in September 2018 for an $100,000 up-front fee and a $15,000 monthly fee. Kurland initially advised Lottery Victim 1 to invest in traditional investment funds, as well as in Cheddar Capital, a company that purportedly lends money to small businesses. Kurland then persuaded Lottery Victim 1 to invest more money in Cheddar Capital, as well as in entities called Francis Bay and JBMML. Ultimately, Lottery Victim 1 agreed to invest $10 million in Cheddar Capital (in two separate installments of $5 million each), $2 million in Francis Bay and $5 million in JBMML.

---

investigate whether additional victims were defrauded by the defendants. To the extent any of the evidence summarized above comes from the Lottery Victims' statements to the Federal Bureau of Investigation ("FBI"), they are only brief summaries, relayed here in sum and in part to give the Court some insight into the defendants' conduct.

[7]     All the recorded conversations quoted in this letter are prepared in draft form only. The government will prepare a finalized version of the transcripts in advance of trial. The government also hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case. In order to preserve the integrity and confidentiality of the government's investigation, notice of some of the defendants of the wiretap interceptions prior to their arrest was not feasible. This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

        a)        October 1, 2018 and January 2, 2019 Transfers Totaling $10
                                    Million to Cheddar Capital (Counts Eight & Ten)

On October 1, 2018,[8] Lottery Victim 1 transferred $5 million to Cheddar Capital. Lottery Victim 1 made the investment after Kurland introduced him/her to Cheddar Capital's Chief Executive Officer. Kurland vouched for this person, and Lottery Victim 1 trusted Kurland completely. Lottery Victim 1 made a second transfer of $5 million to Cheddar Capital on January 2, 2019, for a total investment in that entity of $10 million.

Kurland neglected to tell Lottery Victim that Kurland himself had a 20% stake in Cheddar Capital, and that it was also controlled by Kurland's close associates, Russo and Smookler. Nor did Kurland disclose to Lottery Victim 1 that Kurland would receive a substantial kickback as a result of steering Lottery Victim 1 to invest in Cheddar Capital. Specifically, within two days of receiving the October 1, 2018 $5 million transfer from Lottery Victim 1, Cheddar Capital sent two wires totaling $63,000 to an entity called GK3 LLC ("GK3") that was owned by Kurland.[9] Kurland subsequently transferred that money from GK3 to a personal account, from which he paid taxes and his own expenses. Similarly, Cheddar Capital sent GK3 $63,000 on the same day as the January 2, 2019 $5 million transfer, plus another $13,500 two weeks later. Kurland then paid $20,000 to "Classic Vacations" and transferred additional money to his personal account, from which he paid over $4,000 to Classic Vacations and from which he sent $85,000 to the IRS.

---

[8]       The dates set forth in this letter are all approximate.

[9]       Unless otherwise specified, when this letter refers to Kurland's initial receipt of funds, it is a reference to the transfer of funds into Kurland's GK3 entity. Like his co-defendants, Kurland used an entity to routinely launder proceeds of the fraud scheme; those co-defendants have stated on multiple intercepted conversations that use of such entities was necessary to make it difficult for law enforcement to trace the criminal proceeds of the scheme. On one call, Russo explained to Smookler that he did not want money sitting in one account, stating that they needed to "move it around," and adding that the money had to be moved around "ASAP, I don't like to keep it where it lands." Smookler then discussed which accounts the FBI might subpoena. Bank records show these were not just words. For instance, on January 7, 2019, GK3 sent JBMML $31,250, and just ten days later, JBMML returned the same amount to GK3. As another example, on October 18, 2018, shortly after Kurland received approximately $359,000 from Francis Bay, he transferred $300,000 back to another account associated with Russo and Smookler, followed by another transfer of $25,000. Likewise, on February 19, 2019, Kurland transferred $40,000 to Russo and Smookler, and six days later Russo and Smookler transferred it back.

        b)     October 17, 2018 Transfer of $2 Million to
              Francis Bay (Count Nine)

On October 17, 2018, Lottery Victim 1 transferred $2 million to Francis Bay for an investment. Subsequently, Francis Bay sent about $35,000 as a kickback to Kurland at GK3,[10] which Kurland again forwarded on to his personal account and used for personal expenses. Kurland's co-conspirators also directly stole money that Lottery Victim 1 had invested in Francis Bay. For example, on the same day that Francis Bay received Lottery Victim 1's investment, Russo made two withdrawals from the entity totaling approximately $150,000. In addition, Russo made payments from Francis Bay (by way of one of his other entities, Meeker World Management Inc. ("Meeker")) to cover his personal expenses, including $20,000 for taxes and over $10,000 to American Express.

By April 2019, Francis Bay had virtually no money left in its account and it closed. Indeed, it appears that the co-conspirators used the account primarily to receive Lottery Victim 1's money, which constituted the vast majority of the money that came into Francis Bay.[11]

        c)     April 12, 2019 Transfer of $5 Million to JBMML (Counts Three
              and Fourteen)

On April 12, 2019, Lottery Victim 1 made a $5 million investment to JBMML, which, as noted below, was the same day that Kurland had Lottery Victim 3 send $12.6 million to JBMML. The co-conspirators subsequently used a portion of the Lottery Victims' money as their personal slush fund, making payments directly from JBMML to cover expenses and transferring money from JBMML to their personal accounts. For example, on the date that the two transfers were received from the Lottery Victims, JBMML issued a $2,100.50 check to Porsche, with the memo line "Jays Car" (i.e., Kurland's car); additional payments were made from JBMML by check approximately two weeks later, including $13,475 to "Franks Range Rover" for Smookler's Range Rover, and $17,200 for a watch for one of the co-conspirators ("CC-2"). Similarly, following the transfers from the Lottery Victims, the co-conspirators directed a series of wires from JBMML: $250,000 to Smookler's personal account, $250,000 to Russo's personal account and $66,294 to American Express. They also transferred over a million dollars to Smookler's and Russo's various entities, at least some of which went towards personal expenses, including, for example, Smookler's $23,400 payment to VIP Auto towards a 2019 Bentley, $5,643 in purchases at Dick's Sporting Goods, and thousands more in cash withdrawals and personal expenses.

---

[10]    Kurland initially received $359,000 but following additional transfers—again reinforcing the money laundering charges—kept only approximately $35,000.

[11]    This was true of most of Russo's and Smookler's entities: the majority of the money came from the Lottery Victims.

Kurland also received a kickback for directing Lottery Victim 1 and Lottery Victim 3 to invest in JBMML, which he did not disclose to either Lottery Victim 1 or Lottery Victim 3. Specifically, days after the Lottery Victims transferred a total of $17.6 million to JBMML, JBMML sent Kurland $176,000, his customary 1% kickback. Kurland then transferred that money from GK3 to his personal account and used it to, among other things, pay almost $30,000 for a golf club membership, and to go on shopping sprees, spending over $10,000 at Saks Fifth Avenue, Fendi and Hirshleifers, a high-end luxury store.

As of August 14, 2020, JBMML's account had only $40,588, despite the fact that the Lottery Victims had invested more than $42 million in JBMML.

d)    The Defendants' Conversations About Lottery Victim 1

In approximately 2019, Kurland advised Lottery Victim 1 to retain separate counsel ("Lottery Victim 1's Counsel") to field inquiries from the United States Securities and Exchange Commission (the "SEC"). Based on intercepted communications, Lottery Victim 1's Counsel appears to have been recommended to Kurland by Smookler's counsel ("Attorney 1").

Until recently, Lottery Victim 1 placed complete trust in Kurland and did not request an update on the status of his/her investments in Cheddar Capital, Francis Bay and JBMML. This was because Lottery Victim 1 believed that Kurland—who he/she thought had no affiliation or interest in those entities—would protect his/her interests. But when Lottery Victim 1's Counsel began requesting records from Kurland in connection with Lottery Victim 1's investments, intercepted calls show that Kurland became concerned. Those calls also show that Kurland and the other co-conspirators maligned Attorney 1 for suggesting that Lottery Victim 1 should have separate counsel to communicate with the SEC, and talked about how they could determine whether the requests by Lottery Victim 1's Counsel were driven by the government.

For example, during one intercepted call in May 2020, Kurland told Smookler, "Why don't you call [Attorney 1] on behalf of JBMML and say you heard . . . they [i.e., law enforcement] contacted him." Kurland added, "don't forget, he [Attorney 1] gave me his best friend [Lottery Victim 1's Counsel] to represent my client [Lottery Victim 1]. Like his best friend, that's what he said."[12] Smookler responded, "Right, so I am sure that he [Lottery Victim 1's Counsel] is doing the right thing," i.e., not actually protecting Lottery Victim 1's interest but instead protecting the co-conspirators. Kurland responded, "You would think so," and then explained how the co-conspirators should figure out why Lottery Victim 1 wanted to see the records of his investments, whether Lottery Victim 1 was "working with them [i.e., the FBI]" or whether Lottery Victim 1's Counsel was just "getting in my client's head." On a subsequent call with Smookler, Kurland stated explicitly, "We gotta know if he was contacted or at least talking to them, you know?"

---

[12]    The government is aware that Attorney 1 has represented Smookler and the government has, since the beginning of the interception period, automatically and fully minimized all communications in which Attorney 1 was a party. Communications between Russo and his counsel have also been fully minimized.

7

That same month, on a call that included Kurland, Smookler and Russo, the co-conspirators discussed their potential criminal exposure. Smookler stated that he hoped the Lottery Victims would tell the FBI, "Listen, I don't give a shit, leave me alone, I gave Jay [Kurland] money—I gave him all my money, and I don't even give a shit, just leave me alone," and if they do that, Smookler continued, "then they [i.e., the FBI agents] don't have a case." Kurland responded that he would like to tell Attorney 1 "to tell his friend [i.e., Lottery Victim 1's Counsel] to act like that."

A month later, on a June 2020 call, as Kurland updated Smookler on the Lottery Victims, Smookler wondered if the Lottery Victims could refuse to cooperate with the FBI and thus impede any investigation: "[D]o you think ultimately they are going to look and the clients are going to say 'Jay [Kurland] is my guy and everything's fine, leave me alone?'" Kurland stated he thought that was realistic but Lottery Victim 1's Counsel was getting in the way: "That's where we are right now, but I am gonna be honest, I think that [Attorney 1]'s best friend, I think is stirring the pot."

2.    Lottery Victim 2—"Healthy Rainbow"

The defendants perpetrated the fraud on Lottery Victim 2 in much the same way as Lottery Victim 1. Lottery Victim 2 agreed to pay Kurland and his firm $75,000 up front and another $15,000 monthly. Lottery Victim 2 requested that Kurland recommend conservative investments. Kurland initially recommended to Lottery Victim 2 investments in mainstream financial institutions but soon returned with other "opportunities," that is, investments in entities that unbeknownst to Lottery Victim 2 were run by Kurland's business partners.

a)    October 31, 2019 $5 Million Transfer to JBMML (Counts Five and Fifteen)

On October 31, 2019, on Kurland's advice, Lottery Victim 2 transferred $5 million to JBMML for a purported opportunity to invest in a money-lending entity. Kurland falsely represented to Lottery Victim 2 that JBMML was connected to the Diamond District in Manhattan and was, according to him, a very safe investment that would yield Lottery Victim 2 approximately $48,000 in monthly interest payments. Kurland was apparently referring to JBMML's intention to invest with Gregory Altieri, who was running a business from his home in the New York suburbs that bought and sold jewelry, which Altieri told investors could produce returns as high as 70% in months. In reality, Altieri's jewelry business was a $200-million Ponzi scheme. See United States v. Altieri, 20-CR-249 (BMC).

After Lottery Victim 2 invested in JBMML, the co-conspirators siphoned off a portion of that investment for themselves. Some of the stolen funds were used in their own Ponzi-like scheme to keep the Lottery Victims from realizing that their "investments" were not successful. Specifically, the day after Lottery Victim 2's investment in JBMML, on November 1, 2019, the co-conspirators funneled part of Lottery Victim 2's $5 million investment back to Lottery Victims 1 and 3. Kurland represented to Lottery Victims 1 and 3 that this money constituted interest payments on their own investments.

The co-conspirators also used money stolen from Lottery Victim 2's investment in JBMML for personal expenses, including thousands of dollars in payments to Porsche for Kurland's car, over $260,000 in American Express payments for Russo and Smookler, over $100,000 in payoffs to various individuals associated with the co-conspirators and thousands of dollars more in cash withdrawals after the money was filtered through yet another entity. These payments were again used to fund the co-conspirators' lavish lifestyle; for example, the November American Express payments that were made using Lottery Victim 2's JBMML investment included thousands of dollars spent for, among other things, steakhouse meals, a night at a resort, a private helicopter, and a $134,000 boat for Smookler. Russo also used over $1.5 million from Lottery Victim 2's investment to purchase a home on Motts Cove Drive in Roslyn, New York (the "Motts Cove house"), which Russo was scheduled to move into later this month and is one of the three properties on which the government placed a lien. Bank records related to later investments from Lottery Victims 2 and 3 show additional expenses paid towards the Motts Cove house out of those investments, including $300,000 to an interior design firm.

In addition, six days after Lottery Victim 2's investment, Kurland received a kickback of $50,000 from JBMML. Kurland never disclosed this kickback to Lottery Victim 2. As noted above, there is virtually no money left in JBMML.

   b)  April 29, 2020 Transfer of $2.5 Million to Azimut 43 LLC (Count Seven)

Kurland also persuaded Lottery Victim 2 to make a $2.5 million investment in a company called "PPE Platinum LLC" ("PPE Platinum"), which allegedly invested in PPE that was sold to the state of California. An entity called Azimut 43 LLC ("Azimut") was represented as the borrower of the $2.5 million note.[13] Kurland told Lottery Victim 2 that he/she would receive the entire principal back by July 16, 2020, on top of up to $1.25 million in profit. Lottery Victim 2 signed an agreement with Smookler (on behalf of another entity, called Southbound) and a co-conspirator ("CC-1"), which explicitly stated that PPE Platinum would not distribute any money to its members until Lottery Victim 2's $2.5 million note was repaid. On April 29, 2020, Lottery Victim 2 transferred $2.5 million to Azimut.

Despite the agreement and Kurland's representation, the day after the transfer, Smookler (through his entity called Gold Standard Depository) and Russo (through Meeker), as well as the daughter of CC-1, received $10,000 each from Lottery Victim 2's investment in Azimut. Subsequently, on May 1, 2020, "Chrch Group," the entity controlled by Chierchio, received $1.4 million.

---

[13]  Notably, Azimut is the same entity that received the stolen $19.5 million from Lottery Victim 3, discussed below. Kurland did not disclose to Lottery Victim 2 that Azimut, an entity supposedly specializing in PPE deals, was actually a "boat management company." On a recorded call in July 2020, an assistant working with Russo and Smookler (the "Assistant") told Smookler and CC-2 that a bank had been calling asking about the nature of the company and the Lottery Victims' contact information. The Assistant recounted to Smookler that she had informed the bank this entity was indeed a boat management company but had been "sold" and

The co-conspirators used some of Lottery Victim 2's $2.5 investment in Azimut in a PPE deal with the New York City Police Department ("NYPD"). On May 20, 2020, the NYPD transferred $1.715 million to an account associated with a law firm used by CC-1. By the following day, Smookler and Russo, through the same entities, took $110,000 each; CC-1's daughter received $307,500, to go along with the $10,000 she had received on April 30, 2020, and Kurland took $100,000, though as noted below, he returned it when the FBI interviewed Lottery Victim 2.

As of August 14, 2020, Azimut had $33,823 remaining, despite having received about $22 million from the Lottery Victims.

### c)  The Defendants' Conversations About Lottery Victim 2

The FBI interviewed Lottery Victim 2 on May 29, 2020. Lottery Victim 2 told Kurland about the interview, and Kurland, Smookler and Russo immediately convened a conference call. Kurland freely repeated his conversations with his client to the co-conspirators. Smookler relayed to Russo the problem—"this guy Minsky [i.e., FBI Special Agent Craig Minsky]" interviewed the "chick who gave us the two and a half million for Azimut." Kurland then told his co-conspirators to return the money they took from Lottery Victim 2, as he put it, "claw[] back" any "ah, finder's fee, yeah, maybe that should all go back into, into the account, right, just say it was inadvertently sent, and put it back in there." Later in the call, Kurland asked that Smookler and Russo send Kurland wire instructions that state that the $100,000 Kurland received "was inadvertently sent to you through, I don't know," to explain why Kurland was returning it—for a reason other than the fact that the FBI had interviewed Lottery Victim 2. Two days later, beginning on June 1 and on June 2, 2020, Kurland sent back to Azimut his own share of the money he pocketed, $100,000, in two installments.

This was not the only time that Kurland instructed the co-conspirators how to cover their tracks for the fraud they committed. On a June 2020 call, Kurland told Smookler that it would not be enough simply to pay back the money to Lottery Victim 2, and that Smookler should think about the way the money was routed to make it appear as if the repayment was the product of a legitimate investment. As Kurland warned, referring to the FBI, "It's going to be traced":

> [Y]ou gotta have PPE Platinum, as a real company, as a company
> that does business, and then show that you are going to give them
> the profits because they were induced to give the money based on
> that. . . . [U]se PPE Platinum, you know, as, as, as a company

---

was now being used for PPE-related deals; she also asked Smookler what to do about the Lottery Victims' contact information. Smookler wondered if they could simply decline to provide it but settled on giving the bank Kurland's information instead. Smookler then rationalized to the Assistant that they did take some money from the Lottery Victims "but it wasn't egregious money, you know, it was normal monies within the scope of the size of the monies we were dealing with, but the bulk of the monies went exactly where it was supposed to go."

that's gonna do some stuff [] [b]ecause that's how it was induced.
That word induced, it's like you know . . . important.

Kurland reinforced that message to Russo on a separate call, relaying what he had told Smookler: "[E]verybody can trace everything. . . . [A]ny money . . . around, NYPD, or whatever, you really should—you're playing with fire." Russo did not disagree but thought they could claim ignorance: "[I]f they really throw the book at us, they'll see the text messages and everything, they'll see all, they'll, they'll see that no, yes, what you're saying is accurate, but it's not like everybody did it maliciously."

On a July 2020 call, after Russo acknowledged that perhaps they should at least partly repay Lottery Victim 2, Kurland reminded Russo that the co-conspirators would have to make it seem like they were abiding by the agreement that promised Lottery Victim 2 the return of his/her entire $2.5 million investment, before any other party took money, as well as a percentage of the profits: "don't forget the way it's structured . . . with them [Lottery Victim 2] getting a percentage of distributions kind of thing, at the end, after the 2.5, you know they [Lottery Victim 2] haven't said it, but, you know they're—they have the right to ask for an accounting." In other words, Kurland, who was supposed to be protecting Lottery Victim 2's interests, openly expressed his hope that his client would not ask for "accounting" from the supposedly independent entity in which Kurland persuaded him/her to invest.

In early July 2020, the co-conspirators expressed that they were counting on Chierchio to repay some of the $2.5 million, since after Lottery Victim 2 made the $2.5 million investment in Azimut, Chierchio had received over half of that sum. When Kurland asked, "What about the rest of the 2.5? I'm nervous about that," Smookler responded that the money would be "coming from Chris [i.e., Chierchio]." Later that month, Kurland asked in another call with Smookler, "Where did that money go? Did he lose that million four? Like where did it go?" Smookler responded, "I don't know, I guess he said he was buying shit." Later that month, Russo and Smookler discussed needing to "push" Chierchio to pay something towards the $2.5 million principal, to, as Russo put it, "knock off a chunk so you feel a little better about it." But Chierchio refused to transfer any money, even though bank records show he was, at the same time, freely spending on items such as four private jet flights that cost approximately $90,000. As noted below, Chierchio never had any intention to repay the Lottery Victims. But, on June 29, 2020, in an effort to placate Russo and Smookler, Chierchio sent $1 million to an entity they controlled called Sirenusa G LLC ("Sirenusa").

On July 15, 2020, having failed to return any of Lottery Victim 2's money, Smookler and Russo again debated whether it would help thwart the ongoing FBI investigation if they paid Lottery Victim 2 something towards the $2.5 million principal. Russo thought sending anything short of $2.5 million would not "show any sign of good faith or anything . . . Cause they [i.e., the FBI] are gonna look and see, ok, well, look at this, look at that. And they'll look at the bank records. No way. They'll see people on jets, this that. And if you think they care that you paid back 30% of something while flying on jets, and this and that, they'll make it into this big thing." Smookler disagreed: "I mean this is $2.5 million bucks, we have the ability to pay them back, we should pay them back and get it off of our plate."

11

But despite the ability to pay Lottery Victim 2 the entire principal (to say nothing of his promised profits on his investment), the co-conspirators decided to only pay him a fraction. On a recorded call, Smookler directed the Assistant to send $250,000 to "Jay's Healthy Rainbow people" from their Azimut account. In a follow-up call, Kurland confirmed that Smookler and Russo sent the "250 . . . wire . . . to my guys," and then asked that Chiercho send a bit more because, he explained, even if they could wire just $100,000, an amount that would be "insulting" given how much the co-conspirators owed Lottery Victim 2, "anything will help" to appease Lottery Victim 2 as the FBI continued to interview him/her.[14]

When the FBI contacted Lottery Victim 2 again, on July 20, 2020, the co-conspirators regrouped. Kurland updated the co-conspirators on the conversation that Lottery Victim 2 had with the FBI, telling Smookler that Lottery Victim 2 reported more money was coming to him/her. Kurland said his client drew comfort from knowing "they [i.e., the people with whom Lottery Victim 2 believed he/she contracted for the PPE deal] are not taking anything until, you know, my 2.5 is paid back." Smookler, knowing the co-conspirators had twice siphoned off the money without fully repaying the victim, responded, "Mmmhmm." Kurland noted that since the FBI had focused on this $2.5 million, "I would just, if you guys took anything, I would implore you [to return it] for your own good." Smookler responded, "Yep."

The following day, Kurland again asked his co-conspirators to put back the money they had taken from Lottery Victim 2, just as he had when the FBI interviewed Lottery Victim 2: "[T]he NYPD shit . . . [,] you got to put that back in here, you're crazy not to." Referring to the contract they had signed with Lottery Victim 2, Kurland noted to Smookler and Russo: "[Y]ou got to live up to the docs, I mean that's what you signed for." He explained how the FBI would review the bank records and see where Lottery Victim 2's money had gone, and that the tens of thousands of dollars they stole from this particular transaction—a paltry sum for them—was not worth it: "[T]hey're gonna follow the trail . . . . You're absolutely fucking nuts not to give every single dollar of that to [Lottery Victim 2]. Crazy, like that's what you're gonna go down for? That?" Russo responded simply that he was "not going down for anything." Kurland also referred to CC-1, who signed the agreement with Lottery Victim 2 on behalf of his company and whose daughter received some of the money: "He's going to go to jail over this, that's what he wants to do?"

But instead of returning the money, that same day, Russo walked the Assistant through the past transactions, directing her to make the theft from Lottery Victim 2 appear as legitimate business transactions. During the course of that recorded conversation, the Assistant asked how they could possibly justify the thousands of dollars that had gone to CC-1 daughter's account: "What do you want me to do about [the daughter of CC-1], what do you want—do you want me to say the purpose for her?" Russo settled on labeling that transfer as a "commission pay out." The Assistant asked Russo if he was sure he was "okay with me putting commission?"; Russo confirmed that he was. As for the daughter's occupation, Russo said, "I don't know, put manager, put manager." And when the Assistant asked how to label the $100,000 return of funds (i.e., the kickback that Kurland returned after Lottery Victim 2 was

---

[14]    Lottery Victim 2 has still not been fully repaid for the principal, though he/she may have recently received some additional payments.

interviewed by the FBI), Russo explained that Kurland "deemed [it] as a mistake and it was ah, it was sent back."

Even as late as July 24, 2020, after the co-conspirators had siphoned off hundreds of thousands of dollars from Lottery Victim 2, Kurland continued to lie to his client. He recounted to Smookler that in his earlier conversation with Lottery Victim 2, he told Lottery Victim 2 "every money that is coming in is going back to repayment," adding that Lottery Victim 2 "doesn't think anyone is defrauding [him/her]—which you're not, you know."

3.    Lottery Victim 3—"South Carolina"

The co-conspirators' largest and most egregious fraud was perpetrated against Lottery Victim 3, the winner of a $1.5 billion lottery, and the client whom Kurland touted most in marketing his practice. Kurland and his firm charged Lottery Victim 3 an initial $200,000 payment, and $50,000 monthly fees thereafter. As with the other Lottery Victims, however, Lottery Victim 3 did not know that Kurland was siphoning off additional money from his/her winnings. Like Lottery Victim 2, Lottery Victim 3 told Kurland that he/she was only interested in conservative investments, and understood that Kurland's recommendations were in line with that preference. As with the other Lottery Victims, Kurland persuaded Lottery Victim 3 to invest in seemingly independent entities that were, in reality, connected to the defendants. In total, Kurland persuaded Lottery Victim 3 to invest over $60 million in various entities that are tied to the co-conspirators, and Kurland transferred an additional $19.5 million from an account held by Lottery Victim 3 without his/her knowledge, much less authorization. The co-conspirators have lost more than $70 million of Lottery Victim 3's money.[15]

a)    March 6, 2019 Transfers to JBMML ($20 Million) and Cheddar Capital ($10 Million) (Counts Eleven and Twelve)

Following Kurland's advice, on March 6, 2019, Lottery Victim 3 invested $20 million in JBMML and $10 million in Cheddar Capital. Shortly after the $20 million transfer to the JBMML account, JBMML sent, among other wires, $50,000 to American Express, $2,100.50 to Porsche, and a kickback of $200,000 to Kurland. The same day that Kurland collected his kickback, another entity controlled by Smookler and Russo, Unified Commercial Painters, received $1.5 million from JBMML, which in turn sent (after filtering through out other entities) $210,000 to Smookler's personal account. Within a couple of weeks, JBMML also paid thousands of dollars to BMW and the Muttontown Country Club. In the ensuing days, with the money taking its usual route through the defendants' entities, Smookler and Russo spent tens of thousands of dollars on landscaping, another country club called the Mill River Club, and their vehicles. All in all, the co-conspirators took over $1 million from Lottery Victim 3's $20 million JBMML "investment."

Similarly, the same day that Cheddar Capital took the $10 million infusion, Kurland received a $100,000 kickback—resulting in a cumulative $300,000 payday for Kurland

---

[15]    As noted below, the government has, simultaneously with the defendants' arrests, frozen certain accounts and assets connected to the fraud.

just from this one victim, from one day of "investments."  In the coming days, Kurland "cleaned" this money by transferring it to his personal account and splurging on purchases at Saks, Gucci and Old Westbury Golf and Country Club, among other places.

> b) April 12, 2019 $12.6 Million Transfer to JBMML (Counts Two and Thirteen)

On April 12, 2019, Kurland persuaded Lottery Victim 3 to invest $12.6 million with what he described as a broker and wholesaler of diamonds; again, this appears to have been a reference to Altieri's business.  In an email, Kurland promised Lottery Victim 3 that the investment would "earn $2,000,000 profit."  Kurland timed the transfer to coincide with Lottery Victim 1's transfer of $5 million into the same JBMML account.  As detailed above, the co-conspirators pilfered the funds from both Lottery Victims in the days after, sending hundreds of thousands of dollars to personal accounts, to make car payments for luxury vehicles and for other extravagant expenses.  Smookler and Russo also used the stolen funds to buy themselves a yacht, funneling money from JBMML through other accounts before paying the $451,461 bill for the yacht from Azimut, the "boat management company."  See supra n. 13.

Evidence shows that Kurland, Russo and Smookler learned Altieri was running a Ponzi scheme using his business long before he was arrested.  For instance, in January 2020, according to documents available in Altieri's bankruptcy proceeding, JBMML secured a confession of judgment from Altieri, showing that the defendants were on notice even then about his insolvency.  In March 2020, Russo told Altieri on a recorded call that his "Ponzi scam basically is exhausted, that's what it is.  When a Ponzi scam is exhausted that means you cannot raise money any longer."  And in July 2020, Kurland and Smookler discussed Altieri's business on a recorded call; Kurland estimated that two-thirds of the Lottery Victims' money that had been sent to Altieri had been lost, and that for some of his other clients (who he had also steered towards investments with Altieri), all of their money, according to Kurland, was gone.

Despite knowing this information, Kurland continued to reassure Lottery Victims 1 and 3 through July 2020 that more money was on the way from their investments in that business.  In fact, Kurland told Lottery Victim 3 in July 2020—the same month as his statements to Smookler on the recorded call that two-thirds of the Lottery Victims' funds invested in Altieri's business were gone—that his/her money was safe and accruing an additional $100,000 per month.

c)      April 13, 2020 and April 23, 2020 $19.5 Million Transfers to CC-1
Lawyer's Account and to Azimut (Count Six)

Kurland persuaded Lottery Victim 3 to invest, on April 13, 2020, $19.5 million in
a deal that he represented would purportedly help the state of California obtain PPE.  Lottery
Victim 3 agreed based on the understanding that all of his/her profit on the investment—which
Kurland stated would be $300,000 per month— would go to charity, and the broker on the deal
would match this donation and send an additional $300,000 to charity.  That broker was
apparently the Genovese soldier, Chierchio.

The co-conspirators were not satisfied, however, with simply getting Lottery
Victim 3's $19.5 million investment.  On April 23, 2020, Kurland—who had been given access
to Lottery Victim 3's accounts—simply took another $19.5 million from Lottery Victim 3,
without telling Lottery Victim 3 or getting his/her authorization, and transferred it to Azimut.
Approximately $15.5 million of that money was transferred to Chierchio (at Chrch Group) on the
same day; Chierchio, in turn, in addition to spending some of the money on PPE, distributed the
funds among other entities and individuals, and cashed out almost $900,000 at a check-cashing
business in Staten Island.  He also spent tens of thousands of dollars on, among other things,
private jets, jewelry and yacht club fees.  The rest of the stolen $19.5 million, about $4 million,
was divided evenly between CC-1's daughter and Russo's and Smookler's Unified Commercial
Painters—a first stop on the way to other entities and individuals.  In an ironic twist, Russo and
Smookler even used the stolen money they received from Lottery Victim 3 to pay their
respective attorneys, hired to defend them in an investigation into the fraud related to the Lottery
Victims.

The PPE deal into which Lottery Victim 3 invested almost $40 million—half of
which investment he/she did not know about or authorize—did not turn a profit.  In fact, Lottery
Victim 3 has not received any money back from the two $19.5 million transfers.  But records
show that on June 10, 2020, California paid a total of almost $7.36 million for PPE into an
attorney escrow account, and Chierchio's Chrch Group subsequently received $7.25 million of
that money.  Chierchio did not donate any of it to charity or pay back Lottery Victim 3, instead
spending freely on himself.  Then on June 29, 2020, he wired $1 million to Sirenusa, an entity
controlled by Russo and Smookler.[16]

---

[16]      The remaining money from this deal that is still in the Chrch Group account, as
well as funds in the co-conspirators' other accounts from this transaction and others, were frozen
pursuant to seizure warrants executed earlier today.  The government also placed liens on three
houses.

The co-conspirators turned Lottery Victim 3's desire to help others upside down. Not only did no charity receive any money, at some point, the co-conspirators hired a major law firm to threaten California with litigation over their PPE deal while the state was battling the pandemic. Kurland even wished the COVID-19 outbreak would grow worse in Florida to improve business prospects for an alternate deal, with another state. As the number of cases and deaths in Florida from COVID-19 continued to rise in July 2020, Kurland opined on a call with Smookler that, "The worse, the worse it is the better." Smookler agreed: "True."

> d) May 29, 2019 $1 Million Transfer to Back in Black Stables, LLC
> (Count Four)

With Kurland's assistance, Lottery Victim 3 also bought five thoroughbred horses and let Kurland (himself a horse aficionado) co-own them. On May 29, 2019, Lottery Victim 3 transferred $1 million for this purpose into a new entity that unbeknownst to him/her was created by Russo and Smookler, Back in Black Stables, LLC ("Back in Black"). Although Kurland did not invest any of his own money in the venture, Lottery Victim 3 agreed to list him as a 10% owner of the horses, so that Kurland could feel like he was part of the business. But that act of kindness was not enough for Kurland. Unbeknownst to Lottery Victim 3, Kurland's co-conspirators had full access to the Back in Black bank account. Subsequently, JBMML received $400,000 from Back in Black, and the co-conspirators paid tens of thousands of dollars to American Express. As with their other Ponzi-like scheme noted above, the co-conspirators sent some of the $400,000 back to other accounts associated with Lottery Victim 3, money that Kurland led him/her to believe constituted interest payments from other investments.

A week after the FBI interviewed Lottery Victim 3 Kurland began trying to cover up his co-conspirators' involvement in Back in Black. On a June 30, 2020 call, Russo informed Smookler that, "You know Jay [Kurland] made us sell the horses yesterday?" Further underscoring the illicit nature of the transaction, Russo stated that he completed the transfer by signing "three bills of sale to [Kurland] directly for the consideration of $1." When Smookler asked, "So we don't own horses anymore?" Russo corrected him, referring to the entity Lottery Victim 3 thought was used solely for the horses, "Well we no longer—Back in Black no longer owns."

By end of July 2020, Back in Black had virtually no money left, and with the FBI investigation becoming more overt, Kurland grew increasingly uncomfortable. The Assistant notified Russo that Kurland was inquiring why Back in Black (which had been created over a year earlier) only had $8,000 left in its account. Russo's response confirmed that this account— which Lottery Victim 3 believed was used for his/her horse business—was just another entity from which co-conspirators paid themselves and used in their money laundering scheme. Russo told the Assistant to remind Kurland that JBMML had taken out $150,000 to "sen[d] to JBMML and put into one of the deals." Russo even offered a lie Kurland could take to Lottery Victim 3: he "could say that the bills are paid." When Kurland expressed displeasure about the low amount in the Back in Black account, Russo directed the Assistant to tell him that JBMML would repay some of the money.

e)      The Defendants' Conversations About Lottery Victim 3

The fraud against Lottery Victim 3 was so extensive and so blatant that even Smookler predicted that with the FBI having obtained records from Lottery Victim 3 (the "big fish" as he called him/her), "jail" was all but certain for the defendants.  "[T]here is no way we can get this money back," he told Russo.  In another intercepted call, Smookler stated that when the FBI obtains records and sees "the Chrch Group [i.e., the Chierchio entity that received most of the stolen money] and all this, it's not going to look wonderful."

But while Smookler and Russo worried about their exposure stemming from the fraud on Lottery Victim 3, Chierchio had few concerns.  In a July 2020 call, Smookler pleaded with Chierchio, "we have to fucking give that money back to these people," explaining that the "Feds [have] all the documents pertaining to our transactions" and reminding Chierchio that Lottery Victim 3 just "wanted to donate [the money from the PPE deal] to charity."  Smookler stated if they could pay back the money and make "the fucking donations," then when the "Feds circle back, the people say, 'Yeah, I got paid back,' and they are like, 'Aww fuck, there is no case here.'"  Chierchio replied "[t]hat makes no sense at all.  Then we all lose."  He also rejected Smookler's concerns about the FBI:

| | | |
|---|---|---|
| CHIERCHIO: | It doesn't matter.  This is not an FBI thing. |
| SMOOKLER: | It is now. |
| CHIERCHIO: | OK. So bring the FBI.  Who cares?  They've been up my ass my whole life.  It doesn't matter.  I laugh at them.  Ok?  I laugh at them. |
| SMOOKLER: | All right.  Maybe you have thicker skin.  I hear the FBI--what the--I don't deal with the FBI. |
| CHIERCHIO: | You're giving them too much credit. |

Later in the conversation, Smookler asked Chierchio, "You don't think we are going to get arrested? . . . For taking money from an investor and not paying them back and having this whole cast of characters involved?"  Chierchio, whose phone had been wiretapped before, chastised Smookler for speaking openly: "You're talking stupid, bro."  Chierchio stated that he did not believe they would be arrested and that Kurland would just have to "dance around it and tell his clients it's going to take a little bit more time" to get their money back.  Chierchio also criticized Smookler for drawing attention to themselves by suing the state of California.

Chierchio showed no remorse for stealing money from Lottery Victim 3, as reflected on a May 2020 recorded call:

| | |
|---|---|
| CHIERCHIO: | Remember, you and I did not hit the lotto for 1.5 billion. |

RUSSO:            Know this, they're the least persons I'm worried about.  I'm worried about your family and my family. . . .

Other examples of incriminating conversations regarding Lottery Victim 3 abound.  For instance, on a May 2020 conference call with Russo and Kurland, Smookler asked Kurland what would happen if the FBI "looked into JBMML, they see South Carolina [Lottery Victim 3] put up 35 million [dollars], there's still debts outstanding, and they go to them and they say, they, we want you to work with us, against Jay, would they?"  Kurland exclaimed, "No!"  Smookler pressed on whether Kurland was confident that Lottery Victim 3 would not cooperate with the authorities, "Would they be like, look, I'm living my life, I don't wanna deal with this shit, leave me alone?"  Kurland responded in the affirmative, "That's basically what they would say."

4.      The Defendants Use Lottery Victims' Money to Fund Lavish Lifestyles

The co-conspirators used the money they had taken from the Lottery Victims to live lavishly.  As noted above, Kurland spent some of the money on luxury vehicles, including a $113,000[17] Porsche and exorbitant shopping sprees.  Smookler and Russo, who appear not to have any employment other than creating entities, moving money among them, and dabbling in "investments," also enjoyed expensive cars:  Russo's collection includes a $132,000 Mercedes Benz G550 SUV and a $52,000 Land Rover Discovery; Smookler has had a number of vehicles recently, including a $146,000 Mercedes Benz S560 convertible, a $128,000 Range Rover, and a $194,000 Bentley Bentayaga.  Smookler, Russo and Kurland all have vanity plates on their cars, with Kurland proudly displaying the name of his entity, GK3, through which he siphoned off his clients' winnings.  Russo and Smookler also had two yachts and Smookler, like Chierchio, has also traveled on private jets.

Chierchio purports to be employed running a plumbing business, but appears to have spent most of his time on fraud-related activity.  As he told one of his assistants on a June 2020 call, "Just shut the fuck up and get us out of this plumbing business already."  After Chierchio took millions of dollars from Lottery Victim 2 and 3 and sent almost $1 million of it to cash out at a Staten Island check-cashing location, he spent freely on yacht club fees, private flights and jewelry.  Chierchio has had a chauffeur who drives him in a $73,000 Cadillac Escalade.  He lives in a luxury building in Manhattan, which is equipped with multiple swimming pools, a staff of attaches for personal errands, a fitness center and a climbing wall.  Chierchio's apartment was last listed for rent at over $11,000 per month.

The intercepted conversations provided just a sample of these lifestyles, effectively supported by the Lottery Victims' winnings.  Smookler and Russo poked fun at Kurland's apparent need not just to buy expensive cars with his clients' money but to "wrap" them, a procedure that can cost well over $10,000.  As Russo expressed to Smookler:  "You know if this ever goes to court, they won't even get mad at the cars, you know what they'll get

---

[17]      These figures represent approximate estimated retail prices of the new vehicles. All the cars listed above are 2018 or newer.

mad it? They'll get mad, hey Jay, you wrapped the car? It wasn't enough for you to get brand new cars? You were wrapping cars? Like they'll go over details. It's crazy. He was drinking the juice just like everybody." Speaking with Chierchio, Smookler noted that Kurland was likely worth $15 to $20 million dollars, adding that when he "buys his race horses, he doesn't claim horses for like 25 grand at Aqueduct, he buys like million dollar yearlings out of Secretariat, he trying to win the derby."

The loss and theft of tens of millions of dollars from the Lottery Victims did not affect the co-conspirators' spending habits. In June 2020—with much of the Lottery Victims' money gone—Russo nonchalantly approved the Assistant's request to wire $27,000 to Smookler from JBMML for a private jet to fly him back to New York after he spent months away in Miami and St. John, where Smookler and Russo own homes together. Notably, as recounted above, JBMML is one of the entities into which the Lottery Victims wired money and which suffered significant losses as a result of Altieri's Ponzi scheme; it is also the entity from which the co-conspirators drew for Kurland's kickbacks and various personal expenses. Chierchio continued to fly privately as well, spending $62,000 in July alone (to go along with $27,900 he spent on two flights in June). In one telling moment of reflection on the money the co-conspirators lost and the fact they were subjects of various investigations, Russo told Kurland that he was ready to scale down his lifestyle, "You know, I don't need the helicopters, you know, maybe I take a private jet once a year to Florida with the family."

5.    Attempts to Cover Up the Fraud and Liquidate Assets

As already noted, the co-conspirators repeatedly discussed how to cover their tracks and impede any investigation into their conduct. On other calls, they also discussed manipulating evidence. For example, in June 2020, just as the FBI was beginning to interview the Lottery Victims, Smookler and Russo discussed destroying hard drives, before concluding that it was "almost pointless":

| | |
|---|---|
| SMOOKLER: | Do you think that we should take all the hard drives out of this office and destroy them? |
| RUSSO: | What's on the hard drives? |
| SMOOKLER: | Hard drive is like every piece of data (UI), cause when they subpoena us they're going to ask for that. |
| RUSSO: | Yeah, I'm not against it. |
| SMOOKLER: | I'm saying just remove them, you know, just take the computers out so there are no computers here. |
| RUSSO: | Yep, well you would have to replace them because you can't make it look obvious. |

19

SMOOKLER:            Yeah, we'll take like, you know--

RUSSO:               Just buy three new computers, that's it.

On later calls, they appear to have concluded that it was better not to destroy their hard drives.

      In addition, because they felt the FBI was on their heels, the co-conspirators discussed the urgent need to pay back the money they had taken from the Lottery Victims. This view—that Kurland's clients need to be repaid so that the FBI would stop its investigation—was a common theme throughout the interception period. Smookler repeated it in a June 2020 call with Kurland, saying, "At least if they [Lottery Victim 2] can say they got back their 2.5 [million dollars], it takes one less, you know, the Feds aren't gonna be, like, up our ass." The sentiment was echoed by Russo in a May 2020 call with Chierchio in which Russo stated, "I care just about making sure the next time these people [the Lottery Victims] respond back to the Feds, they respond back that we repaid them and they're very happy." In late June 2020, when Russo and Smookler concluded that the investigators were closing in on Kurland, they agreed that it would be "pointless" to pay the Lottery Victims anything if Kurland was arrested.

      When it was clear the FBI was interviewing the Lottery Victims, and with no prospect or desire to fully repay them, the co-conspirators planned how to make excuses about the theft and mismanagement of the Lottery Victims' funds. Notably, Kurland, who the Lottery Victims believed was not affiliated with any of the investment entities, was heavily involved in drafting a statement from those entities, which Kurland planned to pass along to the Lottery Victims. On a June 22, 2020 call with Russo, Kurland had the following suggestions about how Kurland needed the entities' lawyer ("Attorney 2"),[18] to be "creative" in his letter to Kurland's own clients:

KURLAND:             This is what I called you about, I need from
                     [Attorney 2], well, he--he has to be like creative
                     about it, but I think a letter from JBMML to the
                     investors, letting them know, say like, "I'm the
                     attorney for JBMML," um, you know, something
                     about corona, and thank you for being so patient,
                     and we're going to work very hard (UI) something
                     in the future, you know, um—

RUSSO:               We have not abandoned ship, we are still trying—

KURLAND:             My clients, yea, my clients are doing everything
                     they can to get this back, "I appreciate your
                     patience, once some of these avenues come back,"
                     because I told them (UI), I said there was a big

---

[18]    Russo and Smookler have relied on Attorney 2 for representation in the Altieri bankruptcy proceeding and in connection with certain criminal actions, including providing false information to a bank.

receivable that they're hoping to get back, but that could be in court (UI) I said there's a uh another tranche that (UI) hedge fund came in and now we're fighting with them to get money and we just don't have enough money coming in, but nobody is going to abandon ship, like I told them the truth--

\* \* \*

KURLAND:      I would do, a you know, Healthy Rainbow and the (UI) it doesn't have to be the same kind of letter, but I would do it to them, and then for the other ones, you know, I would say also with the jewelry stuff, you know, just make it like personal, like, you know, we understand (UI) but we're going to make it up to you and we'll come up with a plan, you know something like that.

Weeks later, in mid-July, Kurland discussed this letter again, asking the co-conspirators to put a positive spin on the situation, despite the loss of so much of the Lottery Victims' money:

KURLAND:      . . . You don't need so much detail, like, they don't need every little index number, for this and that, you know, I would think it's more listen this is what happened, this guy was arrested it was a Ponzi scheme, it was a big chunk, you know make it a little more positive, we're gonna do the best we can, you know, this, there's gonna be a recuperation, in the meantime we're probably

RUSSO:      I said, I said the same exact thing, he doesn't have to harp on the negatives, this happened, we have good intentions, we have plans, and, and, keep it light and airy and positive.

Although Russo and Smookler were unwilling to fully repay the Lottery Victims, they openly discussed their need to stash money for themselves if the FBI investigation progressed further, and to complicate any tracing analysis that the FBI would perform.  On June 24, 2020, Smookler stated that, "We could start liquidating shit but then where do we, where do we put it?"  Russo responded, "It's better to liquidate it and move it around, so, trust me," a statement with which Smookler agreed.  Russo added, "Set up a new company, have the wives set up a company and just put the assets in there, do something, it's much better to do anything else."  Also in late June call, Smookler and Russo agreed that, "We are doing nice liquidation, it's beautiful, I'm not worried," concluding that they were progressing towards their goal of "accumulating cash now."

There are numerous additional examples of these types of communications, including the following: (1) Russo explained to Smookler how to keep certain payments "under the layers" by using an American Express card, so that they do not "stick[] out" and "raise[] the flag"; (2) plans to "steer" money into accounts that were outside the "scope of [the] magnifying glass" of investigators; (3) plans to put money in a "clean" corporation (called Southbound), which they thought would not be looked at by the FBI; (4) a late June discussion about the need to transfer money "into our personal corps as soon as possible. Movement, movement, movement, movement."; (5) a discussion about selling a house in which they agreed that it is "sad to see that gem of a property go, but we need it to get traction, we needed to make it get lost in transactions."

C.    The Scheme by Defendants Smookler and Russo to Extort Altieri (Counts Eighteen through Twenty-One)

Separate from the charges related to the Lottery Victims, Smookler and Russo have also been indicted for extortionate extension and collection of credit (and conspiracy to commit those crimes), which they also carried out earlier this year.[19] In recorded conversations, Smookler and Russo threatened Altieri after extending him a "street loan" of approximately $250,000 under usurious terms. This loan was separate from the investments the co-conspirators made in Altieri's Ponzi scheme with the Lottery Victims' money. As Smookler explained in one call to Altieri, the repayment of the "$100 million you owe" (i.e., the millions of dollars of the Lottery Victims' money, plus the profit the co-conspirators apparently thought they should receive) could be delayed and put on a "shelf," but the "couple of hundred grand that you borrowed, you have to pay that back." The threats were violent and explicit: among other things, Smookler and Russo vowed to shoot and kill Altieri and his family. As noted below, during the execution of search warrants earlier today, the arrest teams recovered shotguns from Russo's and Smookler's residences, including the tactical shotgun Russo can be heard describing in detail to Altieri when he threatened him.

On the recorded calls, Smookler and Russo told Altieri that they had borrowed $250,000 from "animals" to extend Altieri the loan. Intercepted conversations between Russo and Smookler made clear that the originator of the loan expected $325,000 back. But the $325,000 sum did not include Smookler's and Russo's "fees." In a call between Altieri and Smookler, the two men discussed $115,000 Altieri had already repaid on the loan, but agreed Altieri still owed about $300,000. This meant that Smookler and Russo had extended Altieri a loan of $250,000 and expected to be repaid about $415,000. Smookler said the originators of the loan were the sort who had to repaid in a timely manner because they were "really crazy people," and that Altieri had to make payments, even if it meant he had to "rob a bank, or just do

---

[19]    There are recorded calls that indicate Kurland was aware that Russo and Smookler tried to forcefully collect their debt from Altieri. For example, in a July 2020 call, Smookler told Kurland that Altieri "could say that they threatened me for the money, ok, we did, the guy owed us $50 million, of course we threatened him." Later in that call, Kurland warned Smookler that the FBI has probably "seen every text you have ever sent to [Altieri]," which Smookler stated was ok because all he was trying to do was "collect our money."

whatever you have to do." As Smookler put it, the people Altieri had to pay were "not lawyers, they're not businessmen, they're just animals."

        To collect the debt on this usurious loan, Smookler and Russo threatened Altieri and his family. For instance, in March 2020, Russo told Altieri that he had just purchased a "few tactical shotguns" with "lasers . . . not that you need a laser on a shotgun." Russo made these statements to reinforce Smookler's threat that if Altieri did not pay at least $10,000 within four to five days, "it's just going to be unbelievable," offering Russo a "lot of ammunition" if he needed it for the shotguns.

        Russo reminded Altieri about his father's death in prison while he was serving a sentence for murder.[20] Russo even compared himself to the mob-affiliated character in "Uncut Gems," a movie that ends with the indebted diamond dealer shot dead. In another call, in which Smookler was also on the line, Russo told Altieri, "They're gonna pop your head off in front of your fucking kids. This guy has no clue what he's getting into." Smookler, for his part, told Altieri that "You can't take our money and tell us you are doing one thing and then do another. You can't do that . . . . You watch my man, you fucked me, now watch what I am gonna do to you, I'm coming brother. Full fucking steam ahead." Smookler also told Altieri, "I hope your lawyer dies in a car accident tonight. You understand? I hope your lawyer dies in a car accident. Him and his whole fucking family."

        Smookler also informed Altieri that people "in the street" were going to inflict harm upon Altieri for the "suffering" he caused Smookler:

> I don't give a fuck about a virus I don't care about people dying. I don't care. I want my money. And you can't pay it so now what happens in the street when you can't pay? They just crush you out of just to say okay we feel a little bit better now and this guy is in a fucking box. Because the money's gone. So who cares, that's been done. Now it's just the internal satisfaction of you suffering the way you made us suffer. No more or no less.

        The co-conspirators threatened Altieri's family as well. For example, on March 31, 2020, Smookler told Altieri that his wife would "pay for your mistakes." When Altieri pleaded to leave his wife out of it, noting that she just had a tragic passing in her family, Smookler responded, "I don't give a fuck. I don't care," later adding that, "You're gonna get fucking tortured." In the same call, Smookler told Altieri that, "[W]e are gonna find your wife today. That's happening." Smookler and Russo knew that Altieri had gotten hit in the face with a wrench by one of his other creditors, and promised to do the same to him.

---

        [20]    Russo's father was Joseph "JoJo" Russo, a Colombo crime family captain who died in federal prison serving a life sentence for racketeering and murder offenses. See 92-CR-351 (E.D.N.Y.).

The threats continued through May 2020 even though, as the calls made clear, Altieri had already paid $115,000 of the $250,000 loan.[21]  In a May 5, 2020 call, Smookler told Altieri that he was not "going to go away" and warned Altieri that he was "not playing the game with the banks and the fucking lawyers and shit."  Altieri, Smookler said, "got big problems coming down the pipe," and Smookler would "turn ungentlemanly."  He promised to "fuck up" Altieri's "family," warning him, "You can call the police. You can call the FBI."  The following day, Russo told Altieri that the threat to his family was imminent, and that if he loved his daughter, son and wife, then Altieri should go to the police and "get them out of that house"— but pay Russo back "ASAP."  Russo claimed that "they" were coming for Altieri's family, and that "if this is being recorded, I don't want any part of this."  When Altieri pressed on what would happen to his family, Russo said, "They're going to make you watch as they rip your son's teeth out of his mouth, watch, they're going to do worse things to your wife."  When Altieri confronted Smookler about this threat, Smookler asked, "are you going down in a blaze of glory?"

## II.    Legal Standard

The Bail Reform Act ("BRA") directs courts to order a defendant detained pending trial if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).   While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).  The government is entitled to "proceed by proffer" in arguing for a defendant's detention.  See Ferranti, 66 F.3d at 542.

In reviewing bail determination, the Second Circuit has repeatedly focused on the safety of witnesses.  See, e.g., United States v. LaFontaine, 210 F.3d 125, 134 (2d Cir. 2000) (affirming finding of dangerousness based on witness tampering in a white collar case with no allegations of violence or threats aimed at witnesses); United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (reversing district court's rejection of dangerousness because no specific witness had been identified as the object of potential influence or intimidation, because no "such . . . identification is required," where there was evidence that the defendant "threatened to harm any witnesses that might testify against them"); see also United States v. Gotti, 02-CR-743 (RCC), 2004 U.S. Dist. LEXIS 3308, at *12-13 (S.D.N.Y. Mar. 2, 2004) ("[A] threat to witnesses in this case and to the integrity of the trial process weighs in favor of pretrial detention.  This threat is especially grave here because the Government proffers that Defendant knows the identity of many of the Government's witnesses."); United States v. Grisanti, No. 91-229A, 1992 WL 265932, at *7 (W.D.N.Y. Apr. 14, 1992) (finding the defendant too dangerous to be released because he lied to the court and because even if his physical movement can be restricted, contact with potential witnesses cannot be); United States v. Rivera, 09-CR-619 (SJF), 2010 U.S. Dist. LEXIS 39641, at *6-8 (E.D.N.Y. Apr. 21, 2010) (affirming Judge Orenstein's order of detention

---

[21]    During recorded meetings that the FBI was able to surveil, Russo continued to threaten Altieri, even as Altieri delivered $5,000.

in part because the defendant knew where the victims lived and the defendant was capable of attempting to intimidate witnesses).

III.    Discussion

There is overwhelming evidence against all four defendants—irrefutable proof based in large part on bank records and the defendants' own admissions on recorded calls. The strength of the evidence and prospect of significant prison terms make all of the defendants a flight risk, and the fact that they have significant means to do so means that any bond must include strict terms of supervision and be secured by property. Russo and Smookler also present a danger to the community, including to the witnesses in this case, and for that reason they should be detained.

A.    Weight of the Evidence

1.    Evidence of the Fraud Scheme

The Lottery Victims' statements and bank records are, standing alone, sufficient to convict all four defendants, because they show, among other things, that (1) Kurland persuaded the Lottery Victims to make the investments without disclosing his affiliation with the businesses or the kickbacks he would receive, (2) the defendants stole some of that money, and (3) the defendants mismanaged the rest of the money they did not steal, not only by failing to disclose the losses to the victims but, in some cases, funneling stolen funds back to the Lottery Victims and falsely claiming those funds constituted "interest payments" on the failed investments to further conceal the scheme. Indeed, as recounted above in detail, all four defendants pocketed money from the Lottery Victims almost immediately after the investments were made, and used them for personal expenses. In the case of Lottery Victim 3, the defendants simply stole almost $20 million. And when the co-conspirators received over $1.7 million from the NYPD and over $7 million from California, they still did not return those funds to the Lottery Victims as promised—though they later contemplated doing so for the sole purpose of stopping the FBI investigation.

As the quoted communications throughout this letter make clear, the intercepted conversations among the co-conspirators will provide damning and indisputable proof at trial. There are dozens of other examples, not previewed above, of similarly incriminating conversations. For example, on a May 2020 call, Russo reaffirmed the sentiment clearly shared by all the co-conspirators: "Nobody gives a fuck about a billionaire or hurting them or what not, but we have access to capital. . . . [W]e could pull hundreds of millions of dollars . . . ." In late July 2020, when Russo observed that the "funniest part" of their predicament was when another person "finds out that we lost $100 million," and "we only raised money from a lottery winner." Smookler and Russo have explicitly admitted to "scrap[ing] things off the top" from the Lottery Victims' investments. It would not look good, Smookler expressed in another call, when investigators "come to me saying, 'Look, you guys made all this money, you guys are buying high end cars, meanwhile, these people lost all this.' 'Yeah, we are living high on the hog when we are working.'"

In some calls, Smookler and Russo even predicted the charges they would face. Russo remarked in the end of June 2020, "I would say 100% wire fraud." Soon after the FBI began interviewing the Lottery Victims, Smookler anticipated that he and Russo were likely headed for jail. One conversation included the following exchange, in which Russo tried to convince Smookler (and perhaps himself) that they would be spared because they were just accepting money that Kurland was offering, as if the temptation of free money is a viable defense for fraud:

> SMOOKLER:     I feel like we're going to jail. Like, I believe that.
>
> RUSSO:        I don't believe that. I think Jay [Kurland], I think Jay should get a second lawyer on top of his first lawyer and start to put a team together because even when you speak to non-legal people they all say how immoral, doesn't understand it, and that alone will get something to stick.
>
> SMOOKLER;     Yeah.
>
> RUSSO:        And I feel like we have a true layer of separation, we really do. Show me one person, in our position, who wouldn't accept the monies coming in.
>
> SMOOKLER:     I know brother, I just feel like if they fucking get him, they're getting us.

Smookler concluded in the conversation that, "I'm fucking telling you, we are going to jail, I know it." When Russo expressed the hope that perhaps they would just be fined $1 million, Smookler responded, "I would sign up for that right now" because "we are in a little bit of a pickle." In other calls, Smookler expressed the expectation that they will be arrested "for taking money from an investor and not paying them back." Chierchio did not share this view. He thought the co-conspirators were giving the FBI "too much credit," and that Kurland should just continue "danc[ing] around for his clients" by giving them excuses about the delay in payments.

When not previewing bogus defenses or predicting their arrests, Russo and Smookler also discussed why the Lottery Victims—who have largely stayed anonymous—would not want to sue them. Russo observed in late May 2020 that, "Jay's guys [i.e., the Lottery Victims] can never sue us, never do anything because they are anonymous," to which Smookler responded, "I know." This exchange confirmed their knowledge that one of Kurland's selling points to the Lottery Victims was his assistance in keeping them anonymous, a fact which the co-conspirators now thought would protect them, as the Lottery Victims would likely not want to be named plaintiffs in civil lawsuits to recover their stolen funds.

In other calls, Russo and Smookler tried to convince themselves that they were not criminals, but in doing so only further revealed their crimes. As Russo put it in one call, "We may not be the cleanest bookkeepers, and we may uh have uh not run the tightest ship, but we

didn't do anything illegal." Smookler discussed their exposure with CC-1 in even more candid terms:

| | |
|---|---|
| CC-1: | Yeah, yeah. I guess that's the, uh, I guess the thought process is fuck Jason, fuck the billionaires, they're billionaires, fuck them, they  don't need the money. |
| SMOOKLER: | Yeah. But I don't think that the Feds will look at it like that. |
| CC-1: | I don't know, I don't know how it plays out. You think people care about lottery winners losing twenty— |
| SMOOKLER: | Yeah, yup.  I think they paint them as naive victims, they paint Jason as the mastermind lawyer, and they paint us as the behind the scenes guy. Yeah, I do. |
| CC-1: | Mmhmm. |
| SMOOKLER: | You got gangsters involved, you got famous lawyers involved, you got billionaires, you got the lottery, you got a case there. |
| CC-1: | Mmhmm. |

As worried as Smookler and Russo were about their own liability, they believed that Chierchio and Kurland were in even worse positions.  As to Chierchio, the two co-conspirators concluded in a June 2020 call that, unlike them, he simply "skimmed $4 million off the top" and as a result he was "more liable."  They repeated in another call that Chierchio "knows he can get in trouble for skimming off the top."

Smookler and Russo also discussed Kurland's exposure at length.  In a late May 2020 conversation, Smookler and Russo agreed that Kurland was the "greediest guy in the room," that he "closes all these deals" because it is "simple greed."  Russo concluded that "It's corruption at its finest . . . .  And he took it from clients he knows can't go after him.  He took it from anonymous clients, the Staten Island and the Rainbow will be a slight issue but South Carolina ain't never putting up a stink on nothing because Jay's exposure is probably really 12 to 15 million the most, that's it, not even."  Months later, Smookler and Russo agreed that Kurland is "fucked," with Russo explaining that "morality is against him," and that "[h]e did it to himself, he knows it. . . ."  In a call with CC-1, Smookler opined that Kurland "won't be happy until he's in jail.  He's gotta see the inside of a cell," a sentiment repeated in another call with CC-1, during which Smookler said that the most likely situation is that Kurland is "gonna end up on the front

of a newspaper with, you know, hung himself in his garage or something because I can't see how he gets out of this."

        Russo accurately stated the law when he observed that even repaying the Lottery Victims would not absolve Kurland because of the fraudulent pretenses under which Kurland extracted those investments: "Jay is in trouble, even if Jay gets all the money back it's still not gonna make the FCC [i.e., the SEC] and the feds go away you know that it's like if you robbed the bank and returned the money you still robbed the bank." The next day, Russo told Smookler that "the only thing he [Kurland] can do is put his hands in the air and plead guilty." Kurland also realized his exposure. On a late June 2020 call with Smookler, he agreed with Smookler that even if the Lottery Victims were not concerned with the co-conspirators' malfeasance, "it matters to the government. . . . The government's not going to just be like 'oh, okay. They don't care, so we don't care.'"

        Incredibly, an FBI investigation and the loss of his clients' money did little to dissuade Kurland from contemplating taking more money from his clients and sending it to the co-conspirators. For instance, on a May 2020 call, Smookler told Chierchio that if they returned at least some money to Kurland, "the spigot [i.e., the Lottery Victims] will open again, and again." In another call, Smookler told Russo that Kurland might still give them more money to invest, causing Russo to remark that, "He's always there, that's why I told you all's we got to do is show him a little green or give him a little positivity and he's ripe for the pickings too." In another call, even Smookler could not believe that Kurland was still willing to continue taking money from his clients:

        RUSSO:           And I spoke to Jay, he's going to get us to use a 2-5 again. I said, Jay, so don't worry.

        SMOOKLER:     He's gonna get us in jail! I love you. We're going  to go to jail! . . . I'd rather be a dead man. And--you know. I can't . This guy's going to get us put in jail. Unless he - dude, the Feds are all over us.

        Kurland echoed concerns about exposure, not only admitting in multiple intercepted conversations to making car payments with his clients' money, but also acknowledging, at times, that presenting investment opportunities to the Lottery Victims without disclosing his affiliation with those opportunities could result in his disbarment. For example, in late June, he noted to Smookler that, "The one thing I did tell my clients is, I am not a member of any these entities [involved in the PPE deals]." And in another call, in end of May, he reminded Smookler that they all took the Lottery Victims' money and spent it on personal expenses:

        SMOOKLER:     Right so what happens, like what like what's the worst thing that could happen?

        KURLAND:      The worst thing that could happen is they, they get the statements, they get all our— and then

>they just fricken, I don't know, I guess – it's, the
>worst is the worst.

SMOOKLER:     What—what—

KURLAND:     You know, the worst is that they say that um
money was raised and it was given to Greg
[Altieri].  That wasn't what everybody knew, I
had no idea that we took - you paid yourselves,
you bought cars, you used money for stuff.

The incriminating exchange continued later:

KURLAND:     They [the Lottery Victims] would all fire me,
for sure. And then they would hire an attorney.

SMOOKLER:     But that's like me being your stockbroker and
you saying—

KURLAND:     Yeah but I'm not a stockbroker. I'm not - this
is not what I'm supposed to be doing. I'm you
know - you know, I am telling you, there would
- I would - It would be a complete disaster.
And God knows what would happen to my
license, like it's a disaster. We gotta pay these
people back.

   2.    Evidence of the Extortion Scheme

As recounted above, Smookler's and Russo's extortionate threats were as explicit
and menacing as such threats get.  In the recorded communications, the co-conspirators narrate
how Altieri owes them $250,000 from a street loan, separating it from the Lottery Victims'
money.  They used extortionate means in an attempt to collect that loan.  Even without the
benefit of a presumption for the usurious rate—from which extortionate extension can be
inferred, see 18 U.S.C. § 892(c)—the government could meet its burden by simply playing the
recordings, though there is other evidence to demonstrate the co-conspirators' guilt.  For
example, the government will introduce evidence of FBI's surveillance of Altieri's payments, of
Smookler's and Russo's access to firearms with which they threatened Altieri and his family,
and of intercepted communications in which Smookler and Russo further describe the terms of
the loan.  The government will also rely on intercepted communications where, for example,
Smookler admitted that Altieri "could say they [i.e., Smookler and Russo] threatened me for the
money, okay, we did."

   B.    All Four Defendants Pose a Significant Flight Risk

There are at least three reasons why the Court should detain the defendants,
particularly Smookler, based on flight risk alone.

First, all four defendants face significant terms of incarceration for offenses that are charged based on overwhelming proof.  See, e.g., United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order, citing United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007)) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee.").  Specifically, they face maximum sentences of 20 years on each count charged in the fraud scheme, and Russo and Smookler face additional maximum sentences of 20 years on each count charged in the extortion scheme, which could result in a sentence of up to 40 years if punishment for their participation in the two schemes is run consecutively.  In addition, a preliminary calculation of the Guidelines for the wire fraud charges alone, based solely on a loss amount of more than $80 million, would result in the defendants facing an adjusted offense level of 31.  See U.S.S.G. §§ 2B1.1(a)(2), 2B1.1(b)(1)(L).[22]  That, in turn, produces a Guidelines range of 108 to 135 months, assuming all of the defendants are in Criminal History Category I.  But all four defendants' Guidelines ranges will likely ultimately be much higher, as the defendants currently face multiple serious charges, and the government may supersede with additional charges.

Second, even without knowing their significant exposure, both Russo and Smookler, as noted above, openly discussed obstructing justice by destroying evidence and liquidating assets.  With the prospect of federal prison, their desire to tamper with evidence may become even more irresistible.

Third, Smookler, Russo and Chierchio have had access either to private jets or boats, or both, which, coupled with their incentives to abscond, make them significant flight risks.  See United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019) (affirming detention based on flight risk alone, based in large part on the white-collar charges against him and the incentive and means to flee).  Even more concerning, the three defendants can fly privately on a moments' notice without triggering alerts, and Smookler and Russo have also had access to boats.

Smookler poses the greatest flight risk of the four defendants.  He has had the most extensive travel history in the last two years, having traveled over a dozen times to and from St. Thomas and the Virgin Islands—places from which permanent flight is much easier.  He has also openly discussed traveling abroad in the future.  In a late-July 2020 call, for example, after telling a business associate that he was better off putting money under a mattress than in one of Smookler's entities, Smookler asked, "Where are we going?  Switzerland?"  And he has repeatedly stated in calls that he would do anything to avoid prison, proclaiming, for instance, "I'd rather be a dead man."

In short, all the defendants present significant flight risks, and Smookler's statements and travel history place him in the category of defendants who are the most likely to abscond.  This Court is well aware that the risk of flight is real, even for defendants of lesser means and fewer incentives than these defendants.  See, e.g., United States v. Viomari Lopez,

---

[22]     Additional enhancements for the wire fraud charges are likely to apply as well. For example, the special skill/abuse of trust enhancement will apply to Kurland, who used his role as the Lottery Victims' attorney to defraud them.  See U.S.S.G. § 3B1.3.

14-CR-626 (LB) (BMC) (Judge Cogan issuing bench warrant for defendant shortly after she was released on bond on the government's consent, even though she was facing only months in prison).

       C.      <u>Smookler and Russo Present a Danger to the Community</u>

       Russo and Smookler present a danger to the community.[23]  As with Smookler's enhanced risk of flight, Russo presents the greater danger.

       **First**, they have threatened to shoot and kill Altieri and his family.  Among other threats—some of which are quoted above—they claimed that Altieri would be shot in front of his family, that his wife was in danger, and that his children would be tortured.  Smookler and Russo both have access to firearms, with Russo possessing "tactical" weapons of which he appears particularly proud as reflected even in call not related to Altieri.  He told one person in June 2020, for example, "I have a tactical shotgun, if anything gets crazy with you guys just come straight here, I have all the lights on, I will tactically shoot everybody's kneecaps off, I'm not worried."  When the person asked, "You have something to shoot?"  Russo responded that he did, "I have a very rare laser sight on a shotgun which is hard to find . . . a tactical shogun which is very scary to look at, and it can hold 13 actual shells in it."  These threats are especially troubling after the FBI's recovery earlier this morning of the weapon (photographed below) with which Russo threatened Altieri over the phone, a tactical shotgun with laser sight:



The FBI team also recovered a shotgun in Smookler's house.

       **Second**, in Russo's case, Altieri was not the only target of his threats.  In more recent intercepted conversations stemming from a business dispute, Russo could be heard explicitly threatening another man, again referring to using his firearms.  He promised to his mother to give the person a "beating like he has never seen before," and told the man directly, "I'm coming straight for your fucking middle of your eyes, watch what I do to you, you scumbag."

---

      [23]      Chierchio's release also poses a danger to the community if his bond is not properly secured.  Even though he is not charged in this case with any violent offenses, he is a soldier in the Genovese crime family, an organization to which this Court needs no introduction.  Significant restrictions should be placed on him, along with meaningful incentives for him to comply with those restrictions.

Third, Russo and Smookler have openly flaunted their disregard of law enforcement, stating repeatedly that they would carry out their threats no matter the consequences. They repeatedly told Altieri, as they were extorting him, that they did not care about law enforcement's involvement, and invited him to call his friends, who they knew were retired police officers. On the phone with Altieri and Smookler in March 2020, Russo said he did not "give a fuck about the law" and that "before the law can even arrest me, I'll have everyone with a fucking bullet in the head." Russo emphasized that he was indifferent if anyone was recording him and he would simply "murder[]" Altieri's "entire family." He continued, as Smookler listened, "I'll make you look at everyone that I fucking kill. . . . I will fucking plow through every one of your fucking people." Russo implied that he would not allow law enforcement to arrest him: "My father said that a death sentence was an easier sentence than life. I will make sure that I have a death sentence for myself. I promise you." Russo invited Altieri to tell anyone he wished "how crazy it's going to get, and you see if anybody wants to fuck with it," suggesting that no one would want to take on Russo and Smookler. Smookler told Altieri in another call that, "I swear you could call whoever you want, call the cops." Even when Altieri was in bankruptcy, and Smookler learned it was unlawful to collect any money from him, he announced to another person that he would still "turn up the heat on [Altieri] extensively. . . . 'I don't really care about your lawyers and your bankruptcy and this and that, the police, or whatever you're going to say. I really don't care. I will spend the rest of my life stalking you all day, every day.'"

Fourth, similar to their discussions about destroying evidence, Russo and Smookler have discussed how to dissuade the Lottery Victims from cooperating with the FBI. As quoted above, Smookler, Russo and Kurland openly wished that the Lottery Victims would just tell the FBI to leave them alone, so that the FBI could not continue its investigation. The defendants' focus will now shift from the FBI's investigation to the government's prosecution, upping the stakes for them and increasing their incentives to encourage witnesses not to come forward.

No condition or combination of conditions of release imposed on Russo and Smookler—no matter how extensive or creative—could adequately protect the community, including the witnesses in this case. As the Second Circuit has explained, "home detention and electronic monitoring" is an imperfect attempt to "replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to word of [the defendant] that [he] will be obey the conditions." Millan, 4 F.3d at 1049 (citation and internal quotation marks omitted). This admonition applies with particular force to individuals like Smookler and Russo, who are not only dangerous but are also sufficiently wealthy to propose the types of restrictions that would approach a private jail. The Second Circuit has recently cautioned against allowing a two-tiered system in which only poor defendants are remanded. See Boustani, 932 F.3d at 82 (holding that the BRA "does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails").

To give the Court a concrete recent example of how home detention and electronic monitoring can fail, consider United States v. Yusufov, 16-CR-553 (BMC). The duty

magistrate judge disagreed with the government that Renat Yusufov, a long-time cocaine dealer from whom we seized a firearm, posed a danger to the community, including that he would resume his cocaine business, and released him on home detention. <u>See</u> ECF No. 14. Immediately thereafter, Yusufov resumed selling significant quantities of cocaine, relying more on cell phones and his couriers, until the government re-arrested him for other charges.[24]

        Smookler and Russo are worse candidates for release than Yusufov. They do not need to leave their homes to commit crimes and threaten witnesses; they just need cell phones and a computer, access to which no one can fully monitor. They have a wider network of associates and the means to easily subvert supervision. They can contact more co-conspirators who remain at large, with whom they can collude and issue instructions to destroy evidence. They pose much greater risk of flight. And unlike Yusufov, they have issued explicit threats to a victim and his family, specifically referencing firearms.[25]

        The Court should not take a chance on these two defendants and place the public at risk, even if they are able to propose significant bail packages.

---

[24]    After his arrest, Yusufov was permanently detained. He cooperated with the government, revealing that he took no break in committing crimes after this Court's release. Yusufov testified at trial and was recently sentenced.

[25]    There are many examples of defendants violating the terms of their bail conditions. Judge Tiscione, for instance, presided over the bail revocation of John Scarpa, Esq., a white-collar defendant who presented none of the dangers posed by Russo and Smookler. <u>See</u> <u>United States v. Scarpa</u>, 18-CR-123 (CBA). Just weeks after securing his release by a substantial bond, Scarpa tried to intimidate a victim of domestic assault by "advising" her to plead the Fifth Amendment when she testified against his client. While Scarpa's violation was serious, the risks posed by Russo and Smookler, particularly to witnesses in this case, are much greater.

IV.    <u>Conclusion</u>

       For the reasons above, the Court should enter permanent orders of detention against Russo and Smookler.  Chierchio and Kurland should be detained as well, unless they present significant bail packages that are fully vetted by the government.

                              Respectfully submitted,

                              SETH D. DuCHARME
                              Acting United States Attorney

By:                    /s/
                              Andrey Spektor
                              Lindsay K. Gerdes
                              Assistant U.S. Attorneys
                              (718) 254-6475/6155

cc:  Defense Counsel of record (by ECF)
      Clerk of the Court (NGG) (by ECF)

# EXHIBIT 4



## Allianz Global Corporate & Specialty®

October 12, 2020

**Via Email**

Telemachus P. Kasulis
Morvillo Abramowitz Grand Iason & Anello P.C.
565 Fifth Avenue
New York, New York  10017
tkasulis@maglaw.com

RE:    Insured:        Rivkin Radler, LLP; Jason M. Kurland
       Claimant:       Various Lottery Winners
       Policy No:      USFF006011200
       Policy Period   January 25, 2020 to January 25, 2021
       File No.        SF-USFF04693420
       Claim No.:      CL-10255480-20
       Insurer:        Fireman's Fund Insurance Company

Dear Mr. Kasulis:

Fireman's Fund Insurance Company, a company of Allianz Global Corporate & Specialty ("FFIC"), acknowledges receipt of your August 31, 2020 letter (the "Notice") advising that it served as "a notice of claim(s)" and that "[t]his claim or claims are related to Mr. Kurland's involvement in *United States v. Chierchio, et al.*, No. 20 Cr. 306 (E.D.N.Y.), the U.S. Securities and Exchange Commission investigation known as *In the Matter of Cheddar Capital* (NY-09826), and any and all related matters concerning the same or similar factual circumstances." By letter dated October 8, 2020, you confirmed that Mr. Kurland is seeking coverage for legal fees and costs associated with the defense of these matters.

We are directing this letter to you in your capacity as the designated representative for Mr. Kurland with respect to insurance coverage matters  If you are not acting in such a capacity, please forward a copy of this letter to the appropriate party or to their insurance representative, and advise us accordingly.

We address in this letter FFIC's analysis of potential coverage under the Policy based on currently available information.   As explained below, coverage is not available under the Policy for (1) *United States v. Chierchio, et al.*, No. 20 Cr. 306 (E.D.N.Y.) (the "Indictment") or (2) *In the Matter of Cheddar Capital* (NY-09826) (the "SEC Investigation", and with the Indictment the "Matters") as a **Claim**[1] seeking **Damages** has not been made against Mr. Kurland.  FFIC will accept the Notice as a **Potential Claim** which may result in a **Claim,** pursuant to Section V of the Policy.  If a **Claim** for **Damages** is made, coverage may also be precluded entirely or limited by a number of other provisions of the Policy.

---

[1] Terms in bold are defined in the Policy.

William J. Perry
Complex Claims Analyst
Allianz Global Corporate & Specialty
225 West Washington, Suite 1800
Chicago, IL  60606, USA
William.Perry@agcs.allianz.com
Phone +1.312.456.3904; Mobile: +1.630.400.3508

Telemachus P. Kasulis
SF-USFF04693420/CL-10255480-20
October 12, 2020
Page 2

### THE POLICY

FFIC issued Lawyers Professional Liability Insurance Policy No. USF00601120 (the "Policy") to the Named Insured, Rivkin Radler, LLP ("Rivkin Radler"), effective for the period January 25, 2020 through January 25, 2021 (the "Policy Period").

The Policy provides limits of liability of $10 million each **Claim** and $20 million in the aggregate, subject to a $500,000 each **Claim** and aggregate self-insured retention.  Pursuant to the Self-Insured Retention Endorsement, the **Named Insured** has the right and duty to defend any **Claim** seeking **Damages** to which the insurance applies until the self-insured retention has been exhausted, at which point FFIC will assume the right and duty to defend a covered **Claim**.  **Claim Expenses** are part of, and not in addition to, the Limits of Liability.

### THE NOTICE

The Notice provided little information on the "claim or claims" against Mr. Kurland purportedly being reported to FFIC, or with respect to when Mr. Kurland became aware of the Matters.  FFIC's analysis is based on currently available information in connection with the Indictment and the Detention Memo filed by the U.S. Attorney on August 18, 2020.  At this time, we have received no information regarding the SEC Investigation of Cheddar Capital.

### A.    The Indictment

On August 13, 2020, the Indictment was returned by a grand jury in the U.S. District Court for the Eastern District of New York against Christopher Chierchio, Jason Kurland, Frangeso Russo, and Francis Smookler (the "Defendants").

The U.S. Attorney alleges that the Defendants intentionally conspired to defraud three anonymous lottery winners (the "Victims") of their money and property through materially false and fraudulent pretenses. According to the U.S. Attorney, Mr. Kurland, an attorney representing the Victims, owed "a duty of honest services to the Victims," but instead engaged in a scheme to personally profit from persuading the Victims to make investments in certain entities without the approval or knowledge of the Victims, and used interstate communications and wires to effect this scheme. The U.S. Attorney also contends that Mr. Kurland and the other Defendants committed money laundering by facilitating or directing certain financial transactions affecting interstate and foreign commerce, and which exchanged property representing the proceeds of unlawful activity.

The Indictment asserts 21 counts for: (i) Conspiracy to Commit Wire Fraud; (ii) Wire Fraud; (iii) Honest Services Wire Fraud; (iv) Conspiracy to Commit Money Laundering; (v) Money Laundering; (vi) Conspiracy to Commit Extortionate Extension of Credit; and (vii) Extortionate Extension of Credit.  Mr. Kurland is named as a defendant in 16 of the 21 counts, with the five exceptions being a single Wire Fraud count, as well as the Conspiracy to Commit Extortionate Extension of Credit and Extortionate Extension of Credit counts.

The Indictment seeks the criminal forfeiture of property from the Defendants upon their conviction.

Telemachus P. Kasulis
SF-USFF04693420/CL-10255480-20
October 12, 2020
Page 3


B.     **The Detention Memo**

On August 18, 2020, the U.S. Attorney filed a memo with the United States District Court for the Eastern District of New York seeking permanent orders of detention against Russo and Smookler and the detention of Chierchio and Mr. Kurland unless they submit significant bail packages (the "Detention Memo").

The Detention Memo asserts that Mr. Kurland is an attorney "specializing in representing lottery winners, purporting to help them make sound investments…"  Mr. Kurland, however, allegedly "abused his clients' trust by encouraging them to make large investments in entities run by Chierchio (a soldier in the Genovese crime family), Smookler (a former securities broker) and Russo, who, in turn, siphoned money from his clients' investments for themselves, and paid Kurland kickbacks for steering his clients to them." According to the U.S. Attorney, Mr. Kurland "failed to disclose to his clients either the kickbacks or his relationship with the entities."  Further, "[o]n one occasion, Kurland simply transferred $19.5 million out of one of his clients' accounts without permission, much of which was ultimately funneled to Chierchio."

The Detention Memo contends that statements from the Victims and bank records are sufficient alone to convict the Defendants of the various criminal charges against them because they demonstrate that: (1) Mr. Kurland persuaded the Victims to make the investments in various entities without disclosing his affiliation with such entities or kickbacks he received for funneling his clients' investments to certain entities; (2) the Defendants stole some of those investments; and (3) the Defendants mismanaged the investments, failed to disclose losses to victims and, in some cases, directed other investments or funds to the Victims while "falsely claiming those funds constituted 'interest payments' on the failed investments to further conceal the scheme."

The U.S. Attorney asserts that the scheme began with Mr. Kurland presenting the Victims with traditional investment options from well-known financial institutions in order to gain his clients' confidence.  Once the Victims became more comfortable with his services, Mr. Kurland would then present them with different investment opportunities, including "entities that extended high-interest loans to small businesses, also known as 'Merchant Cash Advances' and, during the COVID-19 pandemic, a company that sold Personal Protection Equipment ("PPE") to the state of California."  Mr. Kurland allegedly represented that these businesses came on his radar simply because they were promising investment opportunities. He failed to advise, however, that these businesses were run and/or owned by Russo and Smookler, two of his close associates, in some cases he was a part owner of these businesses, and he would receive substantial kickbacks if the Victims invested in those entities.  One of these entities was Cheddar Capital, and the U.S. Attorney claims that Mr. Kurland neglected to inform "Lottery Victim 1" that he had a 20% stake in the company, and that he would receive a substantial kickback Lottery Victim 1 invested in Cheddar Capital.

As an alleged result of this scheme, Mr. Kurland "pocketed hundreds of thousands of dollars in undisclosed kickbacks…[and] of the $107 million that was invested by the Lottery Victims with the defendants' entities, over $80 million was either stolen or lost."

The Detention Memo contends that Mr. Kurland's knowledge that failing to disclose his connection to the entities he recommended to his clients was wrong is demonstrated by a wiretapped phone call in which

Telemachus P. Kasulis
SF-USFF04693420/CL-10255480-20
October 12, 2020
Page 4

he stated: "I'm not a stockbroker. I'm— that's not what I'm supposed to be doing."  Nonetheless, Mr. Kurland directed his clients to invest in his co-conspirators' entities, while "they all secretly lined their pockets...[and] [a]t one point, they simply took almost $20 million from Lottery Victim 3 without Lottery Victim 3's knowledge."

The Detention Memo asserts that Kurland and his firm received upfront payment of between $75,000 and $200,000 from each of the Victims, as well as monthly fees of up to $50,000.  The U.S. Attorney claims that Mr. Kurland falsely "led the Lottery Victims to believe that this money—totaling millions of dollars in compensation—was the only fee Kurland received from them."

The Detention Memo is purportedly based on several interviews with the Victims, bank records, and "months of intercepted communications authorized by four judges in the Eastern and Southern Districts of New York…[which] captured Chierchio, Kurland, Russo and Smookler admitting to their crimes and discussing ways to obstruct the investigation[.]"

## COVERAGE ANALYSIS

Based upon the August 31, 2020 letter, the Indictment, the Detention Memo and other information available at this time, we discuss below actual and potential coverage defenses that have arisen with regard to this matter.

As explained below, coverage is not available to Mr. Kurland as a **Claim** seeking **Damages** has not been made against Mr. Kurland. FFIC will accept the Notice as a **Potential Claim** which may result in a **Claim,** pursuant to Section V of the Policy.  If a **Claim** for **Damages** is made, coverage may also be precluded entirely or limited by a number of other provisions of the Policy.

FFIC reserves all of its rights and defenses under the Policy and at law, including but not limited to the potential coverage issues identified below.  FFIC remains available to consider any additional information Mr. Kurland would like to provide regarding these matters.

     **A.**     **"Insured"**

The Policy defines "**Insured**" to mean "any person or organization qualifying as an **Insured** in the '**Persons Insured**' provision of this policy."  Further, "the insurance afforded applies separately to each **Insured** against whom [a] **Claim** is made or suit is brought, except with respect to the Company's limits of liability."

The Policy defines "**Persons Insured**" to include:

     Each of the following is an **Insured** under this policy to the extent set forth below:

     A.    The entity or person named in Item 1 of the Declarations as the **Named Insured**;

     B.    Any **Predecessor in Business** or **Successor in Business**;

     C.    Any past partners, officers, directors, stockholders or employees of any person or entity specified in item A. or B. above (except as provided in I. below), <u>but only while</u>

Telemachus P. Kasulis
SF-USFF04693420/CL-10255480-20
October 12, 2020
Page 5

<u>acting within the scope of their duties on behalf of such person or entity</u>;  [emphasis added].

\*      \*      \*

As the entity named in Item 1 of the Declarations, Rivkin Radler is the **Named Insured**, and qualifies as an **Insured** under the Policy.  With respect to Kurland, it is our understanding that he is a former equity partner of Rivkin Radler.  As such, he qualifies as an **Insured**, but only while acting within the scope of his duties on behalf of Rivkin Radler.

FFIC reserve its rights as to whether Mr. Kurland was acting outside the scope of his duties on behalf of Rivkin Radler, and therefore would not qualify as an **Insured**.

**B.**     **The Insuring Agreement**

The Policy's insuring agreement, as amended by Endorsement Nos. 4 and 7, as well as the Self-Insured Retention Endorsement, provides:

> The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:
>
> A.  during the **Policy Period**; or
>
> B.  prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business**, and continuously renewed and maintained in effect to the inception of this policy period:
>
> > 1.  the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;
> >
> > 2.  the management committee or other governing body of the **Named Insured** had no reasonable basis to believe that the **Insured** had breached a professional duty or to reasonably foresee that a **Claim** would be made against the **Insured**; and
> >
> > 3.  there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

The **Named Insured** shall have the right and duty to defend any **Claim** or suit against an **Insured** seeking **Damages** to which this insurance applies until the self-insured retention has been exhausted. In the event of litigation, the **Named Insured** agrees to retain defense counsel. The **Named Insured** has the right to settle any **Claim** as long as the payment of **Damages** and **Claim Expenses** will not exceed the self-insured retention. The **Named Insured** agrees to abide by all policy provisions, including **Section IX. CONDITIONS, B., Assistance and Cooperation of the Insured in the Event of Claim or Suit,** and specifically agrees to keep the Company advised as to the investigation and defense of any **Claim** being handled within the self-insured retention.

Upon exhaustion of the self-insured retention as respects any **Claim**, the Company will assume the right and duty to defend...

\*      \*      \*

The Policy, as amended by Endorsement No. 4, defines "**Claim**" to mean "a demand for money or services, or the filing of suit or institution of arbitration proceedings or alternative dispute resolution naming an **Insured** and alleging a[n] act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**. **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief."[2]

As the Indictment  is a proceeding for injunctive or other non-pecuniary relief, it does not constitute a **Claim**.  The SEC Investigation is brought against Cheddar Capital, which is not an Insured, and does not name Mr. Kurland, and therefore it is not a **Claim**.

The Policy defines "**Damages**" to mean "compensatory judgments, settlements or awards but does not include punitive or exemplary damages, sanctions, fines or penalties assessed directly against any **Insured**, the return of fees or other consideration paid to the **Insured**, or that portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law."

"**Professional Services**" is defined in the Policy to mean:

(a) Services performed or advice given by the **Insured** in the **Named Insured's** practice as a law firm or legal professional;
(b) Services as a notary public, title agent, title insurance agent, arbitrator or mediator;
(c) Services as a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity;
(d) Activities of the **Insured** as a member of a formal accreditation, ethics, peer review, licensing board, standards review or similar professional board of committee;
(e) The publication or presentation of research papers or similar materials, but only if direct pecuniary compensation per publication or presentation is less than $3,000;

---

[2] In the event FFIC is required to pay any defense costs on behalf of Mr. Kurland for the Indictment, FFIC will seek to recover any such payments made from Mr. Kurland upon an adverse ruling against or an admission of guilt by Mr. Kurland.

Telemachus P. Kasulis
SF-USFF04693420/CL-10255480-20
October 12, 2020
Page 7

    (f)  Services performed by the **Insured** in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be the performance of **Professional Services** for others in the Insured's capacity as a lawyer, although such services could be performed wholly or in part by non-lawyers.

According to the Indictment and Detention Memo, Mr. Kurland conspired with the other Defendants to defraud the Victims of approximately $80 million through a fraudulent scheme. Mr. Kurland's and the other Defendants' criminal conduct for their own benefit does not constitute an act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others.

Also, the U.S. Attorney seeks criminal forfeiture on any of Mr. Kurland's property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of his alleged criminal offenses, upon his conviction of such offenses, as well as "maximum sentences of 20 years on each count charged in the fraud scheme[.]" Incarceration and the criminal forfeiture of property are not compensatory relief, and do not constitute **Damages** under the Policy.  To the extent that Mr. Kurland is required to disgorge any fees he charged, or other or other consideration paid to him, FFIC will not have any obligation to indemnify Mr. Kurland for the return of such fees or consideration as such forfeiture does not constitute **Damages** under the Policy.

As the Indictment does not seek **Damages**, the Policy's insuring agreement is not triggered, and coverage is not available for Mr. Kurland in connection with the Indictment.  Coverage is also not available for the SEC Investigation as it is not a **Claim** for **Damages**.

FFIC also reserves its rights as to whether these matters arise out of any act, error, omission or **Personal Injury** in the rendering of or failure to render "**Professional Services**" for others by an **Insured**, and whether any payment would constitute "**Claims Expenses**" as that term is defined in the Policy.

**C.**    **Potentially Applicable Exclusions**

As explained below, based on available information, several exclusions may also preclude coverage for this matter.

    **1.**   **Exclusion A**

Exclusion A provides that "[t]his insurance does not apply to **Claims**…[b]ased on or arising out of the **Insured's** services and/or capacity as an employee, owner, partner, stockholder, director, officer or trustee of any sole proprietorship, partnership or corporation or other business enterprise which is not defined as **Named Insured**, **Predecessor in Business** or **Successor in Business** unless such **Claim** arises out of a lawyer-client relationship[.]"

The U.S. Attorney alleges that Mr. Kurland provided the Victims with investment advice, including investments in companies in which he had ownership interest, including Cheddar Capital.  FFIC denies coverage pursuant to Exclusion A to the extent these matters arise out Mr. Kurland's services and/or capacity as an employee, owner, partner, stockholder, director, officer or trustee of any entity other than Rivkin Radler.

Telemachus P. Kasulis
SF-USFF04693420/CL-10255480-20
October 12, 2020
Page 8

### 2.  Exclusion B

Exclusion B provides that "[t]his insurance does not apply to **Claims**...[a]rising out of any dishonest, fraudulent, criminal or malicious act or omission, or deliberate misrepresentation (including but not limited to, actual or alleged violations of state or federal antitrust, pricefixing, restraint of trade, copyright or deceptive trade practice laws, rules or regulations) committed by, at the direction of, or with the knowledge of any **Insured**; however, we will provide a defense of such actions until such time as the act is ruled either by trial verdict, court ruling, regulatory ruling or legal admission as dishonest, fraudulent, criminal or malicious[.]"

As the Indictment arises out of dishonest, fraudulent, criminal and malicious acts and deliberate misrepresentations by Mr. Kurland, Exclusion B would preclude coverage for a settlement or judgment, and if Mr. Kurland's conduct is ruled by a trial verdict, court ruling, regulatory ruling or legal admission as dishonest, fraudulent, criminal or malicious, Exclusion B would preclude coverage for a defense.  FFIC reserves its rights with respect to Exclusion B.

### 3.  Exclusion D

Exclusion D provides that "[t]his insurance does not apply to **Claims**...[a]rising out of the **Insured's** services and/or capacity as: 1. an officer, director, partner, trustee, or employee of: a. a charitable organization; b. a pension, welfare, profit sharing or mutual fund; c. an investment fund or investment trust...4. a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity when any **Insured** is a beneficiary or distributee of any trust or estate serviced and the fee accruing from such work inures to the benefit of any **Insured**."

FFIC reserves the right to preclude coverage for any **Claim** arising out of Mr. Kurland's services and/or capacity included in Exclusion D.

### 4.  Exclusion G

Exclusion G, as amended by Endorsement Nos. 4 and 6, provides that: "[t]his insurance does not apply to **Claims**...[a]rising out of any act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** performed for any organization, corporation, company, partnership, or operation (other than the **Named Insured**, **Predecessor in Business** or **Successor in Business**) while any **Insured** or their spouse has more than 10% equity in such entity..."

The U.S. Attorney alleges that Kurland had a 20% stake in Cheddar Capital and other entities in which the Victims invested.  Exclusion G would preclude coverage for any Claim arising out of any act, error, omission or Personal Injury in the rendering of or failure to render Professional Services for those entities or other entities in which an Insured or their spouse has more than 10% equity. FFIC reserves its rights with respect to Exclusion G.

### D.  Potential Claim

Section V of the Policy, When A Claim Is Deemed As First Made, as amended by Endorsement No. 4 of the Policy, provides:

Telemachus P. Kasulis
SF-USFF04693420/CL-10255480-20
October 12, 2020
Page 9

A **Claim** shall be deemed as being first made at the earlier of the following times:

A.  When the Company first receives written notice from the **Insured** or its representative that a **Claim** has been made; or

B.  When the Company first receives written notice from the **Insured** or its representative of specific circumstances or a **Potential Claim** involving a particular person or entity which may result in a **Claim**.

All **Claims** arising out of the same or related act, error, omission or **Personal Injury** shall be considered as having been made at the time the first such **Claim** is made, and shall be subject to the same limit of liability and deductible.

The Policy defines "**Potential Claim**" to mean "knowledge of any circumstances involving an individual person or entity that could result in a **Claim**."

As explained above, a **Claim** has not been made under the Policy.  FFIC accepts the Notice as a **Potential Claim** which could result in a **Claim** under the Policy.  FFIC will provide its evaluation of potential coverage for any prospective **Claim** if, and when, such **Claim** is actually made, and remains available to consider any additional information Mr. Kurland would like to provide regarding these matters.

## RESERVATION OF RIGHTS

FFIC expressly reserves the right to deny coverage on any of the foregoing bases and additional and alternative grounds as the terms, conditions, exclusions, endorsements and provisions of the Policy are found to apply.  By issuing this letter, FFIC does not waive any rights or defenses and specifically reserves all rights, remedies and defenses under the Policy, applicable law and in equity.  Nothing herein should be deemed or construed to be an admission of coverage or a waiver of any of the terms or conditions of the Policy..

Please let me know if you have any questions.

Very truly yours,

William J. Perry, JD
Financial Lines Complex Claims Analyst
Fireman's Fund Insurance Company, Allianz Global Corporate & Specialty, a Company of Allianz

cc:    Mr. Daid Wilck (by email)
       Rivkin Radler, LLP
       david.wilck@rivkin.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON M. KURLAND<br><br>*Plaintiff*,<br><br>v.<br><br>FIREMAN'S FUND INSURANCE COMPANY<br><br>*Defendant*. | Civil Action No. 2:21-CV-06440 (JMA) (SIL)<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S RULE 56.1 STATEMENT IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Eastern District of New York, Plaintiff Jason M. Kurland ("Mr. Kurland") submits this statement of undisputed material facts and contends that there is no genuine dispute to be tried with respect to the following facts.

**I.      The Insurance Policy at Issue**

1.      Mr. Kurland was an equity partner at New York-based law firm Rivkin Radler LLP ("Rivkin Radler"). Ex. 3 at 2.[1]

2.      Defendant Fireman's Fund Insurance Company ("Fireman's Fund") issued Rivkin Radler a "Lawyer's Professional Liability Claims-Made Insurance Policy," No. USF00601120, effective for the period January 25, 2020, through January 25, 2021. *See* Ex. 1 (the "Policy").

3.      The Policy provides a Limit of Liability of $10,000,000 for each **Claim**[2] and

---

[1] Citations to "Ex." refer to the exhibits attached to the Declaration of Andrew N. Bourne filed with this Motion.

[2] Terms in bold are defined in the Policy.

$20,000,000 in the aggregate, subject to a $500,000 self-insured retention.  *See id.* at Declarations & Self-Insured Retention Endorsement.

  4.  Pursuant to the Self-Insured Retention Endorsement, "[u]pon exhaustion of the self-insured retention as respects any **Claim**," Fireman's Fund agreed to "assume the right and duty to defend [**Insureds**] . . . even if any of the charges of the **Claim** are groundless, false or fraudulent[.]"  *Id.* at Self-Insured Retention Endorsement.

  5.  The basic insuring agreement of the Policy, as amended by Endorsements Nos. 4 and 7, as well as the Self-Insured Retention Endorsement, provides:

> [Fireman's Fund] will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to [Fireman's Fund] during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy.

*Id.* § I, Endorsement Nos. 4, 7 & Self-Insured Retention Endorsement.

  6.  The Policy, as amended by Endorsement No. 4, defines "**Claim**" to mean:

> [A] demand for money or services or the filing of suit or institution of arbitration proceedings or alternative dispute resolution naming an **Insured** and alleging a[n] act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**.  **Claim** does not included proceedings seeking injunctive or other non-pecuniary relief.

*Id.* § VIII, Endorsement No. 4.

  7.  The Policy defines "**Damages**" to mean:

> [C]ompensatory judgments, settlements or awards but does not include punitive or exemplary damages, sanctions, fines or penalties assessed directly against any **Insured**, the return of fees or other consideration paid to the **Insured**, or that portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law.

*Id.* § VIII.

  8.  An "**Insured**" is "any person or organization qualifying as an **Insured** in the

'**Persons Insured**' provision[.]" *Id.*

9.      "**Persons Insured**" include, among others, "[a]ny past partners . . . of [Rivkin

Radler] . . ., but only while acting within the scope of their duties on behalf of [Rivkin Radler.]"

*Id.* at § II.C.

10.      Additionally, the Policy defines **Professional Services**, in relevant part, as:

(a)      services performed or advice given by the **Insured** in [Rivkin Radler's]
         practice as a law firm or legal professional; . . .

                                   ***

(c)      services as a trustee, administrator, conservator, executor, guardian,
         receiver or similar fiduciary capacity; . . . [and]

                                   ***

(f)      services performed by the **Insured** in a lawyer-client relationship on behalf
         of one or more clients shall be deemed for the purpose of this section to be
         the performance of **Professional Services** for others in the **Insured's**
         capacity as a lawyer, although such services could be performed wholly or
         in part by non-lawyers.

*Id.* § VIII(a), (c), (f).

11.      The Policy also includes the following exclusion:

This insurance does not apply to **Claims**: . . .

B.      Arising out of any dishonest, fraudulent, criminal or malicious act or
        omission, or deliberate misrepresentation (including but not limited to,
        actual or alleged violations of state or federal antitrust, price-fixing,
        restraint of trade, copyright or deceptive trade practice laws, rules or
        regulations) committed by, at the direction of, or within the knowledge of
        any Insured; however, [Fireman's Fund] will provide a defense of such
        actions until such time as the act is ruled either by trial verdict, court ruling,
        regulatory ruling, or legal admission as dishonest, fraudulent, criminal, or
        malicious[.]

*Id.* § VII(B).

3

II.     **The Underlying Action**[3]

12.     On August 13, 2020, a grand jury indicted Mr. Kurland in the United States District Court for the Eastern District of New York with 16 counts related to Conspiracy to Commit Wire Fraud, Wire Fraud, Honest Services Wire Fraud, Conspiracy to Commit Money Laundering, and Money Laundering.  *See* Ex. 2 (the "Indictment").

13.     The government contends that, between October 2018 and August 2020, Mr. Kurland conspired with his co-defendants to defraud the Lottery Clients of their earnings.  *See generally id.*

14.     The Indictment alleges, in part, that Mr. Kurland "ow[ed] a duty of honest services to the Lottery [Clients]" as their attorney, *id.* ¶ 3, and seeks forfeiture of "any property, real or personal, constituting, or deriving from, proceeds obtained directly or indirectly as a result of [the alleged] offenses[.]"  *Id.* ¶ 10.

15.     The government alternatively seeks "forfeiture of any other property of [Mr. Kurland and his co-defendants] up to the value of the forfeitable property[.]"  *Id.* ¶ 11.

16.     If Mr. Kurland is convicted of the fraud charges against him, he will be subject to a mandatory order of restitution.  *See* 18 U.S.C. § 3663A.

17.     On August 18, 2020, the government filed a letter with the presiding magistrate judge in the Underlying Action, advising the Court of allegations relevant to bail determinations for Mr. Kurland and his co-defendants.  *See* Dkt. No. 1-3 (the "Detention Memo").

18.     Related to Mr. Kurland, the government alleges:

Kurland is an attorney specializing in representing lottery winners, purporting to

---

[3] The following facts are taken from filings in the underlying criminal lawsuit styled *United States v. Chierchio et al.*, No. 20 Cr. 306 (E.D.N.Y.) (the "Underlying Action").  By reciting the facts herein, Mr. Kurland does not in any way admit the veracity of the allegations and reiterates that he disputes all underlying charges.

help them make sound investments. He abused his clients' trust by encouraging them to make large investments in entities run by [his co-defendants], who, in turn, siphoned money from [Kurland's] clients' investments for themselves, and paid Kurland kickbacks for steering his clients to them. Kurland failed to disclose to his clients either the kickbacks or his relationship with the entities.

*Id.* at 1.

19.     The government recognizes that, at the time in question, Mr. Kurland was a partner at Rivkin Radler. *See id.* at 2.

20.     The government further contends that, as the self-proclaimed "Lottery Lawyer," Mr. Kurland pitched to clients and emphasized in interviews that he offered "trust, transparency and sophisticated financial advice to minimize risk." *Id.*

21.     Additionally, the government claims that "Kurland's clients rely on him to safeguard their winnings and provide sound investment advice. . . . For his services, Kurland and his law firm obtained from the Lottery [Clients] an upfront payment of between $75,000 and $200,000, and additional monthly payments of between $15,000 and $50,000." *Id.* at 2-3.

22.     After gaining his clients' trust, the prosecution avers, Mr. Kurland misappropriated his clients' funds, procuring millions of dollars in kickbacks therefrom. *See id.* at 1-3.

**III.     Fireman's Fund's Coverage Position**

23.     Mr. Kurland tendered notice of the Underlying Action to Fireman's Fund on August 31, 2020, within a month of the government the filing the Underlying Action.

24.     On October 12, 2020, Fireman's Fund informed Mr. Kurland via letter that "coverage is not available to Mr. Kurland as a **Claim** seeking **Damages** has not been made against Mr. Kurland." Ex. 4 (the "Denial Letter) at 4.

25.     Fireman's Fund noted that it would "accept the Notice as a **Potential Claim**

which may result in a **Claim**, pursuant to Section V of the Policy." *Id.*; *see also* Ex. 1 at §

V (titled "When a Claim is Deemed as First Made").

26.   In its Denial Letter, Fireman's Fund asserted that the Policy's insuring

agreement was not triggered. *See* Ex. 4 at 7.[4]

27.   Regarding the definition of a "**Claim**," Fireman's Fund contended that the

Underlying Action is a proceeding for injunctive or other non-pecuniary relief, and thus

does not constitute a **Claim**. *See id.* at 6.

28.   Additionally, Fireman's Fund posited that coverage was not triggered

because "Mr. Kurland's . . . criminal conduct for [his] own benefit does not constitute an

act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional**

**Services** for others." *Id.* at 7.

29.   Finally, Fireman's Fund claimed that forfeiture is not considered

compensatory relief, and therefore, does not constitute "**Damages**." *See id.*

Dated: April 1, 2022            Respectfully submitted,
      New York, New York

                               **COHEN ZIFFER FRENCHMAN &**
                               **MCKENNA LLP**

                               By:  */s/ Andrew N. Bourne*
                               Andrew N. Bourne (No. 4172003)
                               abourne@cohenziffer.com
                               Amber N. Morris (admitted *pro hac vice*)
                               amorris@cohenziffer.com
                               1350 Avenue of the Americas
                               New York, New York 10019

                               *Attorneys for Plaintiff Jason M. Kurland*

---

[4] Fireman's Fund also reserved its rights with respect to whether Mr. Kurland was acting within the scope of his duties on behalf of Rivkin Radler, and thus, whether he was an **Insured** under the Policy, when the alleged conduct occurred. *See id.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

JASON M. KURLAND

                *Plaintiff,*

    v.

FIREMAN'S FUND INSURANCE COMPANY

                *Defendant.*

Civil Action No. 2:21-CV-06440 (JMA) (SIL)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT</u>**

**COHEN ZIFFER FRENCHMAN &
MCKENNA LLP**

Andrew N. Bourne (No. 4172003)
abourne@cohenziffer.com
Amber N. Morris (admitted *pro hac vice*)
amorris@cohenziffer.com
1350 Avenue of the Americas
New York, New York 10019
P: (212) 584-1890
F: (212) 584-1891

*Attorneys for Plaintiff Jason M. Kurland*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF UNDISPUTED FACTS ........................................................3

      A.     The Insurance Policy.............................................................3

      B.     The Underlying Action .........................................................5

      C.     Fireman's Fund Wrongfully Denies Coverage ....................6

ARGUMENT ......................................................................................................7

    I.     MR. KURLAND IS ENTITLED TO SUMMARY JUDGMENT BECAUSE FIREMAN'S FUND CANNOT PROVE THAT THERE IS NO POTENTIAL FOR COVERAGE FOR ANY PORTION OF THE UNDERLYING ACTION..............7

    II.    FIREMAN'S FUND MUST DEFEND MR. KURLAND AGAINST THE UNDERLYING ACTION .......................................................9

      A.     Mr. Kurland is an Insured ...................................................9

      B.     The Underlying Action Seeks Damages ............................10

      C.     The Underlying Action is a Claim .....................................13

      D.     The Underlying Action Arises Out of an Act, Error, Omission, or Personal Injury in the Rendering or Failure to Render Professional Services for Others ............15

CONCLUSION ..................................................................................................16

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................................7

*Avondale Indus., Inc. v. Travelers Indem. Co.*,
887 F.2d 1200 (2d Cir. 1989)......................................................................................8, 16

*CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*,
720 F.3d 71 (2d Cir. 2013).........................................................................................9, 13

*City of Johnstown v. Bankers Standard Ins. Co.*,
877 F.2d 1146 (2d Cir. 1989).............................................................................................9

*Cont'l Cas. Co. v. Donald T. Bertucci, Ltd.*,
926 N.E.2d 833 (Ill. App. Ct. 2010) .............................................................................14

*Cont'l Cas. Co. v. Jones*,
No. 3:09-CV-1004-JFA, 2011 WL 3880963 (D.S.C. Sept. 2, 2011) ..................................14

*Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*,
754 F.3d 136 (2d Cir. 2014).............................................................................................8

*Fabozzi v. Lexington Ins. Co.*,
639 F. App'x 758 (2d Cir. 2016) .....................................................................................16

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
639 F.3d 557 (2d Cir. 2011).................................................................................8, 10, 13

*Gen. Star Indem. Co. v. Driven Sports, Inc.*,
80 F. Supp. 3d 442 (E.D.N.Y. 2015) ..................................................................................9

*Hsu v. United States*,
954 F. Supp. 2d 215 (S.D.N.Y. 2013)................................................................................12

*Hughey v. United States*,
495 U.S. 411 (1990)..........................................................................................................12

*Int'l Bus. Machines Corp. v. Liberty Mut. Fire Ins. Co.*,
303 F.3d 419 (2d Cir. 2002)...............................................................................................8

*Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*,
363 F.3d 137 (2d Cir. 2004)...............................................................................................8

*Maryland Cas. Co. v. Cont'l Cas. Co.*,
  332 F.3d 145 (2d Cir. 2003) .......................................................................8

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
  505 F.2d 989 (2d Cir. 1974) ...............................................................14, 16

*Quanta Lines Ins. Co. v. Investors Capital Corp.*,
  No. 06 Civ. 4624 (PKL), 2009 WL 4884096 (S.D.N.Y. Dec. 17, 2009) ..............14

*U.S. Underwriters Ins. Co. v. Weatherization, Inc.*,
  21 F. Supp. 2d 318 (S.D.N.Y. 1998) ......................................................11

*United States v. Chierchio et al.*,
  No. 20 Cr. 306 (NGG) (E.D.N.Y.) ................................................... *passim*

*United States v. Kalish*,
  626 F.3d 165 (2d Cir. 2010) ...............................................................11, 12

*United States v. Maynard*,
  743 F.3d 374 (2d Cir. 2014) ....................................................................13

*United States v. Schwimmer*,
  968 F.2d 1570 (2d Cir. 1992) ..................................................................12

*United States v. Seabrook*,
  661 F. App'x 84 (2d Cir. 2016) ..............................................................11

*United States v. Stevenson*,
  834 F.3d 80 (2d Cir. 2016) ......................................................................11

*United States v. Torres*,
  703 F.3d 194 (2d Cir. 2012) ....................................................................11

*United States v. Uddin*,
  551 F.3d 176 (2d Cir. 2009) ....................................................................11

*Wausau Underwriters Ins. Co. v. QBE Ins. Corp.*,
  496 F. Supp. 2d 357 (S.D.N.Y. 2007) ......................................................8

*Willis Mgmt. (Vt.), Ltd. v. United States*,
  652 F.3d 236 (2d Cir. 2011) ....................................................................12

*Wohlforth v. Am. Cas. Co. of Reading, Pa.*,
  No. 3:17-CV-01247, 2018 WL 3962933 (D. Conn. Aug. 18, 2018) ............14

*Zurich Am. Ins. Co. v. XL Ins. Am., Inc.*,
  547 F. Supp. 3d 381 (S.D.N.Y. 2021) ......................................................11

**Statutes**

18 U.S.C. § 981(a)(2)(B) ...................................................................................................11

18 U.S.C. § 981(e)(6) .......................................................................................................12

18 U.S.C. § 3663A ..............................................................................................................5

18 U.S.C. § 3663A(c)(1)(A)(ii) .......................................................................................12

21 U.S.C. § 853(i)(1), (3) .................................................................................................12

28 U.S.C. § 2461(c) ..........................................................................................................11

Federal Rules of Civil Procedure. ......................................................................................1

Fed. R. Civ. P. 56(a). ..........................................................................................................7

C:\Users\ClarePellegrini\AppData\Local\Microsoft\Windows\INetCache\Content.Outloo

k\F1183BUB\10 - _BA_Cite_4F9799_000320

Plaintiff Jason M. Kurland ("Mr. Kurland") respectfully submits this memorandum of law in support of his motion for partial summary judgment on Count I of the Complaint pursuant to Federal Rule of Civil Procedure 56 (the "Motion") and seeks a ruling that Defendant Fireman's Fund Insurance Company ("Fireman's Fund") breached its duty to advance defense costs that Mr. Kurland has incurred, and continues to incur, in excess of a self-insured retention in connection with an underlying criminal lawsuit styled *United States v. Chierchio et al.*, No. 20 Cr. 306 (NGG) (E.D.N.Y.) (the "Underlying Action").  Given the time-sensitive nature of the Underlying Action – which is scheduled to proceed to trial before the Honorable Nicholas J. Garaufis in less than four months in July 2022 – Mr. Kurland respectfully requests that this Court order Fireman's Fund to immediately pay, on a current and continuing basis, defense costs incurred in the Underlying Action up to the applicable insurance policy's liability limits.

## PRELIMINARY STATEMENT

At issue in this Motion is a fundamental promise of an insurance company – the promise to defend an **Insured**[1] against any **Claim** for **Damages**, even if any of the "charges of the **Claim** are groundless, false or fraudulent."  When Mr. Kurland notified Fireman's Fund of the Underlying Action, Fireman's Fund refused to defend Mr. Kurland, contending that the Underlying Action does not constitute a **Claim** for **Damages** under the Policy.  Fireman's Fund is wrong.

The relevant facts are not in dispute.  Mr. Kurland served as an equity partner for many years at New York-based law firm Rivkin Radler LLP ("Rivkin Radler").  In exchange for substantial premiums, Rivkin Radler purchased a professional liability insurance policy (the "Policy") which protects Mr. Kurland from **Claims** for **Damages** arising from the rendering or failure to render **Professional Services**.  Critically, Fireman's Fund agreed to "assume the right

---

[1] Terms in bold are defined in the Policy.

1

and duty to defend . . . even if any of the charges of the **Claim** are groundless, false or fraudulent." Moreover, it contractually committed to provide a defense for any dishonest, fraudulent, criminal or malicious act or omission, or deliberate misrepresentation "until such time as the act is ruled either by trial verdict, court ruling, regulatory ruling or legal admission as dishonest, fraudulent, criminal or malicious[.]"

In August 2020, the United States government brought charges against Mr. Kurland arising from his representation of certain clients – namely, several lottery winners (the "Lottery Clients"). Mr. Kurland continuously and emphatically asserts his innocence in the Underlying Action, and accordingly, submitted a **Claim** to Fireman's Fund to defend him, as Fireman's Fund contractually promised to do under the Policy.  But, despite its broad duty to defend Mr. Kurland, and despite not excluding criminal suits from the Policy, Fireman's Fund abandoned Mr. Kurland at the height of his need to mount an effective defense, severely prejudicing his ability to prepare for a July 11 trial on which his freedom and livelihood depend.  Fireman's Fund's refusal to honor its fundamental promise to Mr. Kurland is now simultaneously requiring him to incur the significant added expense of pursing this coverage claim.

There are no genuine issues of material fact here.  The unambiguous Policy language, read in light of the allegations in the Underlying Action, obligates Fireman's Fund to defend Mr. Kurland in the Underlying Action.  Accordingly, Mr. Kurland respectfully requests that this Court grant his motion for partial summary judgment on Count I of the Complaint and rule that Fireman's Fund breached its contract with Mr. Kurland and has a duty to defend Mr. Kurland in the Underlying Action.

## STATEMENT OF UNDISPUTED FACTS

### A.     The Insurance Policy

Mr. Kurland was an equity partner at Rivkin Radler.  *See* Ex. 3 at 2.[2]  In exchange for a

substantial premium paid to Fireman's Fund, Rivkin Radler obtained the Policy, which covers Mr.

Kurland as a past partner at Rivkin Radler.  *See* Ex. 1 at § II.C.  The Policy is a "Lawyer's

Professional Liability Claims-Made Insurance Policy," No. USF00601120, effective for the period

January 25, 2020, through January 25, 2021, and provides a Limit of Liability of $10,000,000 for

each **Claim** and $20,000,000 in the aggregate, subject to a $500,000 self-insured retention.  *See*

*id.* at Declarations & Self-Insured Retention Endorsement.  Pursuant to the Self-Insured Retention

Endorsement, "[u]pon exhaustion of the self-insured retention as respects any **Claim**," Fireman's

Fund agreed to "assume the right and duty to defend [**Insureds**] . . . even if any of the charges of

the **Claim** are groundless, false or fraudulent[.]"[3]  *Id.* at Self-Insured Retention Endorsement.

The basic insuring agreement of the Policy, as amended by Endorsements Nos. 4 and 7, as

well as the Self-Insured Retention Endorsement, provides:

> [Fireman's Fund] will pay on behalf of the **Insured** all sums which the **Insured**
> shall become legally obligated to pay as **Damages** for **Claims** first made against
> the **Insured** and reported to [Fireman's Fund] during the **Policy Period** or
> Extended Reporting Period, as applicable, arising out of any act, error, omission or
> **Personal Injury** in the rendering of or failure to render **Professional Services** for
> others by an **Insured** covered under this policy.

*Id.* § I, Endorsement Nos. 4, 7 & Self-Insured Retention Endorsement.  The Policy, as amended

by Endorsement No. 4, defines "**Claim**" to mean:

> [A] demand for money or services or the filing of suit or institution of arbitration
> proceedings or alternative dispute resolution naming an **Insured** and alleging a[n]
> act, error, omission or **Personal Injury** resulting from the rendering of or failure to
> render **Professional Services**.  **Claim** does not include proceedings seeking

---

[2] Citations to "Ex." refer to the exhibits attached to the Declaration of Andrew N. Bourne filed with this Motion.

[3] It is undisputed that the $500,000 self-insured retention has been satisfied as it relates to the Underlying Action.

injunctive or other non-pecuniary relief.

*Id.* § VIII, Endorsement No. 4.  The Policy defines "**Damages**" to mean:

> [C]ompensatory judgments, settlements or awards but does not include punitive or exemplary damages, sanctions, fines or penalties assessed directly against any **Insured**, the return of fees or other consideration paid to the **Insured**, or that portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law.

*Id.* § VIII.  An "**Insured**" is "any person or organization qualifying as an **Insured** in the '**Persons Insured**' provision[.]"  *Id.*  "**Persons Insured**" include, among others, "[a]ny past partners . . . of [Rivkin Radler] . . ., but only while acting within the scope of their duties on behalf of [Rivkin Radler.]"  *Id.* § II.C.  Additionally, the Policy defines **Professional Services**, in relevant part, as:

> (a)   services performed or advice given by the **Insured** in [Rivkin Radler's] practice as a law firm or legal professional; . . .
>
> ***
>
> (c)   services as a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity; . . . [and]
>
> ***
>
> (f)   services performed by the **Insured** in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be the performance of **Professional Services** for others in the **Insured's** capacity as a lawyer, although such services could be performed wholly or in part by non-lawyers.

*Id.* § VIII(a), (c), (f).

The Policy also includes numerous exclusions, none of which bar criminal lawsuits from coverage.  To the contrary, the Policy includes the following exclusion with a carveout for defense costs related to dishonest, fraudulent, criminal, and malicious acts:

> This insurance does not apply to **Claims**: . . .
>
> B.   Arising out of any dishonest, fraudulent, criminal or malicious act or omission, or deliberate misrepresentation (including but not limited to, actual or alleged violations of state or federal antitrust, price-fixing, restraint of trade, copyright or deceptive trade practice laws, rules or regulations) committed by, at the direction of, or with the knowledge of any Insured;

4

> *however*, [Fireman's Fund] *will provide a defense of such actions until such time as the act is ruled* either by trial verdict, court ruling, regulatory ruling, or legal admission *as dishonest, fraudulent, criminal, or malicious*[.]

*Id.* § VII(B) (the "Conduct Exclusion") (emphasis added).

### B.   The Underlying Action[4]

On August 13, 2020, a grand jury indicted Mr. Kurland in the United States District Court for the Eastern District of New York with 16 counts related to Conspiracy to Commit Wire Fraud, Wire Fraud, Honest Services Wire Fraud, Conspiracy to Commit Money Laundering, and Money Laundering.  *See* Ex. 2 (the "Indictment").  The government contends that, between October 2018 and August 2020, Mr. Kurland conspired with others to defraud the Lottery Clients of their earnings.  *See generally id.*  Specifically, the Indictment alleges, in part, that Mr. Kurland breached a "duty of honest services to the Lottery [Clients]" as their attorney, *id.* ¶ 3, and seeks forfeiture of "any property, real or personal, constituting, or deriving from, proceeds obtained directly or indirectly as a result of [the alleged] offenses[.]"  *Id.* ¶ 10.  The government alternatively seeks "forfeiture of any other property of [Mr. Kurland and his co-defendants] up to the value of the forfeitable property[.]"  *Id.* ¶ 11.  Additionally, if Mr. Kurland is convicted of the fraud charges against him, he will be subject to a mandatory order of restitution.  *See* 18 U.S.C. § 3663A.

On August 18, 2020, the government filed a letter with the presiding magistrate judge in the Underlying Action, advising the Court of allegations relevant to bail determinations for Mr. Kurland and his co-defendants.  *See* Ex. 3 (the "Detention Memo").  Related to Mr. Kurland, the government alleges:

> Kurland is an attorney specializing in representing lottery winners, purporting to help them make sound investments.  He abused his clients' trust by encouraging them to make large investments in entities run by [his co-defendants], who, in turn,

---

[4] The following facts are taken from filings in the Underlying Action.  By reciting the facts herein, Mr. Kurland does not in any way admit the veracity of the allegations and reiterates that he disputes all underlying charges.

> siphoned money from [Kurland's] clients' investments for themselves, and paid
> Kurland kickbacks for steering his clients to them.  Kurland failed to disclose to his
> clients either the kickbacks or his relationship with the entities.

*Id.* at 1.  The government recognizes that, at the time in question, Mr. Kurland was a partner at Rivkin Radler.  *See id.* at 2.  The government further contends that, as the self-proclaimed "Lottery Lawyer," Mr. Kurland pitched to clients and emphasized in interviews that he offered "trust, transparency and sophisticated financial advice to minimize risk."  *Id.*   Additionally, the government claims that "Kurland's clients rely on him to safeguard their winnings and provide sound investment advice. . . . For his services, Kurland and his law firm obtained from the Lottery [Clients] an upfront payment of between $75,000 and $200,000, and additional monthly fees of between $15,000 and $50,000."  *Id.* at 2-3.  After gaining his clients' trust, the prosecution avers, Mr. Kurland misappropriated his clients' funds, procuring millions of dollars in kickbacks therefrom.  Mr. Kurland strongly denies all allegations against him in the Underlying Action, and Judge Garaufis granted Mr. Kurland bail pending trial.

### C.   Fireman's Fund Wrongfully Denies Coverage

Mr. Kurland promptly tendered notice of the Underlying Action to Fireman's Fund on August 31, 2020.  On October 12, 2020, Fireman's Fund informed Mr. Kurland via letter that "coverage is not available to Mr. Kurland as a **Claim** seeking **Damages** has not been made against Mr. Kurland."  Ex. 4 (the "Denial Letter") at 4.  Fireman's Fund noted that it would "accept the Notice as a **Potential Claim** which may result in a **Claim**, pursuant to Section V of the Policy."  *Id.*; *see also* Ex. 1 at § V (titled "When a Claim is Deemed as First Made").

In its Denial Letter, Fireman's Fund incorrectly asserted that the Policy's insuring

agreement was not triggered.[5]  Regarding the definition of a "**Claim**," Fireman's Fund erroneously contended that the Underlying Action is a proceeding solely for injunctive or other non-pecuniary relief, and thus does not constitute a **Claim**.  *See* Ex. 4 at 6.  Additionally, Fireman's Fund posited that coverage was not triggered because "Mr. Kurland's . . . criminal conduct for [his] own benefit does not constitute an act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others." *Id.* at 7.  Finally, Fireman's Fund claimed that forfeiture is not considered compensatory relief, and therefore, does not constitute "**Damages**." *See id.*

Left with mounting defense costs and none of the insurance protection Fireman's Fund promised him, Mr. Kurland has been forced to bring this action seeking recovery.  As of the filing of this motion, Mr. Kurland has incurred hundreds of thousands of dollars in total defense costs – and anticipates incurring substantially more costs at trial as he defends himself against the government's baseless allegations.

## ARGUMENT

**I.    MR. KURLAND IS ENTITLED TO SUMMARY JUDGMENT BECAUSE FIREMAN'S FUND CANNOT PROVE THAT THERE IS NO POTENTIAL FOR COVERAGE FOR ANY PORTION OF THE UNDERLYING ACTION**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  Because there are no disputes regarding the

---

[5] Fireman's Fund also reserved its rights with respect to whether Mr. Kurland was acting within the scope of his duties on behalf of Rivkin Radler, and thus, whether he was an **Insured** under the Policy, when the alleged conduct occurred. As described more fully below, Mr. Kurland was acting within the scope of his duties as an attorney at Rivkin Radler at the time the alleged conduct occurred, and thus, qualifies as an **Insured**.

language of the Policy, or the allegations in the Underlying Action, a determination that Fireman's Fund must defend Mr. Kurland is ripe for summary adjudication. *See Wausau Underwriters Ins. Co. v. QBE Ins. Corp.*, 496 F. Supp. 2d 357, 360 (S.D.N.Y. 2007) ("[A]n insurer's duty to defend presents a question of law appropriate for resolution by summary judgment.").

In New York, an insurer's duty to defend is "exceedingly broad" and distinct from the duty to indemnify. *See Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (quoting *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006)). The duty to defend is triged "whenever the four corners of the complaint suggest . . . a reasonable possibility of coverage." *Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 160 (2d Cir. 2003). Thus, a court should determine whether a duty to defend exists by examining "the policy language and the allegations of the complaint to see if the underlying complaint alleges *any* facts or grounds which bring the action within the protection purchased." *Int'l Bus. Machines Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 424 (2d Cir. 2002) (emphasis added). Insurance policies are to be read according to their "plain and ordinary meaning," which courts may ascertain by referring to dictionary definitions when the policy does not define the terms at issue. *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (citations omitted).

"[A]n insurer seeking to avoid its duty to defend bears a heavy burden." *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir. 1989). To avoid its contractual duty, "the insurer must demonstrate that the allegations in the underlying complaints are 'solely and entirely' within specific and unambiguous exclusions from the policy's coverage." *Id.* at 1205. Importantly, New York law requires "[a]ny ambiguity as to the insurer's duty to defend [be] resolved in favor of the insured." *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004). Additionally, "if *any* of the claims are covered by the policy, the insurer

'consequently has a duty to defend the *entire* action brought under any of the . . . policies,' including the uncovered claims." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 83 (2d Cir. 2013) (citation omitted) (emphasis added).

As courts in this Circuit have recognized, the State of New York has balanced these standards in favor of insured parties because an "insurer contracts with an insured to defend more than the policy obligates the insurer to ultimately pay" as damages. *Gen. Star Indem. Co. v. Driven Sports, Inc.*, 80 F. Supp. 3d 442, 462 (E.D.N.Y. 2015); *see also City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1148 (2d Cir. 1989) ("The insurer's duty to defend works, in essence, as a form of 'litigation insurance' for the insured.").

When the Underlying Action is reviewed under these standards, it is clear that Fireman's Fund must defend Mr. Kurland.

## II.   FIREMAN'S FUND MUST DEFEND MR. KURLAND AGAINST THE UNDERLYING ACTION

### A.   Mr. Kurland is an Insured

Mr. Kurland is an **Insured** under the Policy.  The Policy defines "**Insured**" as, among others, "[a]ny past partners . . . of [Rivkin Radler] . . ., but only while acting within the scope of their duties on behalf of [Rivkin Radler.]"  Ex. 1 at §§ II.C, VIII.  As Fireman's Fund admits, the Lottery Clients retained Mr. Kurland, a partner at Rivkin Radler at the time, to represent them as their attorney; in exchange for Mr. Kurland's services, the Lottery Clients made both upfront and monthly payments to Rivkin Radler for these services; and in rendering these services, Mr. Kurland owed "a duty of honest services to the [Lottery Clients]" as their attorney.  Ex. 4 at 2. Additionally, regardless of Fireman's Fund's admissions, the Underlying Action alleges that the crimes charged arose between October 2018 and August 2020, at which time Mr. Kurland was a partner at Rivkin Radler.  *See* Ex. 2 at ¶ 3; Ex. 3 at 2.  Moreover, the Underlying Action avers that

"[f]or his services, Kurland and his law firm obtained from the Lottery [Clients] an upfront payment of between $75,000 and $200,000, and additional monthly fees of between $15,000 and $50,000." Ex. 3 at 2-3. The Underlying Action also alleges that, after accepting payments from the Lottery Clients, Mr. Kurland "abused his clients' trust" and misappropriated his clients' funds. *Id.* at 1-3. Although Mr. Kurland denies wrongdoing, the temporal and professional context of these claims establishes that he was acting within the scope of his duties as an attorney at Rivkin Radler, and thus, qualifies as an **Insured**.

### B.    The Underlying Action Seeks Damages

The Underlying Action seeks **Damages** as that term is defined in the Policy. The Policy defines "**Damages**" to include "compensatory judgments, settlements or awards . . . ." Ex. 1 at § VIII. "Compensatory" is not defined by the Policy, and thus must be given its plain and ordinary meaning. *See Fed. Ins. Co.*, 639 F.3d at 567. "Compensatory" means "a . . . refund" or "money awarded to a victim to make up for an injury, damage, etc." *Compensatory*, Brittanica, https://www.britannica.com/dictionary/compensatory. "Compensate" means "to give money or something else of value . . . as payment for something lost, damaged, etc.," "to provide something good as a balance against something bad or undesirable," or "to make up for some defect." *Compensate*, Brittanica, https://www.britannica.com/dictionary/compensate.

Here, the government seeks to "make up for" Mr. Kurland's alleged pecuniary gains by demanding their return in the form of, among other things, a monetary refund to the Lottery Clients for the money they invested. Indeed, the government specifically seeks forfeiture of "*any* property, real or personal, *constituting, or derived from, proceeds* obtained directly or indirectly as a result of [the] offenses" charged, or alternatively, "forfeiture of any other property of [Mr. Kurland and his co-defendants] up to the value of the forfeitable property[.]" Ex. 2 at ¶¶ 10-11 (emphasis

10

added) (citing 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c)).[6]  Section 981 defines "proceeds" as "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services."  18 U.S.C. § 981(a)(2)(B); *see also United States v. Torres*, 703 F.3d 194, 198 (2d Cir. 2012) (recognizing the breadth of the definition of "proceeds" under Section 981).

Although the government has preliminarily identified specific property to be forfeited, the government alternatively seeks "forfeiture of *any other property* of [Mr. Kurland and his co-defendants] up to the value of the forfeitable property[.]"[7]  Ex. 2 at ¶¶ 10-11 (emphasis added) (citations omitted).  It is beyond dispute that this "other property" can include a plethora of monetary interests.  *See, e.g., Torres*, 703 F.3d at 199 ("[C]ash is among the types of property subject to forfeiture under [Section 981].");  *United States v. Stevenson,* 834 F.3d 80, 86-88 (2d Cir. 2016) (contributions to or benefits of a pension plan are forfeitable); *United States v. Kalish*, 626 F.3d 165, 168-69 (2d Cir. 2010) (upholding forfeiture order of almost $4 million in cash); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (cash diverted from food stamp program is forfeitable).  Moreover, the Second Circuit has held that Section 853 (governing criminal

---

[6] Section 981 is titled "Civil forfeiture," but it is made applicable to criminal cases by Section 2461.  *See* 28 U.S.C. § 2461(c); *United States v. Seabrook*, 661 F. App'x 84, 86 (2d Cir. 2016) (citation omitted).

[7] New York law has long recognized that an insurer's duty to defend may be triggered by alternative allegations because "a defense obligation may be avoided only where there is no possible factual or legal basis on which an insurer's duty to indemnify under any provision of the policy could be held to attach." *Zurich Am. Ins. Co. v. XL Ins. Am., Inc.*, 547 F. Supp. 3d 381, 393 (S.D.N.Y. 2021) (cleaned up) (finding alternative theories of relief sufficient to trigger an insurer's duty to defend) (citing *Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 82-83 (2d Cir. 2006); *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985)); *see also U.S. Underwriters Ins. Co. v. Weatherization, Inc.*, 21 F. Supp. 2d 318, 325 (S.D.N.Y. 1998) (finding an underlying complaint's "broad and alternative theories of negligence" against a policyholder sufficient to trigger the insurer's duty to defend).

forfeiture) "permits imposition of a money judgment[.]" *Kalish*, 626 F.3d 168 (quoting *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010)).[8]

Upon judgment in the government's favor, the Attorney General has the authority to dispose of the forfeited property by restoring it "to any victim of the offense giving rise to the forfeiture, including, in the case of a money laundering offense, any offense constituting the underlying specified unlawful activity," 18 U.S.C. § 981(e)(6) (civil forfeiture), or by "restor[ing] forfeited property to victims" or "award[ing] compensation to persons providing information resulting in a forfeiture." 21 U.S.C. § 853(i)(1), (3) (criminal forfeiture). In this regard, upon a favorable verdict, the government may place the forfeited property in a constructive trust to compensate the Lottery Clients for their losses. *See, e.g.*, *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 243 (2d Cir. 2011) (recognizing that "to compensate victims" of a criminal offense, "beneficiaries of properly traced constructive trusts could claim third-party interests under [Section 853]" (relying on *United States v. Schwimmer*, 968 F.2d 1570, 1582-84 (2d Cir. 1992)); *Hsu v. United States*, 954 F. Supp. 2d 215, 222 (S.D.N.Y. 2013) (recognizing that victims "were already being compensated through forfeiture"))).

Furthermore, if Mr. Kurland is ultimately convicted on the fraud counts against him, he will be subject to a mandatory restitution order. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii) (requiring restitution for "an offense against property . . . including any offense committed by fraud or deceit"). Courts have routinely found that restitution is inherently compensatory in nature. *See, e.g.*, *Hughey v. United States*, 495 U.S. 411, 416 (1990) (recognizing that "restitution as authorized

---

[8] The Second Circuit's position is unanimously supported by the other circuits that have considered the issue. *See Kalish*, 626 F.3d 168-69 (citing *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006); *United States v. Vampire Nation*, 451 F.3d 189, 201-03 (3d Cir. 2006); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000); *United States v. Casey*, 444 F.3d 1071, 1077 (9th Cir. 2006)).

by statute is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction" (citations omitted)); *United States v. Maynard*, 743 F.3d 374, 377-78 (2d Cir. 2014) (the purpose of restitution is "to fully compensate . . . victims for their losses and to restore these victims to their original state of well-being" (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006))).

Thus, because the government may use the forfeited property to compensate the Lottery Clients for their alleged losses, and because restitution is compensatory in nature, the Underlying Action seeks, *at least in part*, a compensatory judgment, settlement, or award constituting **Damages** under the plain terms of the Policy. *See CGS Indus.*, 720 F.3d at 83 ("[I]f *any* of the claims are covered by the policy, the insurer 'consequently has a duty to defend the *entire* action brought under any of the . . . policies,' including the uncovered claims." (emphasis added)).

C.     **The Underlying Action is a Claim**

The Underlying Action constitutes a **Claim** under the Policy. The Policy defines "**Claim**" to include "[a] demand for money or services, or the filing of suit . . . naming an **Insured** and alleging a[n] act, error, omission or Personal Injury resulting from the rendering of or failure to render **Professional Services**." Ex. 1 at § VIII, Endorsement No. 4. As discussed, Mr. Kurland is an **Insured** under the Policy, and the Underlying Action demands money in the form of **Damages** as that term is defined in the Policy. *See supra* Sections II.B.-C.[9]

In addition to being a demand for money, and in the alternative, the Underlying Action also constitutes the "filing of suit" naming an **Insured**. The Policy does not define "suit," and thus, the term must be ascribed a meaning consistent with "common speech" and the "reasonable expectations" of the average insured. *See Fed. Ins. Co.*, 639 F.3d at 568. Dictionaries define "suit"

---

[9] As discussed more fully below, the Underlying Action also alleges an act, error, omission, or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**. *See infra* Section II.D.

13

as "a process by which a court of law makes a decision to settle a disagreement or problem between people or organizations."  *Suit*, Britannica, https://www.britannica.com/dictionary/suit (further explaining that a "suit" can be civil or criminal in nature).

Notably, none of the exclusionary language in the Policy purports to bar criminal suits from coverage.[10]  Just the opposite.  Fireman's Fund included a carve out in the Policy's Conduct Exclusion related to defense costs for dishonest, fraudulent, criminal, or malicious acts or omissions.  Ex. 1 § VII(B).  In doing so, Fireman's Fund promised "*to provide a defense of such actions* until such time as the act is ruled either by trial verdict, court ruling, regulatory ruling, or legal admission as dishonest, fraudulent, criminal, or malicious[.]"  *Id.* (emphasis added).

Mr. Kurland has continuously maintained in innocence in the Underlying Action, and no contrary ruling or admission has been made.  Thus, the Underlying Action, docketed at *United States v. Chierchio et al.*, No. 20 Cr. 306 (NGG) (E.D.N.Y.), is a "suit," which the federal government, on behalf of the citizens of the United States, filed in federal court against Mr. Kurland and his co-defendants.  Accordingly, the Underlying Action is a **Claim**.

### D.     The Underlying Action Arises Out of an Act, Error, Omission or Personal Injury in the Rendering or Failure to Render Professional Services for Others

The Underlying Action also alleges an act, error, omission or **Personal Injury** in the course of rendering or failing to render professional legal services.  The Policy defines "**Professional**

---

[10] Indeed, other widely used definitions of "Claims" and Conduct Exclusions similar to those at issue in this Policy, plainly bar criminal proceedings.  *See, e.g.*, *Quanta Lines Ins. Co. v. Investors Capital Corp.*, No. 06 Civ. 4624 (PKL), 2009 WL 4884096, at *2 (S.D.N.Y. Dec. 17, 2009) ("The definition [of a 'Claim'] specifically excludes '1. a demand for declaratory, injunctive or other nonmonetary relief [and] 2. *any form of criminal proceeding* . . . ." (emphasis added)); *Cont'l Cas. Co. v. Donald T. Bertucci, Ltd.*, 926 N.E.2d 833, 845 (Ill. App. Ct. 2010) ("Criminal proceedings are not covered under this Policy regardless of the allegations made against the Insured[.]"); *Cont'l Cas. Co. v. Jones*, No. 3:09-CV-1004-JFA, 2011 WL 3880963, at *2 (D.S.C. Sept. 2, 2011) (same); *Wohlforth v. Am. Cas. Co. of Reading, Pa.*, No. 3:17-CV-01247, 2018 WL 3962933, at *1-2 (D. Conn. Aug. 18, 2018) (same).  Fireman's Fund failed to include any such language in the Policy.  *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1001 (2d Cir. 1974) (insurers "act[] at their own peril" when they fail to include clear and distinct language to exclude a cause of loss known in the market)

14

**Services**" to include "services performed or advice given by the **Insured** in [Rivkin Radler's] practice as a law firm or legal professional;" "services as a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity;" and "services performed by the **Insured** in a lawyer-client relationship on behalf of one or more clients . . . although such services could be performed wholly or in part by non-lawyers." Ex. 1 at § VIII(a), (c), (f).

The Underlying Action alleges an act, error, omission, or **Personal Injury** by averring that Mr. Kurland:

- "knowingly and intentionally conspire[d] to devise a scheme and artifice to defraud" the Lottery Clients;
- "obtain[ed] money and property from the Lottery [Clients];"
- "did transmit and cause to be transmitted by means of wire communication . . . one or more writings, signs, signals, pictures, and sounds;"
- "engaged in a scheme to obtain payments for himself from others;" and
- "used and caused the use of interstate communications to effect the scheme[.]"

Ex. 2 at ¶¶ 1-3. These acts, errors, or omissions resulted from the rendering or failure to render **Professional Services** as that term is defined in the Policy. As stated, Fireman's Fund admits that the Lottery Clients hired Mr. Kurland as their attorney, the Lottery Clients paid Rivkin Radler for Mr. Kurland's services, and Mr. Kurland owed "a duty of honest services" to them as their lawyer. Ex. 4 at 2.

And regardless of Fireman's Fund's admissions, the conduct alleged in the Underlying Action constituted **Professional Services**. The government avers that Mr. Kurland's alleged actions occurred between October 2018 and August 2020, during which time he was a partner at Rivkin Radler. *See generally* Ex. 2; *see also* Ex. 3 at 2. Indeed, the government specifically alleges conduct that was inherently intertwined with Mr. Kurland's representation of his clients:

> Kurland is an attorney specializing in representing lotter winners, purporting to help them make sound investments. He abused his clients' trust by encouraging them to make large investments in entities run by [his co-defendants], who, in turn, siphoned money from [Kurland's] clients' investments for themselves, and paid

Kurland kickbacks for steering his clients to them.  Kurland failed to disclose to his clients either the kickbacks or his relationship with the entities.

Ex. 3 at 1.  The government further states that Mr. Kurland pitched to clients and emphasized in interviews that he offered "trust, transparency and sophisticated financial advice to minimize risk" and that his "clients rely on him to safeguard their winnings and provide sound investment advice." *Id.* at 2.  Thus, the alleged acts arose in the context of Mr. Kurland's provision of **Professional Services**.

***

The Underlying Action therefore triggered Fireman's Fund's duty to defend Mr. Kurland because the Underlying Action: (1) names an **Insured** (Mr. Kurland, a past partner of Rivkin Radler); (2) seeks **Damages** (in the form of forfeited property and/or restitution); (3) for **Claims** (a demand for money or the filing of suit); (4) arising from an act, error, omission or **Personal Injury** (conspiracy, money laundering, wire fraud, etc.) in the rendering or failure to render **Professional Services** (advising the Lottery Clients).

## <u>CONCLUSION</u>

Fireman's Fund is a sophisticated global insurer.  As such, if it intended to exclude criminal lawsuits or dishonest, fraudulent, criminal, or malicious acts or omissions from coverage, it was required to do so clearly and unambiguously.  *See Avondale Indus.*, 887 F.2d at 1205; *Pan Am.*, 505 F.2d at 1001; *see also Fabozzi v. Lexington Ins. Co.*, 639 F. App'x 758, 762 (2d Cir. 2016) (an insurer "knows how to make itself plain").  It did not.  Instead, the plain language of the Policy makes clear that Fireman's Fund promised "*to provide a defense of such actions* until such time as the act is ruled either by trial verdict, court ruling, regulatory ruling, or legal admission as dishonest, fraudulent, criminal, or malicious[.]"  Ex. 1 § VII(B) (emphasis added).  Mr. Kurland has consistently maintained his innocence in the Underlying Action, and no contrary ruling or

admission has been made.  Thus, although Fireman's Fund may not ultimately be required to *indemnify* Mr. Kurland if he is convicted of "dishonest, fraudulent, criminal, or malicious acts or omissions," the Policy requires Fireman's Fund to *defend* Mr. Kurland against the Underlying Action and presume his innocence even where the "charges of the **Claim** are groundless, false or fraudulent." *Id.* at Self-Insured Retention Endorsement.

Accordingly, for the aforementioned reasons, Mr. Kurland respectfully requests that this Court grant him partial summary judgment on Count I of the Complaint, find that Fireman's Fund breached its duty to defend Mr. Kurland in the Underlying Action, and order Fireman's Fund to immediately pay, on a current and continuing basis, defense costs incurred in the Underlying Action up to the applicable insurance policy's liability limits.

Dated: April 1, 2022
      New York, New York

Respectfully submitted,

**COHEN ZIFFER FRENCHMAN & MCKENNA LLP**

By: */s/ Andrew N. Bourne*
Andrew N. Bourne (No. 4172003)
abourne@cohenziffer.com
Amber N. Morris (admitted *pro hac vice*)
amorris@cohenziffer.com
1350 Avenue of the Americas
New York, New York 10019
P: (212) 584-1890
F: (212) 584-1891

*Attorneys for Plaintiff Jason M. Kurland*